**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.: 20-cv-00991

ESTATE OF JEFFREY MELVIN, by and through its personal representative Jeffrey Melvin Sr.;

      Plaintiff,

v.

CITY OF COLORADO SPRINGS, COLORADO;
DANIEL PATTERSON, in his individual capacity; and
JOSHUA ARCHER, in his individual capacity,

      Defendants.

---

**COMPLAINT AND JURY DEMAND**

---

      Plaintiff, through his counsel, Darold Killmer, Liana Orshan, and Reid Allison of KILLMER, LANE & NEWMAN, LLP, and Tyrone Glover of STIMSON STANCIL LABRANCHE HUBBARD, LLC submits his Complaint and Jury Demand, and states:

## INTRODUCTION

      1.     On April 26, 2018, Colorado Springs Police Department ("CSPD") officers responded to a disturbance at the Remington Apartments. While checking for arrest warrants in one of the units in the apartment complex, Jeffrey Melvin, a young African American man, arrived at the apartment where the officers were.

      2.     The officers forcibly detained him, threw Mr. Melvin to the ground, held him down, choked him, pepper sprayed him and deployed a Taser on Mr. Melvin no less than five

times in two minutes. The Taser use and other force the officers used was so excessive that Mr. Melvin went into Lactic Acidosis, releasing so much lactic acid into Mr. Melvin's body that it killed him. The coroner ruled Mr. Melvin's death a homicide.

3.      This violent and completely unreasonable force was used against Mr. Melvin despite the facts that he was unarmed, acting lawfully and did not threaten any officer.

4.      Mr. Melvin was African American. The Colorado Springs Police Department ("CSPD") has a long history of unjustified violence and discriminatory law enforcement against people of color. This brutality continues because CSPD, through the repeated formal tolerance and approval of violent, racially biased policing by its officers, has made clear that CSPD officers are authorized and even encouraged to use excessive force against people of color. Mr. Melvin was one unfortunate victim of CSPD's pattern of racially motivated violence.

## JURISDICTION AND VENUE

5.      This action arises under the Constitution of the United States and is brought under 42 U.S.C. § 1983, which confers jurisdiction on this Court under 28 U.S.C. § 1331.

6.      42 U.S.C. § 1988 confers jurisdiction supporting Plaintiff's claim for attorney fees and costs.

7.      Venue is proper in the District of Colorado under 28 U.S.C. § 1391(b). All the events alleged occurred within the State of Colorado, and all the parties were residents of the State at the time of the events giving rise to this Complaint.

## PARTIES

8.      At all times relevant to this Complaint, decedent Jeffrey Melvin was a citizen of the United States of America and a resident of the State of Colorado. At all relevant times,

Jeffrey Melvin Sr. was the father of Jeffrey Melvin, Jr. and the personal representative of the
Estate of Jeffrey Melvin.

9.      At all times relevant to this Complaint, Defendant Daniel Patterson was a citizen
of the United States and a resident of the State of Colorado. At all relevant times, Defendant
Patterson was acting within his official duties and employment and under color of state law in his
capacity as a law enforcement officer for Colorado Springs, Colorado.

10.     At all times relevant to this Complaint, Defendant Joshua Archer was a citizen of
the United States and a resident of the State of Colorado. At all relevant times, Defendant Archer
was acting within his official duties and employment and under color of state law in his capacity
as a law enforcement officer for Colorado Springs, Colorado.

11.     At all times relevant to this Complaint, Defendant City of Colorado Springs
("Colorado Springs") was a Colorado municipal corporation. Defendant Colorado Springs is a
"person" subject to suit under 42 U.S.C. § 1983.

## FACTUAL ALLEGATIONS

12.     Jeffrey Melvin was a loving father of four, brother to five sisters and one brother,
and son to Gerrie Craft-Thornton and Jeffrey Melvin, Sr. He was an avid basketball player,
boxer, and an up-and-coming musician. Mr. Melvin was well-loved by his family and many
friends, and he was always willing to support and care for others.

