## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No: 20-cv-00991-CMA-KMT

ESTATE OF JEFFREY MELVIN,

Plaintiff,

v.

CITY OF COLORADO SPRINGS, COLORADO;
DANIEL PATTERSON, in his individual capacity; and
JOSHUA ARCHER, in his individual capacity,

Defendants.

---

## MOTION TO DISMISS AMENDED COMPLAINT

---

Defendants the City of Colorado Springs ("City") and Daniel Patterson move to dismiss

Plaintiff's Equal Protection and Municipal Liability claims pursuant to Fed. R. of Civ. P. 12(b)(6).[1]

### INTRODUCTION

Although styled as one claim for relief under 42 U.S.C. § 1983, Plaintiff's Amended

Complaint appears to assert three against all Defendants: (1) arrest without cause (id. ¶¶ 70-72);

(2) use of excessive force (id. ¶ 75); and (3) denial of equal protection (id. ¶¶ 23, 38-66, 77).[2]

---

[1] **CMA Civ. Practice Standard 7.1D(a)**: Undersigned counsel certifies that she conferred in good faith with Plaintiff's counsel concerning the specific bases for this motion. Mr. Killmer reported that Plaintiff opposes the motion and declined the invitation to file an amended complaint.

[2] Plaintiff's original Complaint explicitly asserted an equal protection claim against all Defendants. (Doc. 1 at 18-21) In the Amended Complaint, Plaintiff struck the explicit equal protection claim (*see* Doc. 31-1 at 18-21) but did not strike the allegations supporting it (*see id.* ¶¶ 1, 4, 23, 38-66, 77). In a filing with this Court and when conferring on this motion, Plaintiff contended that the

After Plaintiff's conclusory and inapposite allegations are stripped away, Plaintiff's equal protection claim against Officer Patterson rests on just one fact: Officer Patterson was White, and Mr. Melvin was Black. That one and only fact—a difference in race—is insufficient to state a plausible equal protection claim, entitling Officer Patterson to qualified immunity.

Plaintiff's allegations likewise fail to state claims against the City based on an informal custom or on a failure to train, supervise or discipline. Plaintiff's equal protection claim against Officer Patterson and municipal liability claims against the City should be dismissed.

## FACTUAL ALLEGATIONS

On April 26, 2018, Colorado Springs Police Department ("CSPD") Officers Daniel Patterson and Joshua Archer were dispatched at 12:31 A.M. to an apartment on a report of a disturbance. (Doc. 30 ¶ 14) A resident told them he had heard a fight in Unit 211. (Id. ¶ 15) The occupant of Unit 211 confirmed "that an altercation had occurred earlier between him and a friend, but the situation was under control and that his friend had since left." (Id. ¶ 16) The Officers were invited into the apartment, where they found "others." (Id. ¶¶ 16-17) The Officers checked for warrants on the individuals and searched the unit for evidence of crime, which they allegedly did not find. (Id. ¶ 18) "During their investigation, the occupants of the unit treated the officers with

---

Amended Complaint does not assert an Equal Protection claim. (*See* Doc. 32 at 2) But because Plaintiff's Amended Complaint still contains allegations of racial discrimination, it can be construed as asserting equal protection claims against the Defendants. (*See* Doc. 30 ¶¶ 1, 4, 23, 38-66, 77) Moreover, it is clear that Plaintiff intends to continue the narrative that there was racial discrimination at play in Mr. Melvin's arrest, despite Plaintiff's contention that no Equal Protection claim is asserted. (*See* Doc. 32 at 1-2 (asserting that the City has a "long history of unjustified violence, *especially against people of color*" despite stating that Plaintiff has dismissed the Equal Protection claim against all Defendants (emphasis added)). Thus, Defendants file this motion in good faith to eliminate from this case any claims *and any allegations* that race discrimination played any role in Mr. Melvin's arrest and in the City's policies and customs.

respect, answered every question asked of them, and [allegedly] never gave the officers reason to fear for their safety or believe criminal activity was occurring in the unit." (Id. ¶ 17)

Then Jeffrey Melvin ("Melvin"), "a young African American man," arrived. (Id. ¶ 1) He "hastily entered [the] unit and closed the door behind him," separating Officer Patterson, who was outside in the hallway, from Officer Archer, "who unbeknownst to Mr. Melvin was inside of the apartment." (Id. ¶¶ 19-20) Officer Archer "ordered Mr. Melvin away from the door, and Mr. Melvin immediately complied." (Id.) The door was opened and Officer Patterson entered. (Id.)