13.     On the night of April 26, 2018, Mr. Melvin faced an impossible choice: die on the
floor of his friend's apartment as a victim of police brutality or take his chances and try to escape
the brutal and wholly unjustified beating. He eventually escaped, temporarily, from the

apartment but would still tragically lose his life at the hands of the Colorado Springs Police
Department ("CSPD").

14.    That night, CSPD Officers Daniel Patterson and Joshua Archer responded to a
report of a disturbance at the Remington Apartments on 3341 East Fountain Boulevard. They
arrived around 12:31 A.M.

15.    A resident informed CSPD officers that he had heard what sounded like a fight in
the unit below his. After learning this information, Officers Patterson and Archer made their way
to apartment 211, on the floor below, to investigate.

16.    Jordan Bruno rented unit 211 and greeted the officers at the door.  Mr. Bruno was
friendly and accommodating, inviting the officers into his unit.  He explained that an altercation
had occurred earlier between him and a friend, but the situation was under control and that his
friend had since left. He said that there were no continuing problems or concerns.

17.    Mr. Bruno and the others in his apartment displayed no aggression or hostility
toward the officers.  During their investigation, the occupants of the unit treated the officers with
respect, answered every question asked of them, and never gave the officers reason to fear for
their safety or believe criminal activity was occurring in the unit.

18.    After approximately 18 minutes of warrant-checking and searching the unit for
evidence of other crimes, which officers did not find, Jeffrey Melvin arrived at the apartment.

19.    Mr. Melvin, surprised by the officer's presence, hastily entered Mr. Bruno's unit
and closed the door behind him.

20.     Officer Archer, who unbeknownst to Mr. Melvin was inside of the apartment, ordered Mr. Melvin away from the door, and Mr. Melvin immediately complied with the order. The door was then opened and Officer Patterson entered the unit.

21.     Officer Archer began aggressively yelling at and grabbing Mr. Melvin in the small entryway. Officers Archer and Patterson yelled that Mr. Melvin was "going to get hurt" while attempting to handcuff him.

22.     Mr. Melvin had done nothing wrong to warrant this detainment. Officers Archer and Patterson had no legitimate reason to believe that Mr. Melvin had committed any crimes or posed a danger to them or others. The officers did not tell Mr. Melvin why they were attempting to arrest him or read him his rights.

23.     All the officers knew was that Mr. Melvin was a young black man who did not immediately submit to their baseless and unreasonable assault and detention.

24.     Mr. Melvin repeatedly insisted that the officers had the wrong person, and he tried to move away from them. He pleaded for the officers to calm down and stop manhandling him.

25.     Officers Patterson and Archer escalated their physical assault by grabbing Mr. Melvin, choking him, and throwing him to the ground.

26.     Officer Patterson threatened Mr. Melvin with the infliction of pepper spray. In fear for his safety, Mr. Melvin sought refuge from the assault by trying to leave the second-story apartment through a nearby window. He continued to plead for the officers to cease their attack.

27.     Officer Archer fired the first Taser prongs into Mr. Melvin's flesh less than two minutes after their initial innocuous encounter, starting an excruciatingly painful five-second burst of electricity into and through Mr. Melvin's body.

28.     Less than five seconds later, Officer Archer deployed another Taser charge into Mr. Melvin, causing another five seconds of violent electrocution, while Mr. Melvin continued to beg for help from those around him.

29.     Approximately twenty seconds after the second electrocution cycle ceased, Officer Archer began yet another five second electrocution cycle through the prongs still embedded in Mr. Melvin's skin.

30.     Approximately twelve seconds after that, Officer Archer started yet another five second cycle, and then another cycle ten seconds after that.[1]

31.     At some point during this assault, Officer Patterson deployed pepper spray into Mr. Melvin's face.  As it was intended to do, the infliction of the pepper spray caused acute and excruciating pain on Mr. Melvin.