"Officer Archer began aggressively yelling at and grabbing Mr. Melvin in the small entryway." (Id. ¶ 21) The Officers were "attempting to handcuff him." (Id.) Melvin "did not immediately submit" to the Officers. (Id. ¶ 23) Instead, Melvin "tried to move away from them." (Id. ¶ 24) A struggle ensued, with the Officers allegedly "grabbing Mr. Melvin, choking him, and throwing him to the ground," and Melvin "trying to leave the second-story apartment through a nearby window." (Id. ¶¶ 25-26) Approximately two minutes into the melee, Officer Archer deployed his Taser on Melvin, ultimately pulling the trigger five times over a period of more than a minute. (Id. ¶¶ 27-30) Officer Patterson allegedly sprayed pepper spray in Melvin's face "[a]t some point." (Id. ¶ 31) Melvin "beg[ged] for help from those around him" and "scream[ed] that the officers were 'going to kill him,'" but, notably, Plaintiff does not allege that Melvin complied with the Officers' orders. (Id. ¶¶ 28, 32) Melvin "went for the door to the apartment." (Id. ¶ 33) Officer Patterson fired his Taser at Melvin, the first cartridge missed but the second one connected "with his upper torso." (Id.) Melvin fell to the ground, then "stood up, ripped the metal Taser prongs from his skin," and "ran" from the apartment. (Id. ¶¶ 3334) Officers caught up to Melvin "across the street" and handcuffed him. (Id. ¶ 34) Melvin ultimately was charged with "resisting

arrest and interference with a public official." (Id. ¶ 40)

Paramedics immediately took Melvin to the hospital. (Id. ¶ 35) Doctors put him "in a medically induced coma," but he died six days later. (Id. ¶ 35)

Plaintiff alleges that "Colorado Springs' population is approximately 6.5% African American," but, from 2014-2017, African Americans comprised 20-26% of the people on whom CSPD officers used force. (Id. ¶ 59) In 2017, Plaintiff alleges, CSPD officers used force on 21% of African American male arrestees and on 12% of White male arrestees. (Id. ¶ 60)

## ARGUMENT

### I. Qualified Immunity Shields Officer Patterson From Liability For An Equal Protection Violation.

Plaintiff alleges that the City has a custom of "racially biased policing" and that Officer Patterson acted "consistent with" it when arresting Mr. Melvin. (Doc. 30 ¶¶ 4, 23, 42, 63)

The Equal Protection Clause essentially directs "'that all persons similarly situated should be treated alike.'" Requena v. Roberts, 893 F.3d 1195, 1210 (10th Cir. 2018), cert. denied, 139 S.Ct. 800 (2019) (citation omitted). "A claim of racially selective law enforcement requires the plaintiff to 'demonstrate that the defendant's actions had a discriminatory effect and were motivated by a discriminatory purpose.'" Blackwell v. Strain, 496 Fed. App'x 836, 839 (10th Cir. 2012) (citation omitted). Because Plaintiff fails to state a plausible equal protection claim, Officer Patterson is entitled to qualified immunity. Ashcroft v. Iqbal, 556 U.S. 662, 684-86 (2009); Cummings v. Dean, 913 F.3d 1227, 1239 (10th Cir.), cert. denied, 140 S.Ct. 81 (2019).

#### A. Discriminatory Effect

The Tenth Circuit recognizes "three possible methods of proving discriminatory effect in a selective-enforcement case: statistical evidence; the identification of a similarly situated

individual who could have been, but was not, stopped or arrested; and, in certain circumstances, anecdotal evidence establishing an officer's pattern of similar discriminatory behavior." U.S. v. Alabi, 597 Fed. App'x 991, 996 (10th Cir. 2015). Plaintiff adequately alleges none of these.

### 1.    Statistics

"To be useful, … a statistical comparison 'requires a reliable measure of the demographics of the relevant population, a means of telling whether the data represent similarly situated individuals, and a point of comparison to the actual incidence of crime among different racial or ethnic segments of the population.'" Blackwell, 496 Fed. App'x at 840 (citation omitted).