32.     After being electrocuted no less than five times in two minutes, Mr. Melvin continued to beg for his life, screaming that the officers were "going to kill him."

33.     To escape the officer's repeated electrocutions and use of chemical agents, Mr. Melvin went for the door to the apartment.  When Mr. Melvin reached the door, Officer Patterson fired two of his Taser cartridges at Mr. Melvin; one missed its target, and the other connected with his upper torso near his vital organs. The electric shock forced Mr. Melvin to the

---

[1] Notably, Officer Archer reported firing only two Taser cartridges into Mr. Melvin. He failed to note the three follow-up electrocution cycles that occurred in less than one minute and which are obvious on the body-worn camera footage. Officer Archer's report states that his Taser use was ineffective, but the video footage clearly shows Mr. Melvin's agony as he was repeatedly electrocuted.

ground. Fearing for his life, Mr. Melvin stood up, ripped the metal Taser prongs from his skin, escaped the apartment, and ran for his life.

34.     After running across the street, Mr. Melvin collapsed. CSPD officers piled on top of him and handcuffed him. At that point, Mr. Melvin began slurring his words, clearly needing medical attention. The repeated electrocutions, use of chemical weapons, and excessive beating by Officers Patterson and Archer had taken a devastating toll on Mr. Melvin's body.

35.     Paramedics transported Mr. Melvin to the hospital. Hospital staff immediately declared a full trauma on admission. Doctors placed Mr. Melvin in a medically induced coma to try and save his life. Tragically, he never woke up. Jeffrey Melvin was pronounced dead on May 2, 2018, at age 27.

36.     Defendants Patterson and Archer have forever deprived Mr. Melvin's four children of their father, his siblings of their brother, and his father and mother of their son.

37.     Before Mr. Melvin's death, physicians noted that he was suffering from Lactic Acidosis, a condition in which lactic acid accumulates faster than the body can dispose of it. This upsets the natural pH balance of the human body and is potentially lethal.  Excessive use of Tasers, which cause intense muscle contractions and a subsequent release of lactic acid, are linked to Lactic Acidosis. The multiple and significant stressors inflicted by the Colorado Springs Police officers culminated in this fatal and tragic outcome. The coroner determined that the manner of Mr. Melvin's death was homicide.

**Defendant Colorado Springs is municipally liable for the Individual Defendants'
actions and has a custom and practice of using excessive force to arrest individuals
without probable cause.**

38.    It has long been the custom and actual practice of CSPD to engage in, encourage,

and condone the use of excessive force by CSPD officers, particularly against people of color.

39.    It is customary in Colorado Springs for officers to use excessive force against

people of color and then charge them with false offenses to conceal that the officers used

excessive force. These charges are most often resisting arrest, obstruction, failure to obey a

lawful order, interference with a public official, or a combination thereof.

40.    Though Mr. Melvin was in the hospital in a medically induced coma, CSPD

officers charged him (and Mr. Bruno) with resisting arrest and interference with a public official.

41.    Colorado Springs did not discipline either of the Individual Defendants or counsel

them for their actions. Further, CSPD provided no additional training to either Individual

Defendant, or other CSPD officers, related to the incident with Mr. Melvin.

42.    The conduct of the Individual Defendants as described in detail herein were

consistent with and pursuant to the policies, customs, and training provided to law enforcement

officers for use in the situation with which they were confronted.

43.    Defendants Patterson and Archer acted intentionally, knowingly, willfully,

wantonly, maliciously and/or recklessly in disregard for Mr. Melvin's federally protected rights

and acted under the preexisting and ongoing deliberately indifferent custom, policy, practice,

training, and supervision of Defendant Colorado Springs acting under color of state law.

44.    CSPD has a history of making arrests without probable cause—an issue it should

have addressed and remedied long ago. The following cases show that at the time of Mr.