Plaintiffs' alleged statistics fail all three measures of relevance and reliability. First, the statistics lack "'a reliable measure of the demographics of the relevant population.'" Id. (citation omitted). For starters, they fail altogether to address any racial disparities in seizures. (Doc. 30 ¶¶ 59-60) In addition, they purport to compare apples and oranges: the African American resident population in 2020 to CSPD uses of force on African Americans in 2014 through 2017. (Id. ¶ 59)

Second, Plaintiff's alleged statistics lack "'a means of telling whether the data represent similarly situated individuals.'" Blackwell, 496 Fed. App'x at 840 (citation omitted). Statistics that fail to show "disparate treatment between *comparable* individuals," fail to "eliminate nondiscriminatory explanations for the disparity," and therefore fail to "create an inference of discrimination." Carney v. City & Cty. of Denver, 534 F.3d 1269, 1276 (10th Cir. 2008) (emphasis in original). Plaintiff's statistics fail to identify White persons who, like Melvin, "did not immediately submit" to handcuffing and resisted arrest (Doc. 30 ¶¶ 21-33, 40), who were *not* subjected to comparable uses of force. Thus, Plaintiff's statistics fail to "address the critical issue of whether that particular group was treated differently than a similarly-situated group." U.S. v.

James, 257 F.3d 1173, 1179 (10th Cir. 2001) (rejecting statistics that "failed to identify non-black persons who could have been prosecuted for those same offenses, but were not").

Third, the statistics lack "'a point of comparison to the actual incidence of crime among different racial or ethnic segments of the population.'" Blackwell, 496 Fed. App'x at 840 (citation omitted). In United States v. Armstrong, 517 U.S. 456, 469-70 (1996), the Supreme Court rejected the presumption that all races commit all crimes with equal frequency. Here, Plaintiff nowhere alleges the incidence of conduct justifying the use of force—such as "resisting arrest" (Doc. 30 ¶ 40)—among Colorado Springs subjects by race, for comparison to uses of force by CSPD officers.

### 2.     Similarly Situated But Treated Differently

Plaintiff's complaint is silent on a similarly situated White person that Officer Patterson treated differently. "Individuals are 'similarly situated' only if they are alike 'in all relevant respects.'" Requena, 893 F.3d at 1210 (citation omitted). In this case, Plaintiff neither identifies (1) a White person who, like Melvin, "hastily entered" a dwelling where officers were investigating a reported disturbance and shut the dwelling's door in Officer Patterson's face, who Officer Patterson did *not* detain, nor (2) a White person who, like Melvin, instead of immediately submitting to Officer Patterson's attempt to handcuff him, tried to move away from him and to flee by jumping through a second story window, who Officer Patterson did *not* seek to control by use of pepper spray and a Taser. (Doc. 30 ¶¶ 19-34)

### 3.     Anecdotal Evidence

Plaintiff does not allege any anecdotal evidence indicating a pattern of discriminatory arrests or uses of force by Officer Patterson.

### B.     Discriminatory Purpose

Discriminatory purpose may be shown with direct, circumstantial, or statistical evidence.

See Blackwell, 496 Fed. App'x at 839, 844. Plaintiff fails to allege that Officer Patterson acted

with a discriminatory purpose when seizing and using force on Melvin. Nor do Plaintiff's statistical

allegations demonstrate as much, because Plaintiff's statistics do not focus on Officer Patterson's

conduct at all. (Id. ¶¶ 59-60) Rather, they comprise "aggregated enforcement data for *all* officers"

in the City. U.S. v. Coleman, 483 Fed. App'x 419, 420-21 (10th Cir. 2012) (emphasis in original).

> So even if true, … the statistics are of no help to [Plaintiff] … because to prove an
> Equal Protection claim he "must prove that the decisionmakers in *his* case acted
> with discriminatory purpose." And the statistics [Plaintiff alleges] do not even
> purport to speak to *that* question, saying nothing one way or the other about the
> practices of … Officer [Patterson]. After all, it would be a gross misuse of statistical
> data to extrapolate about Officer [Patterson's] conduct in particular merely from
> aggregate data that covers many other individuals.[3]

Id. (emphasis in original; citation omitted). "Mere differences in race do not, by themselves,

support an inference of racial animus." Green v. Corrections Corp. of Am., 401 Fed. App'x 371,

376 (10th Cir. 2010). Nor does a plaintiff's "subjective belief of racial discrimination." Howard v.