Melvin's arrest, there was a custom and practice known to Defendant Colorado Springs, of wrongfully arresting individuals without probable cause and condoning such arrest by CSPD officers. These cases also illustrate an obvious need, that Defendant Colorado Springs knew at the time of Mr. Melvin's arrest, for Defendant Colorado Springs to provide further training to CSPD officers on the necessity of establishing probable cause before making an arrest.

**Ryan and Joey Brown**

45.     On March 25, 2015, brothers Ryan and Joey Brown were pulled over by CSPD officers. The brothers were young black men who were driving to their home, which was in a predominantly white neighborhood. CSPD officers had no grounds on which to pull them over, and officers would not tell the Brown brothers why they had been pulled over. Instead, the officers held them at taser- and gun-point. Though the brothers had done nothing wrong, the officers ordered them out of their car at gunpoint, frisked them, threw Ryan to the ground and threw his phone away to stop him from recording the interaction. The officers wrongfully arrested both brothers, and CSPD responded to the brothers' complaint about their mistreatment by determining that the officers conduct was justified. Colorado Springs paid $212,000 and made substantial policy changes to settle the Brown brothers' claims.

**Grant Bloomquist**

46.     In 2013, CSPD officers arrested Grant Bloomquist without probable cause after he verbally protested two CSPD officers' beating of another man outside of a nightclub. Mr. Bloomquist was outside Cowboys Night Club in Colorado Springs and saw officers brutally beating an African American man, so he stepped to about 7 feet away and said, "get the fuck off him." At that point, he was blindsided and struck by an officer, who hit him in the face. Multiple

CSPD officers struck Mr. Bloomquist repeatedly in the groin area with knee strikes and pinned

him against a police vehicle. The officers then threw him in the police car and arrested him.

**John Sturgis**

47.     On January 26, 2012, CSPD officers arrested John Sturgis, an African American

man, without probable cause and subjected him to excessive force after a civilian witness

misidentified Mr. Sturgis as a homicide suspect. The witness told CSPD officers he had seen a

man at a gas station—Mr. Sturgis—who he claimed resembled a homicide suspect. Mr. Sturgis

in fact was twice the age of the suspect (40 vs 20), was bald when the suspect had hair, and

exhibited many other physical dissimilarities with the suspect. Despite these obvious differences,

officers followed Mr. Sturgis and arrested him. Mr. Sturgis surrendered peacefully and asked the

officers not to handcuff him behind his back because he had recently had surgery on his

shoulder; he even offered to show the officers MRI images of his injured shoulder that were

sitting on his front seat as proof. The officers ignored Mr. Sturgis's pleas, and excessively

forcefully handcuffed him behind the back, causing Mr. Sturgis to significantly reinjure his

shoulder and require further surgery. Several officers falsified their reports about the incident to

invent probable cause to arrest Mr. Sturgis. Colorado Springs paid $300,000 to settle Mr.

Sturgis's claims.

**James Sorensen**

48.     On July 21, 2012, law enforcement arrested James Sorensen without probable

cause, for violating a law banning guns in parks. That law had been repealed in 2003. CSPD

officers unlawfully detained, handcuffed, and arrested James Sorensen for carrying a holstered

pistol at a festival. A Colorado Springs spokeswoman publicly admitted that Mr. Sorensen was

correct, and the officers were "in the wrong, definitely." After Mr. Sorensen sued to vindicate his constitutional rights, Colorado Springs settled the case.

**Jarrot Martinez**

49.    Also in 2012, the City of Colorado Springs paid $480,000 to settle claims that two CSPD officers had conspired to falsely charge, arrest, and maliciously prosecute one officer's ex-boyfriend, Jarrott Martinez. Despite Mr. Martinez's presentation of a video-supported alibi for the time when he was accused of the false charges, CSPD nevertheless pursued his prosecution through two criminal trials.