Jaramillo, No. 07-cv-01268-CMA-CBS, 2008 WL 5381469, at *8 (D. Colo. Dec. 22, 2008).

## II.     Municipal Liability Claims

Plaintiff asserts all three of his claims—arrest without cause, excessive force, and denial of

equal protection—against the City. (Doc. 30 ¶¶ 44, 77) In addition to showing that a municipal

employee committed an underlying constitutional violation, to state a claim for municipal liability,

a plaintiff must show the existence of an official policy or custom; a direct causal link between the

---

[3] In addition, Plaintiff's statistics purport to address CSPD uses of force between 2014 and 2017. (Doc. 30 ¶¶ 59-60). But Plaintiff does not allege that Officer Patterson was employed by CSPD as a police officer during those years. Thus, even if it were appropriate to extrapolate about Officer Patterson's conduct from the aggregated data (which it isn't), Plaintiff has not alleged that data specific to Officer Patterson even is included in the statistics Plaintiff alleges.

policy or custom and the injury alleged; and "at least for claims of inadequate hiring, training, or other supervisory practices," deliberate indifference on the part of the municipality. Waller v. City & Cty. of Denver, 932 F.3d 1277, 1283-84 (10th Cir. 2020).

### A.    No Equal Protection Violation By an Employee

Because Plaintiff fails to allege a plausible equal protection violation by the Officers[4] (see supra Part I at 4-7), he fails to state an equal protection claim against the City. See Harris v. City & Cty. of Denver, 19-cv-572-MEH, 2019 WL 6876870, at *9 (D. Colo. Dec. 17, 2019).

### B.    Existence of an Official Policy or Custom

A municipal policy or custom may take various forms. See Bryson v. City of Okla. City, 627 F.3d 784, 788 (10th Cir. 2010). In this case, Plaintiff bases his municipal liability claim on allegations of (1) an informal custom amounting to a widespread practice and (2) a failure to train, supervise and discipline employees. (*See* Doc. 30 ¶¶ 38-66)

### 1.    Informal Custom Amounting to a Widespread Practice

Plaintiff asserts that the City had customs of "making arrests without probable cause," using excessive force, and "racially biased policing." (Doc. 30 ¶¶ 4, 44, 53) "A 'custom' has come to mean an act that, although not formally approved by an appropriate decision maker, has such widespread practice as to have the force of law." Carney, 534 F.3d at 1274 (citation omitted). "In order to establish a custom, the actions of the municipal employees must be 'continuing, persistent and widespread.'" Id. (citation omitted).

### a.    Lawsuits Alleging Unconstitutional Conduct Prior to This Incident

---

[4] Although Officer Archer has not appeared in this action, Plaintiff's allegations would fail to state a plausible equal protection claim against him for the same reasons as they fail against Officer Patterson.

Plaintiff alleges that allegations in six lawsuits based on events occurring between 2009 and 2015 show that the City had the alleged customs on April 26, 2018. (Doc. 30 ¶¶ 44-51) Plaintiff's allegations fail to demonstrate the existence of such customs for many reasons.

First, Plaintiff's allegations consist of mere accusations by other plaintiffs against other City police officers and, thus, should be disregarded as "entirely conclusory." Metzler v. City of Colo. Springs, No. 19-cv-878-RM-KMT, 2020 WL 533735, at *5 (D. Colo. Feb. 3, 2020). In Metzler, the plaintiff relied on the *same* six lawsuits as Plaintiff does here as support for the *same* allegation that "CSPD has a history of making arrests without probable cause." (*Compare* Ex. A, Metzler Am. Compl., ¶¶ 109-119 to Doc. 30 ¶¶ 44-51)[5] On defendants' motion to dismiss, the court "decline[d] to accept these entirely conclusory allegations as true for present purposes." Metzler, 2020 WL 533735, at *5. See also Baltierra v. Adams Cty., No. 18-cv-00664-CMA-MEH, 2019 WL 1331914, at *7 (D. Colo. Mar. 25, 2019) ("Listing lawsuits and cases filed against predecessor organizations in various states over the years does not constitute evidence [of] an official policy or custom."); Duran v. City & Cty. of Denver, No. 10-CV-01569-REB-KMT, 2012 WL 4478800, at *2 (D. Colo. Sept. 28, 2012) (dismissing municipal liability claim based on others' excessive force complaints because court would not assume the claims "were meritorious"; "'People may file a complaint for many reasons, or for no reason at all'" (citation omitted)).