**Joseph Martinez**

50.    In 2009, law enforcement arrested Joseph Martinez after a CSPD officer misidentified him as the individual who had sold him drugs during an undercover operation. The officer knew the drug dealer's nickname as "Casper," and searched for mugshots of individuals associated with that nickname. He incorrectly selected Mr. Martinez's photograph. When Mr. Martinez voluntarily turned himself in and professed his innocence, officers did not confirm the bad identification that had led to the arrest, even though Mr. Martinez lacked the only identifying mark of which the undercover officer had taken note, a tattoo on his shin. Mr. Martinez spent approximately 40 days in jail, and prosecutors dismissed his case for lack of evidence.

51.    Several of these representative cases resulted in Colorado Springs paying substantial monetary sums to settle police misconduct claims, yet the facts surrounding Mr. Melvin's case make apparent that the Colorado Springs Police Department has yet to learn its lesson and adequately train and supervise its officers on the probable cause and reasonable suspicion requirements, or regarding the appropriate and legal use of force under the

circumstances, or ensure that the clear ongoing custom and practice of police misconduct as occurred here ceases.

52.     Indeed, Colorado Springs's custom, practice, and policy of using excessive force against African American men has continued unabated since the Individual Defendants killed Mr. Melvin. On August 3, 2019, CSPD officers were investigating a 911 call and stopped De'Von Bailey and Lawrence Stoker, two young African American men. Neither Mr. Bailey nor Mr. Stoker threatened the officers in any way. As the officers approached him, Mr. Bailey sprinted away. After Mr. Bailey had been sprinting away for less than five seconds—during which time he never once even looked back at the officers let alone threatened any of them— CSPD Sgt. Alan Van't Land and Officer Blake Evenson shot him four times in the back, killing him.

53.     Defendant Colorado Springs knew, based on its long history and widespread practice of its officers using excessive force and taking racially biased actions against people of color and its condoning of those actions, that its officers would likely be influenced by racial bias when contacting people of color, and that such bias could cause the CSPD officers to use excessive and unnecessary force against people of color like Mr. Melvin.

54.     Considering this knowledge, Defendant Colorado Springs could have and should have pursued reasonable methods for training and supervising CSPD officers, including the individual Defendants, in recognizing and guarding against implicit or explicit racial bias in interacting with people of color and not using excessive force, but it failed to do so.

55.     Because Defendant Colorado Springs created and tolerated a custom of deliberate indifference and failed to train adequately and supervise CSPD officers, people of color, including Mr. Melvin, have repeatedly been subjected to violations of their constitutional rights.

56.     Defendant Colorado Springs fostered "a policy of inaction" in the face of knowledge that CSPD officers were routinely violating specific constitutional rights under the Fourth and Fourteenth Amendments to the United States Constitution, which makes up the functional equivalent of a decision by Colorado Springs itself to violate the Constitution.

57.     Defendant Colorado Springs's "policy of inaction" and policies, customs, or practices in failing to train properly and supervise its employees were a moving force and proximate cause of Individual Defendants' violation of Mr. Melvin's constitutional rights.

58.     CSPD has persistently failed to investigate and counsel or discipline CSPD officers for their similar uses of excessive force against people of color. Colorado Springs's failure to find wrongdoing and failure to counsel or discipline officers in this case, the cases described above, and others reflects a custom, policy, or practice of encouraging, tolerating and ratifying blatantly illegal conduct. These encouragements, toleration of, and ratifications show that CSPD officers carry out such police misconduct under the policies of and regimen of training provided by Colorado Springs, and that such conduct is customary within CSPD.

59.     Indeed, CSPD's Use of Force analyses from 2014-2017 show racially biased uses of force. Colorado Springs' population is approximately 6.5% African American. Even so, in 2014 and 2015, approximately 20% of the people against whom CSPD used force were African American. In 2016 and 2017, that figure jumped to 26% and 25%, respectively.

60.     In 2017, CSPD officers used force against 21% of the total number of African American males who were arrested. In the same year, CSPD officers used force against only 12% of the total number of White males who were arrested.

61.     These figures make clear that CSPD officers are disproportionately more likely to use force against African American men, like Mr. Melvin, than against similarly situated white suspects.