Second, Plaintiff's list of lawsuits fails to show that "similarly situated individuals were mistreated by the municipality in a similar way." Carney, 534 F.3d at 1274. None of the six cases

_____

[5] In a Rule 12(b)(6) motion, the Court may consider facts subject to judicial notice, including the Court's "own files and records, as well as facts which are a matter of public record," without converting the motion to dismiss into a motion for summary judgment. Tal v. Hogan, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006).

involved an officer's attempt to detain someone who "hastily entered" a dwelling where officers were investigating a reported disturbance and shut the dwelling door in an officer's face. (Doc. 30 ¶¶ 19-20) Nor did any involve the use of pepper spray or a Taser on someone who "did not immediately submit" to handcuffing but rather tried to flee by jumping through a second story window and running away. (*Id.* ¶¶ 23-34) The lawsuits Plaintiff cites arose in contexts as foreign as a traffic stop (*id.* ¶ 45), misidentifications (*id.* ¶¶ 47, 50), an arrest based on a repealed law (*id.* ¶ 48), and an alleged conspiracy to frame an officer's ex-boyfriend (*id.* ¶ 49). As the court found in Metzler, "these instances have little in common with the circumstances of Plaintiff's arrest and are not relevant here." Metzler, 2020 WL 533735, at *5. See also Harris, 2019 WL 6876870, at *12 (allegations of other complaints of civil rights violations against municipality's employees failed to demonstrate an informal policy, custom or practice because "the examples of 'similar' events proffered by the Plaintiffs are not sufficiently similar").

Third, Plaintiff fails to allege outcomes of the six lawsuits showing an unconstitutional custom. For two of the six lawsuits, Plaintiff fails to allege *any* outcome.[6] (Doc. 30 ¶¶ 46, 50) "'[T]he mere fact that a lawsuit was filed without any mention of the disposition of the lawsuit or whether the City was found to have violated any rights does not establish a pattern and practice.'" Estate of Lobato by & through Montoya v. Correct Care Sols., LLC, No. 15-CV-02718-PAB-STV, 2017 WL 1197295, at *8 (D. Colo. Mar. 31, 2017) (citation omitted). The City allegedly settled the other four, but a settlement "'is not even evidence of wrongdoing, let alone that the City has a custom or policy that fosters or results in wrongdoing.'" Id. (citation omitted).

---

[6] One of the cases on which Plaintiff relies—filed by Joseph Martinez—Judge Matsch dismissed on defendants' motion to dismiss, finding that the allegations were "not sufficient to establish liability for a constitutional violation." (*See* Ex. B, Joseph Martinez Ord. of Dismissal at 2)

10

Fourth, the lawsuits, based on six arrests over six years between 2009 and 2015, are too remote in time and few number to show a "'continuing, persistent and widespread'" custom of "making arrests without probable cause." Carney, 534 F.3d at 1274 (citation omitted). Only three cases involved allegations of excessive force (Doc. 30 ¶¶ 45-47), and just two involved African American subjects (*Id.* ¶¶ 45, 47). In 2018, the City's population exceeded 473,000, making it the second largest city in Colorado.[7] Two, three, or even six accusations over a period of six years hardly shows a continuing, persistent and widespread practice of unconstitutional conduct by the City's police officers. See Lankford v. City of Hobart, 73 F.3d 283, 287 (10th Cir. 1996) ("'isolated and sporadic acts'" did not amount to a custom under § 1983 (citation omitted)).

### b. An Accusation Of Unconstitutional Conduct After This Incident

Plaintiff alleges that two City police officers' use of deadly force on an African American male on August 3, 2019 somehow shows that the City had customs on April 26, 2018 of "using excessive force and taking racially biased actions against people of color." (Doc. 30 ¶¶ 52-53) The allegation fails to sustain Plaintiff's municipal liability claims for the same reasons as do the six lawsuits preceding Melvin's arrest: it merely is an accusation of unconstitutional conduct, the allegations fail to show mistreatment similar to Melvin's, no outcome of the accusations is alleged, and the event occurred some 15 months after the Melvin arrest.