62.     CSPD's approval and defense of the use of excessive force by CSPD employees sends a clear and unequivocal message to those employees—such approval and failure to appropriate respond actually *trains* CSPD law enforcement officers—that such use of excessive force is acceptable, consistent with policy, and is approved practice, causing the use of such excessive force to be likely or even inevitable in the future.

63.     Colorado Springs is responsible for training its officers to ensure they perform their duties consistent with the law and to discipline their improper conduct, so officers can learn from their experiences and be deterred from engaging in future misconduct that violates the constitutional rights of people with whom the police interact. Colorado Springs's failure to do so has communicated to CSPD officers, including Defendants Patterson and Archer, that excessive force against people of color is authorized and tacitly (or explicitly) encouraged. In this sense, the failure to counsel or discipline constitutes training which authorizes future similar unconstitutional conduct.

64.     Colorado Springs's past ratification and toleration of similar unconstitutional conduct thus caused and was the moving force behind the Individual Defendants' use of

excessive force against Mr. Melvin, and Colorado Springs's failure to discipline the Individual

Defendants for this illegal use of force will lead to more unconstitutional conduct.

65. Defendant Colorado Springs's acts or omissions caused Mr. Melvin damages

because he suffered physical and mental pain, humiliation, fear, anxiety, loss of enjoyment of

life, loss of liberty, privacy, and sense of security and individual dignity, and death, among other

injuries, damages, and losses.

66. Defendant Colorado Springs's actions, as described deprived Mr. Melvin of the

rights, privileges, liberties, and immunities secured by the Constitution of the United States of

America, and caused him other damages.

## STATEMENT OF CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
*42 U.S.C. § 1983 - 4th & 14th Amendment*
*Excessive Force Resulting in Death*
(Against All Defendants)

67. Plaintiff incorporates all other paragraphs of this Complaint as if set forth herein.

68. At all relevant times, the Individual Defendants were acting under the color of

state law in their capacities as CSPD law enforcement officers.

69. Mr. Melvin had a clearly established Fourth and Fourteenth Amendment right to

be protected from unreasonable seizure and excessive force and excessive force at the hands of

law enforcement personnel.

70. No Individual Defendant had a legally valid basis to seize Mr. Melvin's person

under the circumstances and in the manner described herein.

71. The Individual Defendants unlawfully seized Mr. Melvin by means of excessive

physical force.

72.     The Individual Defendants had no warrant authorizing any seizure of Mr.
Melvin's body. The Individual Defendants had no probable cause or reasonable suspicion that
Mr. Melvin had committed, or was about to commit, any crime.

73.     The Individual Defendants' actions were objectively unreasonable considering the
circumstances confronting them.

74.     Mr. Melvin had committed no crime (nor could any of the Individual Defendants
have reasonably believed he had committed any crime) that would legally justify the use of such
force, and he gave the officers no reason to fear for their safety.

75.     The Individual Defendants' acts of grabbing Mr. Melvin, slamming him to the
ground, repeatedly Tasing him, and pepper spraying him constituted excessive force.

76.     The Individual Defendants engaged in these actions intentionally, willfully, and
wantonly, showing deliberate indifference to, and a reckless disregard for, Plaintiff's
constitutionally protected rights.

77.     Defendant Colorado Springs failed to properly train, supervise, and/or discipline
its employees regarding the proper use of physical restraint and force, resulting in the use of
excessive force. Defendant Colorado Springs failed to properly train, supervise, and/or discipline
its employees regarding the constitutional limits on use of force and how to avoid engaging in
racially biased or disproportionately aggressive policing.

78.     Colorado Springs's inadequate training, supervision, and/or discipline resulted
from a conscious or deliberate choice to follow a course of action from among various
alternatives available to Defendant Colorado Springs.