### c. Statistics

For the reasons discussed in relation to the equal protection claim against Officer Patterson,

---

[7] *See* https://demography.dola.colorado.gov/population/population-totals-municipalities/#population-totals-for-colorado-municipalities, "Municipalities Ranked by Population," last visited July 7, 2020. "A court may consider 'matters of which a court may take judicial notice,'" such as demographic information from a government-hosted website, "in a Rule 12(b)(6) analysis." Harris, 2019 WL 6876870, at *12 & n.6 (citation omitted).

Plaintiff's statistical allegations fail to demonstrate a custom of "racially biased uses of force." (<u>Supra</u> Part I.A.1 at 5-6).

### 2.   Failure To Train, Supervise, or Discipline

Plaintiff also fails to allege a municipal policy of failing to train, supervise, or discipline its police officers. To demonstrate the existence of the policy, Plaintiff must allege "facts regarding the officers' training or supervision—when it occurred, who conducted it, or how it was deficient." <u>Rehberg v. City of Pueblo</u>, No. 10-CV-00261-LTB-KLM, 2012 WL 1326575, at *5 (D. Colo. Apr. 17, 2012). Plaintiff alleges that the City fails to "train, supervise, and/or discipline its employees" regarding "probable cause and reasonable suspicion requirements," "constitutional limits on use of force and how to avoid engaging in racially biased or disproportionately aggressive policing." (Doc. 30 ¶¶ 51, 77) But Plaintiff "'do[es] not allege specific facts about who, what, where, and when that establish a plausible claim.'" <u>Rehberg</u>, 2012 WL 1326575, at *5 (citation omitted).

Plaintiff further alleges that the City "actually *trains*" its officers by its "approval and defense of the use of excessive force by CSPD employees … against people of color" and its "failure to counsel or discipline." (Doc. 30 ¶¶ 62-63 (emphasis in original)) But the complaint references only three instances of alleged uses of excessive force predating Melvin's arrest (only two of which involved African Americans) (<u>see</u> <u>id.</u> ¶¶ 45-47), and those instances are inapposite to this case. (<u>See</u> <u>supra</u> Part II.B.1.a at 9-10) Moreover, Plaintiff fails to allege that the Individual Defendants, let alone CSPD officers department-wide, *knew* of the three instances and *knew* of the City's "approval and defense of" or "failure to counsel or discipline" concerning the uses of force employed in the three instances. Without such knowledge, CSPD officers cannot have been trained by such purported municipal conduct.

Plaintiff otherwise supports his municipal liability claim with conclusory allegations that the City failed to train its officers regarding Melvin's arrest (Doc. 30 ¶ 41) and failed to "investigate and counsel or discipline" the officers in this case, in the six lawsuits Plaintiff cites predating Melvin's arrest, in the one deadly force incident post-dating it, and unidentified "others" (id. ¶ 58). The decision not to train or discipline based on this single incident, "'as opposed to a systematic policy, cannot support a claim of municipal liability.'" Estate of Reat v. Rodriguez, No. 12-CV-02531-REB-MEH, 2014 WL 4358333, at *2 (D. Colo. Sept. 3, 2014) (citation omitted). See also Schneider v. City of Grand Junction Police Dep't, 717 F.3d 760, 777 (10th Cir. 2013) ("Rarely if ever is 'the failure of a police department to discipline in a specific instance ... an adequate basis for municipal liability'"). And the allegation that the City failed to discipline its officers in any of the other instances fails to sustain his claim here, because Plaintiff's allegations fail to demonstrate outcomes warranting more discipline. See supra Part II.B.1.a at 10 & n.6; Duran, 2012 WL 4478800, at *2 (because the court would not assume excessive force complaints against municipality "were meritorious," it would not "infer that more of these 'complaints should have resulted in discipline of police officers'").