16

79.     Considering the duties and responsibilities of personnel of Defendant Colorado Springs—who must decide when forcible restraint and use of physical force is appropriate— and the frequency with which such law enforcement personnel will confront circumstances such as those presented as described herein, the need for specialized training, supervision and discipline regarding such decisions was so obvious, and the inadequacy of training and/or supervision was so likely to result in a violation of constitutional rights, that Defendant Colorado Springs is liable for its failure to properly train, supervise, and/or discipline its subordinate employees and agents.

80.     Such failure to properly train, supervise, and/or discipline constitutes an unconstitutional policy, procedure, custom, and/or practice. It was a moving force behind and proximate cause of the Individual Defendants' use of excessive force against Mr. Melvin.

81.     Mr. Melvin lost his life at the hands of the CSPD and his family has been and continues to be damaged by the Individual Defendants' unreasonable use of excessive force. He endured physical and mental pain, humiliation, fear, anxiety, loss of enjoyment of life, loss of liberty, privacy, loss of consortium with his family, friends and associates, and sense of security and individual dignity, among other injuries, damages, losses, and loss of life.

82.     Each Individual Defendant's acts or omissions described herein, including the unconstitutional policy, procedure, custom and/or practice described, were the legal and proximate cause of Mr. Melvin's damages.

83.     At the time when the Individual Defendants unlawfully grabbed Mr. Melvin, slammed him to the ground, Tased, and pepper sprayed him, Mr. Melvin had a clearly established constitutional right under the Fourth Amendment to the United States Constitution to be secure in his person from unreasonable seizure through excessive force.

17

84.     The Individual Defendants are not entitled to Qualified (or any other) Immunity.

Any reasonable law enforcement officer knew or should have known of this established right.

85.     Intent to harm Mr. Melvin motivated the Individual Defendants' actions, as

described above.

86.     The Individual Defendants' acted intentionally, maliciously, willfully, wantonly,

and/or in reckless disregard of Mr. Melvin's federally protected rights.

**SECOND CLAIM FOR RELIEF**
*42 U.S.C. § 1983 - Fourteenth Amendment*
*Denial of Equal Protection*
(Against All Defendants)

87.     Plaintiff incorporates all other paragraphs of this Complaint as if set forth herein.

88.     The Individual Defendants were acting under color of state law in their actions

and inactions at all times relevant to this action.

89.     At the time of the complained of events, Mr. Melvin had the clearly established

constitutional right to be free from racial discrimination in law enforcement by police officers

and to enjoy the equal protection of the laws.

90.     Mr. Melvin's race was a motivating factor in the Individual Defendants' decisions

to unlawfully seize him and inflict upon him excessive force under the circumstances and in their

decisions regarding how much force to use against him. The Individual Defendants acted with

the purpose of depriving Plaintiff of the equal protection and benefits of the law, and equal

privileges and immunities under the law, in violation of the Fourteenth Amendment.

91.     The Individual Defendants treated Mr. Melvin less favorably—and with much

more unreasonable force—than his similarly situated White counterparts, wholly or in part

because of his race.

92.     There was no rational basis for Individual Defendants' discriminatory actions, let alone a purpose narrowly tailored to serve a compelling governmental interest.

93.     The Individual Defendants used excessive force against Mr. Melvin without reasonable suspicion or probable cause to believe Mr. Melvin had committed a crime or posed a threat of harm or fleeing that would legally justify the level of force used.

94.     The Individual Defendants intentionally, willfully, unreasonably and wantonly seized Mr. Melvin by using excessive force against him, wholly or in part because of his race.

95.     The Individual Defendants' actions were objectively unreasonable considering the facts and circumstances confronting them.

96.     The Individual Defendants engaged in these actions intentionally, willfully, maliciously, and wantonly, showing deliberate indifference to and reckless disregard of Mr. Melvin's federally protected constitutional rights.

97.     Defendant Colorado Springs failed to properly train, supervise, and/or discipline its employees regarding the constitutional requirement not to engage in racially based policing, resulting in the Individual Defendants' unlawful seizure of Mr. Melvin and use of excessive force. Defendant Colorado Springs particularly failed to properly train, supervise, and/or discipline its employees regarding the proper use of physical restraint and force against people of color, and the prohibition on using racially based excessive force.