## C.    Causation

Plaintiff must also allege "'a direct causal link between the municipal action and the deprivation of federal rights.'" See Schneider, 717 F.3d at 770 (citation omitted). This means that "'the challenged policy or practice must be 'closely related to the violation of the plaintiff's federally protected right.'" Id. (citation omitted). On a municipal liability claim, "'rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee.'" Id. (citation omitted).

In this case, Plaintiff alleges municipal causation only in a conclusory fashion. (See Doc. 30 ¶¶ 57, 64-66, 80) No facts are alleged that plausibly suggest a direct causal link between any action of the City and any constitutional violation. See Weitzman v. City & Cty. of Denver, No. 17-cv-02703-KLM, 2019 WL 1438072, at \*15 (D. Colo. Mar. 31, 2019) (allegation that municipality's "policies, customs, or practices in failing to properly train and supervise their employees were the moving forces and proximate cause of the violation of [plaintiff's] constitutional rights" failed to satisfy causation element of municipal liability claim). Nor does Plaintiff "explain how the incident described in the … complaint could have been avoided with different or better training or supervision." Rehberg, 2012 WL 1326575, at \*5.

Furthermore, the deadly force incident that occurred on August 3, 2019, and any failure to train or discipline the Individual Defendants or other officers after Melvin's arrest (see Doc. 30 ¶¶ 41, 52), could not cause Plaintiff's alleged constitutional deprivations. See Cordova v. Aragon, 569 F.3d 1183, 1194 (10th Cir. 2009) ("basic principals [sic] of linear time prevent us from seeing how conduct that occurs *after* the alleged violation could have somehow caused that violation" (emphasis in original)).

### D.     State of Mind

Finally, at least for Plaintiff's failure to train, supervise or discipline claims, Plaintiff "'must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences.'" Waller, 932 F.3d at 1284 (citation omitted). "'Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.'" Id. It cannot be alleged with conclusions; plaintiff must make "specific factual allegations from which a factfinder could infer a deliberately

14

indifferent decision." Garcia v. Adams Cty., Colo., No. 16-cv-01977-PAB-NYW, 2017 WL 4251931, at *4 (D. Colo. Sept. 25, 2017).

Plaintiff relies on the accusations in six lawsuits predating Melvin's arrest to demonstrate the City's alleged deliberate indifference. (Doc. 30 ¶ 44) But the six cases on which Plaintiff relies are factually dissimilar from this case and, thus, could not have put the City on notice of the deficiencies in any training. See Leonhard v. Correct Care Sols., LLC, No. 19-cv-00600-PAB-STV, 2020 WL 1694377, at *9 (D. Colo. Apr. 8, 2020); Metzler, 2020 WL 533735, at *5; Lobato, 2017 WL 1197295, at *7; Estate of Lillis v. Correct Care Sols., LLC, No. 16-cv-03038-KLM, 2018 WL 1569752, at *17-18 (D. Colo. Mar. 30, 2018). Next, Plaintiff merely alleges the accusations made in the lawsuits, not outcomes such as a jury verdict or judgment, that could have put the City on notice that its training is deficient in any way. Id. Finally, Plaintiff fails to allege specific facts "from which a factfinder could infer a deliberately indifferent decision." Garcia, 2017 WL 4251931, at *4.

## CONCLUSION

Plaintiff's equal protection claim against Daniel Patterson and all of Plaintiff's claims against the City of Colorado Springs should be dismissed with prejudice.

Respectfully submitted July 7, 2020.

<div style="margin-left:40%">

OFFICE OF THE CITY ATTORNEY OF THE
CITY OF COLORADO SPRINGS, COLORADO
Wynetta P. Massey, City Attorney

*/s/ Anne H. Turner*
Anne H. Turner, Assistant City Attorney
30 S. Nevada Ave., Suite 501
Colorado Springs, Colorado 80903
Telephone: (719) 385-5909
anne.turner@coloradosprings.gov

</div>

15

## <u>CERTIFICATE OF SERVICE (CM/ECF)</u>

I hereby certify that on the 7th day of July, 2020, I electronically filed the foregoing **MOTION TO DISMISS AMENDED COMPLAINT** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Darold W. Kilmer
Liana G. Orshan
Reid R. Alison
1543 Chapman St. Ste 400
Denver, CO 80202
*Attorneys for Plaintiff*


*/s/Donnielle Davis*
Donnielle Davis
Legal Secretary