98.     Colorado Springs's inadequate training, supervision, and/or discipline resulted from a conscious or deliberate choice to follow a course of action from among various alternatives available to Defendant Colorado Springs.

99.     Considering the duties and responsibilities of personnel of Defendant Colorado Springs—who must police and interact with people of color regularly— and the frequency with which such law enforcement personnel will confront people of color while discharging their duties as law enforcement officers as described herein, the need for specialized training, supervision and discipline regarding such decisions is so obvious, and the inadequacy of training and/or supervision is so likely to result in a violation of constitutional rights, such as those described herein, that Defendant Colorado Springs is liable for its failure to properly train, supervise, and/or discipline its subordinate employees and agents.

100.    Such failure to properly train, supervise, and/or discipline was a moving force behind and proximate cause of the Individual Defendants' racially biased treatment of Mr. Melvin, and makes up an unconstitutional policy, procedure, custom, and/or practice.

101.    CSPD exonerated the Individual Defendants for their racially based conduct under Colorado Springs's municipal customs, policies and/or actual practices described herein. Such decision to exonerate racially discriminatory conduct was made deliberately and pursuant to Colorado Springs's longstanding customs and practices. The decision sends a clear message that the Individual Defendants acted pursuant to the customs, practices, and policies of Defendant Colorado Springs.

102.    Defendant Colorado Springs's failure to train and/or supervise, as well as the failure to take appropriate disciplinary or remedial action on past instances of similar unconstitutional conduct, as described herein, was a legal and proximate cause of the Mr. Melvin's death.

103.    As a direct and proximate result of Defendants' actions, Mr. Melvin lost his life and his family has been and continues to be damaged by the Individual Defendants' unreasonable use of excessive force. He endured physical and mental pain, humiliation, fear, anxiety, loss of enjoyment of life, loss of liberty, privacy, loss of consortium with his family and friends, and sense of security and individual dignity, among other injuries, damages, losses, and eventually and tragically the loss of his life.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants, and award him all relief as allowed by law and equity, including, but not limited to:

a.    Declaratory and equitable relief and injunctive relief, as appropriate;

b.    Actual economic damages as established at trial;

c.    Compensatory damages, including, but not limited to those for past and future pecuniary and non-pecuniary losses, physical and mental pain, humiliation, fear, anxiety, loss of enjoyment of life, loss of liberty, privacy, and sense of security and individual dignity, and other non-pecuniary losses;

d.    Punitive damages for all claims as allowed by law in an amount to be determined at trial;

e.    Issuance of an Order mandating appropriate equitable relief, including but not limited to:

    i.    Issuance of a formal written apology from each Defendant to Plaintiffs;

    ii.    The imposition of policy changes designed to avoid future similar misconduct by Defendants;

       iii.   Mandatory training designed to avoid future similar misconduct by
Defendants;

       iv.   Imposition of disciplinary action against appropriate employees of
Colorado Springs;

   f.   Pre-judgment and post-judgment interest at the highest lawful rate;

   g.   Attorney's fees and costs; and

   h.   Such further relief as justice requires.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Dated this 8th day of April 2020.

                KILLMER, LANE & NEWMAN, LLP

                */s/ Darold W. Killmer*
                Darold W. Killmer
                Liana Orshan
                Reid Allison
                1543 Champa Street, Suite 400
                Denver, CO 80202
                (303) 571-1000 - telephone
                (303) 571-1001 - facsimile
                dkillmer@kln-law.com
                lorshan@kln-law.com
                rallison@kln-law.com

                and

                A. Tyrone Glover
                STIMSON STANCIL LABRANCHE HUBBARD, LLC
                1652 N. Downing Street
                Denver, CO 80218
                (720) 689-8909
                glover@sslhlaw.com

                ATTORNEYS FOR PLAINTIFF