**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No:  20-cv-00991-CMA-MDB

ESTATE OF JEFFREY MELVIN,
Plaintiff,

v.

CITY OF COLORADO SPRINGS, COLORADO; et al.,
Defendants.

---

**INDIVIDUAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

---

Individual Defendants Daniel Patterson and Joshua Archer move pursuant to Fed.

R. Civ. 56 for summary judgment on Plaintiff's claim(s) against them.

**Statement of Undisputed Facts[1]**

On Thursday, April 26, 2018, at approximately 12:31 a.m., Colorado Springs Police

Officers Daniel Patterson and Joshua Archer are dispatched to investigate a disturbance

at apartment 211 in a building in Colorado Springs. The apartment's occupant, Jordan

Bruno (a 26-year old male), confirms he was in a "violent," "physical" fight with his

"homeboys" who have since left. But the Officers also find inside the apartment two

unrelated females: one 34 years old; the other just a week past her sixteenth birthday,

provocatively dressed and quietly sitting in a corner. The juvenile tells the Officers that

her legal guardian lives in Texas. A logical explanation for the juvenile's presence in the

apartment is not provided. Suspecting that the juvenile is a runaway and potentially is

being harbored or sexually exploited, the Officers embark on finding a local relative or

---

[1] According to CMA Civ. Practice Standard 7.1E(b)(1)(C), the pinpoint locations in the
record for the material facts are provided in the formatted argument section, below.

organization who can collect the juvenile.

While Officer Patterson is in the hallway outside the apartment finishing a phone call and Officer Archer is inside the apartment with the three individuals, Jeffrey Melvin appears at the apartment building's exterior door. Officer Patterson recognizes Mr. Melvin from when the Officers arrived on scene; Mr. Melvin was exiting the building, allowing the Officers to enter. Officer Patterson opens the door for Mr. Melvin and asks him if he is going to apartment 211. Mr. Melvin says "No," but then he runs straight into apartment 211. Officer Patterson makes chase, but Mr. Melvin slams the door shut, locks it, and then barricades it with his body from the inside. Officer Patterson tries to open the door but can't. He shouts, "Josh!" to alert Officer Archer to Mr. Melvin's presence inside the apartment. Among other suspicions, the Officers believe that Mr. Melvin may be the male who fought with Mr. Bruno earlier, returning, potentially with a weapon, to finish the fight.

Once the apartment door is opened, Officer Patterson enters and commands Mr. Melvin to turn around and put his hands behind his back because he is being detained. Mr. Melvin says, "No!", pulls away from the Officers, and walks deeper into the apartment. The Officers grab Mr. Melvin's arms to try to handcuff him, but Mr. Melvin resists. He breaks away from the Officers and twice tries to jump head first out of the second story window. The Officers pull him back inside both times. Mr. Melvin yells to Mr. Bruno to "help" him. Mr. Bruno responds by approaching Officer Patterson, balling his fists, and jogging in place, which the Officers interpret as pre-attack indicators. While struggling with Mr. Melvin, Officer Patterson sprays Mr. Bruno with OC spray, causing him to retreat.

The Officers repeatedly issue commands to Mr. Melvin to stop resisting, to lay down on the ground, and to give up his hands, but Mr. Melvin does not comply. After

approximately two minutes of hands-on struggling with Mr. Melvin, the Officers are fatiguing, but Mr. Melvin is not. Mr. Melvin is exhibiting super-human strength and stamina, which the Officers interpret as signs of drug use. Officer Patterson fears that Mr. Melvin will overpower the Officers and gain control of a weapon.

Officer Patterson yells to Officer Archer, "Tase him! Tase him! Tase him, now!" In the dynamic situation, Mr. Melvin is constantly moving, twisting, and shifting his body into different positions while struggling with Officer Patterson. Officer Archer deploys the first cartridge of his Taser at Mr. Melvin. But he doesn't observe any change in Mr. Melvin's behavior during the five-second Taser cycle. Mr. Melvin continues to actively resist detention throughout. Officer Archer therefore pulls the trigger of his Taser a second time, deploying his Taser's second cartridge of probes. He again doesn't observe any change in Mr. Melvin's behavior. Officer Archer pulls the trigger on his Taser a third time, which re-activates the probes of his second cartridge but, again, sees no change in Mr. Melvin's behavior. Although Officer Archer doesn't realize it, he pulls the trigger on his Taser a fourth and fifth time, which reactivates the probes of his Taser's second cartridge. Because the Officers observe no change in Mr. Melvin's behavior during any of Officer Archer's Taser deployments, they believe that Mr. Melvin has not been tased at all.

Officer Patterson sprays Mr. Melvin with OC spray, which does not cause Mr. Melvin to cease resisting or to comply with their commands. Instead, Mr. Melvin runs toward the front of the apartment. Officer Patterson warns Mr. Melvin and then deploys his Taser at his back but immediately sees that it has no effect on Mr. Melvin. Officer Patterson pulls the trigger of his Taser a second time, deploying his Taser's second cartridge. It is effective in producing neuromuscular incapacitation ("NMI"). Mr. Melvin falls

to the ground. After the five-second cycle, Mr. Melvin jumps up, swats the Taser wires away, and runs out of the apartment, down the hallway, down the stairs, out the building and across the street, where he eventually stops running and lowers down to his knees.

The Officers chase after Mr. Melvin, eventually catching up to him. Lying on his side, Mr. Melvin continues to hold one arm underneath his body. The Officers order Mr. Melvin to surrender his hands, but he still refuses. Officer Patterson delivers two elbow strikes to Mr. Melvin's torso, but they fail to enable the Officers to handcuff Mr. Melvin. Two additional police officers arrive, and with their assistance, the Officers finally succeed in getting Mr. Melvin handcuffed, about seven minutes after Mr. Melvin arrived.

<u>Argument</u>

**The Individual Defendants Are Entitled to Qualified Immunity.**

The Individual Defendants are entitled to qualified immunity because Plaintiff will be unable to prove that they violated Mr. Melvin's clearly established constitutional rights. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). "[W]hen a defendant advances a qualified immunity defense, this 'trigger[s] a well-settled twofold burden' that the plaintiff must bear. That burden requires 'the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established.'" *Clark v. Bowcutt*, 675 Fed. App'x 799, 805 (10th Cir. 2017) (citations omitted). "This is a heavy burden. If the plaintiff fails to satisfy either part of the inquiry, the court must grant qualified immunity." *Carabajal v. City of Cheyenne*, 847 F.3d 1203, 1208 (10th Cir. 2017).

I.    **No Constitutional Violation**

A.    **Unlawful Seizure Claim**

Plaintiff must show that at the seizure's inception, the Officers lacked an arrest

warrant, probable cause, *and* reasonable suspicion to detain Mr. Melvin. *See Halley v. Huckaby*, 902 F.3d 1136, 1145 (10th Cir. 2018). While the officers lacked an arrest warrant, Plaintiff cannot prove that they lacked probable cause or reasonable suspicion.

### 1.    Probable Cause

Probable cause to arrest exists where, "'under the totality of the circumstances,'" a "'reasonable person'" would "'believe that an offense has been or is being committed by the person arrested.'" *United States v. Munoz–Nava*, 524 F.3d 1137, 1144 (10th Cir. 2008) (citation omitted). The "assessment … must be based on what the officer knew at the time." *Meadows v. City of Okla. City*, 851 Fed. App'x 127, 129-30 (10th Cir. 2021).

Officer Patterson had probable cause to arrest Mr. Melvin for Obstructing a Peace Officer (Colo. Rev. Stat. § 18-8-104(1)(a))[2]. Closing, locking, and holding a door shut, thereby preventing a police officer from lawfully entering a property, constitutes obstruction. *See Dolson v. United States*, 948 A.2d 1193, 1202 (D.C. Ct. App. 2008) (defendant who closed, locked, and held shut a gate to prevent an officer from entering interfered with a police officer); *Diehl v. Munro*, 170 F. Supp. 2d 311, 319 (N.D.N.Y. 2001) ("attempt[ing] to lock the door and hold it closed to prevent [the officer] from opening it and removing [plaintiff]" constituted obstruction).

Before seeking to detain Mr. Melvin, Officer Patterson witnessed the following:

1.   Officer Patterson asked Mr. Melvin if he was going to apartment 211. (Movants' Appx. 37:18-20 - Patterson Dep.)

2.   Mr. Melvin told Officer Patterson, "No," he wasn't going to apartment 211 but then

---

[2] At Movant's Appx. pp. 162-171, Defendants include the Colorado Revised Statutes cited herein as they existed at the time of this 2018 incident.

immediately ran to apartment 211, opened its door, entered the apartment, slammed the door shut, locked the door, and leaned against the door from the inside with his body. (Movants' Appx. 36:21-41:15 - Patterson Dep.; 74 ¶ 28-Patterson Aff.; 90:13-91:17 - Archer Dep.; Ex. 1, Archer BWC 17:58-18:05)

3.  Officer Patterson made chase but was unable to get to the door before Mr. Melvin shut, locked, and barricaded it. (Movants' Appx. 74 ¶ 29 - Patterson Aff.; 90:13-91:17 - Archer Dep.; Ex. 1, Archer BWC 17:58-18:20)

4.  Officer Patterson tried to open the apartment door but was unable to open it. (Movants' Appx. 74 ¶ 30 - Patterson Aff.)

Mr. Melvin knew Officer Patterson was on site in relation to apartment 211, and he used the door as an "obstacle." Colo. Rev. Stat. § 18-8-104(1)(a). Although Officer Archer had not witnessed Mr. Melvin's conduct in the hallway, he could rely on Officer Patterson's knowledge pursuant to the collective knowledge doctrine. *See United States v. Latorre*, 893 F.3d 744, 753 (10th Cir. 2018); Movants' Appx. 94:14-95:13 - Archer Dep.

### 2.  Reasonable Suspicion

"[A] police officer may briefly detain an individual suspected of criminal activity if the officer has reasonable suspicion based on articulable facts, together with rational inferences to be drawn therefrom, that criminal activity is afoot." *United States v. Rodriguez*, 739 F.3d 481, 485 (10th Cir. 2013). It "'is not, and is not meant to be, an onerous standard.'" *United States v. Gurule*, 935 F.3d 878, 885 (10th Cir. 2019).

### a.  The Physical Fight

The Officers had reasonable suspicion to detain Mr. Melvin in relation to the physical fight that had occurred in the apartment, potentially for felony burglary (Colo.

Rev. Stat. §§ 18-4-202, -203), felony trespass (Colo. Rev. Stat. § 18-4-502), assault (Colo. Rev. Stat. § 18-3-204), and harassment (Colo. Rev. Stat. § 18-9-111(1)(a))[2]:

1.  The Officers were dispatched to apartment 211 on a report of a disturbance. (Movants' Appx. 20:10-12 - Patterson Dep.; 71-72 ¶ 3 - Patterson Aff.; 82:13-19 - Archer Dep.)

2.  The Officers observed Mr. Melvin leave the apartment building when they arrived (Movants' Appx. 5:12-14 - Patterson Dep.)

3.  Mr. Bruno told the Officers that he had a "physical" fight in his apartment with his "homeboys" that "got pretty violent" when he kicked them out; they left. (Movants' Appx. 11:11-13, 12:11-12 - Patterson Dep.; Ex. 1, Archer BWC 0:29-42, 2:27-32, 7:15-26)

4.  The juvenile told Officer Patterson that it was just one male who fought with Mr. Bruno, who said, "No, I'm not fucking leaving," when Mr. Bruno asked him to leave. (Ex. 2, Patterson BWC1 12:50-13:03)

5.  Mr. Melvin returned to the apartment building approximately 30 minutes after the officers arrived. (Movants' Appx. 71-72 ¶ 3, 74 ¶ 25 - Patterson Aff.)

6.  Mr. Melvin told Officer Patterson, "No," he wasn't going to apartment 211 but then immediately ran to apartment 211, opened its door, entered the apartment, slammed the door shut, locked the door, and leaned against the door from the inside with his body. (Movants' Appx. 36:21-41:15 - Patterson Dep.; 90:13-91:17 - Archer Dep.; 74 ¶ 28 - Patterson Aff.; Ex. 1, Archer BWC 17:58-18:05)

### b.  The Juvenile

The Officers had reasonable suspicion to detain Mr. Melvin in relation to the juvenile, potentially for human trafficking of a minor for sexual servitude (Colo. Rev. Stat. § 18-3-504(2)(a)), procurement of a child for sexual exploitation (Colo. Rev. Stat. § 18-6-

404), contributing to the delinquency of a minor (Colo. Rev. Stat. § 18-6-701), and harboring a minor (Colo. Rev. Stat. § 18-6-601)[2]:

1.  It was after midnight on a Thursday night in April, typically a school night for teenagers. (Movants' Appx. 7:23-24 - Patterson Dep.; 71-72 ¶ 3 - Patterson Aff.)

2.  Mr. Bruno answered the door holding a liquor bottle and said he was drunk. (Movants' Appx. 6:5-14 - Patterson Dep.; 135 ¶ 84 - Archer Aff.; Ex. 1, Archer BWC 0:08-11)

3.  The Officers perceived the apartment to be sparsely furnished, as if it was not being lived in. (Movants' Appx. 7:1-20, 10:20-24, 47:3-4 - Patterson Dep.; 128 ¶ 12-Archer Aff.)

4.  In the Officers' training and experience, adults involved in human trafficking often run their brothels out of sparsely furnished residences. (Movant's Appx. 72 ¶ 14 - Patterson Aff.; 128 ¶ 13 - Archer Aff.)

5.  A female juvenile was sitting on the floor in the corner of the living room with a blanket wrapped around her shoulders and an adult female, Nancy Dorado, sat on the sofa. (Movants' Appx. 10:18-11:16, 47:7-9 - Patterson Dep.; 79 ¶ 85-Patterson Aff.; Ex. 2, Patterson BWC1 1:53-1:57)

6.  The juvenile was wearing a tight-fitting, lacy, low cut tank top. (Movants' Appx. 11:8-11, 47:7-8-Patterson Dep.; Ex. 1, Archer BWC 16:15-20; Ex. 2, Patterson BWC1 at 12:55)

7.  The juvenile had just turned 16 years old. Mr. Bruno was nearly 27 years old. Ms. Dorado was 34. (Movants' Appx. 7:22-8:6 - Patterson Dep.; Ex. 2, Patterson BWC1 4:24-5:24, 7:56-8:04)

8.  The juvenile told the Officers that her legal guardian resides in Texas and that her father lives in Colorado Springs. (Movants' Appx. 12:19-23, 47:9-14 - Patterson Dep.; Ex. 1, Archer BWC 3:28-3:50)

9.  The juvenile provided a phone number for her father, but no one answered when Officer Patterson called the number. (Movants' Appx. 12:19-23 - Patterson Dep.; Ex. 2, Patterson BWC1 8:20-11:16)

10. A logical explanation for how the juvenile knew Ms. Dorado or Mr. Bruno was not provided. (Movants' Appx. 8:4-6, 47:6-7 - Patterson Dep.; Ex. 1, Archer BWC 6:09-6:45)

11. The juvenile asked Officer Archer if she could "smoke a bowl" of marijuana. (Movants' Appx. 129 ¶ 20 - Archer Aff.; Ex. 1, Archer BWC 17:08-11)

12. In the Officers' training and experience, runaway juveniles often support themselves through child prostitution and/or become victims of child sex trafficking. (Movants' Appx. 14:16-15:9 - Patterson Dep.; 129 ¶ 18 - Archer Aff.)

13. In the Officers' training and experience, people typically consume drugs and alcohol together, in settings such as they found in the apartment. (Movants' Appx. 73 ¶ 15 - Patterson Aff.; 129 ¶ 21 - Archer Aff.)

14. The manner and circumstances under which Mr. Melvin entered the apartment evidenced that he may be armed and intend to harm someone in the apartment. (Movants' Appx. 34:1-9, 36:17-37:8, 39:24-41:15, 43:13-44:6 - Patterson Dep.; 89:13-22, 92:8-21, 116:16-117:10, 122:22-123:14 - Archer Dep.)

### c.  Unauthorized Entry Into Apartment

Mr. Melvin's manner of entry into the apartment also supplied reasonable suspicion to the Officers to detain him, potentially for felony burglary (Colo. Rev. Stat. §§ 18-4-202, -203) and felony trespass (Colo. Rev. Stat. § 18-4-502)[2], as follows:

1.  Mr. Bruno did not indicate to the Officers that anyone else resided with him at the apartment. (Ex. 1, Archer BWC 0:01-17:58)

2.  The Officers observed Mr. Melvin enter the apartment without first seeking Mr. Bruno's permission. (Movants' Appx. 36:21-41:15, 43:8-44:6 - Patterson Dep.; 99:6-14 - Archer Dep.; Ex. 1, Archer BWC 17:58-18:05)

3.  The manner and circumstances under which Mr. Melvin entered the apartment evidenced that he may be armed or intend to commit a crime against another person or property in the apartment. (Movants' Appx. 34:1-9, 36:17-37:8, 39:24-41:15, 43:13-44:6 - Patterson Dep.; 89:13-22, 92:8-21, 116:16-117:10, 122:22-123:14 - Archer Dep.)

> **B.   Unlawful Handcuffing Claim**

Plaintiff complains that the Officers lacked the authority to handcuff Mr. Melvin. (*See* Doc. 30, Am. Compl. ¶¶ 21-22) "[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 396 (1989). "[I]n the ordinary course, handcuffing any arrestee … is lawful." *A.M. v. Holmes*, 830 F.3d 1123, 1155 (10th Cir. 2016). Moreover, "officers may use force during a *Terry*-type detention to the extent that 'such steps [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of [the] stop.' " *Novitsky v. City Of Aurora*, 491 F.3d 1244, 1254 (10th Cir. 2007) (citation omitted). Handcuffing is permissible. *See id.*

Because Officer Patterson had probable cause to believe that Mr. Melvin committed the crime of Obstruction in his presence (*see supra* Part I.A.1 at 5-6), he was authorized to handcuff Mr. Melvin. *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001).

The Officers also were concerned for their and the other occupants' safety:

1.  Mr. Melvin allowed two officers to enter the apartment building at approximately 12:31 a.m. (Movants' Appx. 5:12-14 - Patterson Dep.)

2.  When Mr. Melvin returned to the apartment building at approximately 1:00 a.m., Mr. Melvin found only one officer—Officer Patterson—at the door to the apartment building. (Movants' Appx. 38:2-39:11 - Patterson Dep.; 74 ¶ 25-Patterson Aff.)

3.  Officer Patterson asked Mr. Melvin if he was going to apartment 211 and, thus, Mr. Melvin reasonably could have concluded that Officer Archer was in apartment 211. (Movants' Appx. 37:9-39:11 - Patterson Dep.; 72 ¶ 4, 74 ¶¶ 25-27-Patterson Aff.)

4.  Mr. Melvin told Officer Patterson, "No," he wasn't going to apartment 211 but then immediately ran to apartment 211, opened its door, entered the apartment, slammed the door shut, locked the door, and leaned against the door from the inside with his body. (Movants' Appx. 36:21-41:15 - Patterson Dep.; 74 ¶ 28-Patterson Aff.; 90:13-91:17 - Archer Dep.; Ex. 1, Archer BWC 17:58-18:05)

5.  Mr. Melvin separated the Officers. (Movants' Appx. 88:9-19 - Archer Dep.)

6.  Mr. Bruno told the Officers that he had a "physical" fight in his apartment with his "homeboys" that "got pretty violent" when he kicked them out; they left. (Movants' Appx. 11:11-13, 12:11-12 - Patterson Dep.; Ex. 1, Archer BWC 0:29-42, 2:27-32, 7:15-26)

7.  The juvenile told Officer Patterson that it was just one male who fought with Mr. Bruno. (Ex. 2, Patterson BWC1 12:59-13:03)

8.  The manner and circumstances under which Mr. Melvin entered the apartment evidenced that he may be armed and intend to harm someone in the apartment. (Movants' Appx. 34:1-9, 36:17-37:8, 39:24-41:15, 43:13-44:6 - Patterson Dep.; 89:13-22, 92:8-21, 116:16-117:10, 122:22-123:14 - Archer Dep.)

From the Officers' perspective, Mr. Melvin did not run away from Officer Patterson; Mr. Melvin ran with purpose *into* apartment 211 and locked Officer Patterson out. Given

"the possibility of danger" that Mr. Melvin posed, the Officers had "a right to take reasonable steps to protect [themselves] and an obligation to ensure the safety of innocent bystanders, regardless of whether probable cause to arrest [Mr. Melvin] exist[ed].'" *United States v. Carter*, 360 F.3d 1235, 1240 (10th Cir. 2004).

The Officers also were authorized to handcuff Mr. Melvin " 'to maintain the status quo.' " *Novitsky*, 491 F.3d at 1254 (citation omitted). Mr. Melvin derailed the Officers' investigations into the physical fight and the juvenile. The Officers needed to get physical control of Mr. Melvin so that their investigations could continue. (Movants' Appx. 35:22-36:10 - Patterson Dep.; 86:13-24, 88:9-19, 119:3-13 - Archer Dep.)

### C. Excessive Force Claim

"To state an excessive force claim 'under the Fourth Amendment, plaintiffs must show both that a 'seizure' occurred and that the seizure was 'unreasonable.'" *Clark*, 675 Fed. App'x at 805. The Officers seized Mr. Melvin, but Plaintiff cannot prove that the seizure was unreasonable. The Officers used the following force on Mr. Melvin:

1. Once Mr. Melvin disobeyed the command to turn around and put his hands behind his back, the Officers grabbed Mr. Melvin's arms. (Movants' Appx. 74-75 ¶¶ 34-36-Patterson Aff.; 130 ¶¶ 30-32 - Archer Aff.)

2. Officer Archer pulled the trigger of his Taser five times. (Movants' Appx. 104:7-25 - Archer Dep.; Ex. 1, Archer BWC 19:47-20:57)

3. Officer Patterson sprayed Mr. Melvin with OC spray. (Movants' Appx. 23:3-24:9, 45:17-46:1 - Patterson Dep.; 77 ¶¶ 61-62 - Patterson Aff.)

4. Officer Patterson deployed his Taser on Mr. Melvin three times: two trigger pulls followed by an inadvertent arc switch activation. (Movants' Appx. 56:1-12 - Patterson

Dep.; 77-78 ¶¶ 64-74 - Patterson Aff.)

5.  An effective Taser deployment is one which causes neuromuscular incapacitation ("NMI") or otherwise enables officers to handcuff the individual. (Movants' Appx. 2:5-13 - Patterson Dep.; 108:6-11 - Archer Dep.)

6.  During the incident, the Officers believed that only one of their Taser deployments was effective—Officer Patterson's second trigger pull—because Mr. Melvin actively resisted during all other Taser deployments. (Movants' Appx. 3:3-4:9, 24:10-25:9, 26:6-23, 27:23-28:20, 32:9-33:25, 57:6-58:19, 59:12-60:10, 61:17-65:5 - Patterson Dep.; 105:1-108:11, 109:3-111:1, 112:10-113:14, 114:3-10 - Archer Dep.; Ex. 1, Archer BWC 19:47-21:31)

7.  After the foot chase, when Mr. Melvin lay with an arm underneath his body, Officer Patterson twice struck him with his elbow. (Movants' Appx. 30:9-31:13 - Patterson Dep.)

8.  All force ceased once Mr. Melvin was handcuffed. (Movants' Appx. 79 ¶ 84-Patterson Aff.; 135 ¶ 83 - Archer Aff.; 147 ¶ 3 - Evenson Aff.; 160 ¶ 3 - Gonzalez Aff.)

Determining the objective reasonableness of a seizure requires analyzing the totality of the circumstances, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. The Court is to conduct this analysis from the perspective of a reasonable officer on the scene, rather than with the vision of 20/20 hindsight, acknowledging that the officer may be forced to make split-second judgments in certain difficult circumstances. *See id*.

An officer's use of a taser on an individual who is actively resisting handcuffing is objectively reasonable. *See Edwards v. City of Muskogee, Okla.*, 841 Fed. App'x 79, 85 (10th Cir.), *cert. denied sub nom. Edwards v. Harmon*, 142 S. Ct. 98 (2021); *Hinton v.*

*City of Elwood, Kan.*, 997 F.2d 774, 781 (10th Cir. 1993). In *Edwards*, two officers sought to handcuff a driver who they suspected to be under the influence of PCP. 841 Fed. App'x at 80. "[B]oth officers had trouble handcuffing [plaintiff], as he did not keep his arms behind him." *Id.* The officers forced the plaintiff to the ground, but they " 'could not control [the plaintiff's] hands and arms,' as '[h]e was extremely strong.' " *Id.* at 81. The officers tasered the plaintiff multiple times, but the taser appeared to have no effect on the plaintiff. *Id.* Additional officers arrived and only with their assistance were the officers able to handcuff the plaintiff. *Id.* at 82. Over almost four minutes, "officers employed considerable force against [the plaintiff]." *Id.* at 80, 84. The Tenth Circuit affirmed summary judgment for the officers on plaintiff's excessive force claim, finding that all three *Graham* factors weighed against the plaintiff and, thus, "the absence of a constitutional violation." *Id.* at 84-85.

In *Hinton*, the Tenth Circuit likewise affirmed summary judgment for officers who used a taser "numerous" times on an actively resisting individual. 997 F.2d at 781. In *Hinton*, officers were investigating a misdemeanor, and the suspect was not a threat to the officers or to the public, was not armed, was not under the influence of drugs, was outnumbered by the officers, and was in the company of five children. *Id.* But the suspect refused to talk to the police, shoved one of the officers, and wrestled with officers on the ground. *Id.* The officers tasered the man multiple times. *Id.* Although the first two *Graham* factors weighed against the officers' use of force, in light of the suspect's active resistance to the officers' attempts to handcuff him, the Tenth Circuit found no constitutional violation. *See id. See also Hagans v. Franklin County Sheriff's Office*, 695 F.3d 505, 509 (6th Cir. 2012) ("If a suspect actively resists arrest and refuses to be handcuffed, officers do not violate the Fourth Amendment by using a taser to subdue him.")

### 1.     Severity of the Crime

This factor is judged "from the perspective of a reasonable officer 'at the precise moment that they used force,' not with hindsight of the crimes the suspect was eventually charged," and is determined based on the crimes that the circumstances *potentially* "could have supported" when the officer used force. *Coronado v. Olsen*, No. 20-4118, 2022 WL 152124, at *4 (10th Cir. Jan. 18, 2022) (citation omitted). This factor "weighs against the plaintiff when the crime at issue is a felony, irrespective of whether that felony is violent or nonviolent." *Vette v. K- 9 Unit Deputy Sanders*, 989 F.3d 1154, 1170 (10th Cir. 2021).

As discussed above, the "crime[s] at issue" from the Officers' perspective at the time they used force on Mr. Melvin included felonies such as burglary, trespass, human trafficking of a minor for sexual servitude, procurement of a child for sexual exploitation, and contributing to the delinquency of a minor. (*See supra* Part I.A.2 at 6-10)

### 2.     Immediacy of Threat to Safety

Mr. Melvin posed an immediate threat to the safety of himself and others:

1. Mr. Melvin twice tried to jump head first out of the second story window of the apartment. (Movants' Appx. 75 ¶¶ 37, 42 - Patterson Aff.; 87:6-8, 118:8-16 - Archer Dep.; Ex. 1, Archer BWC 18:56-19:21)

2. Mr. Melvin repeatedly invited Mr. Bruno to "help" him. (Ex. 1, Archer BWC 19:21, 19:26, 19:41, 19:57, 20:06, 20:50)

3. Mr. Bruno responded to Mr. Melvin's requests for "help" by demonstrating pre-attack indicators: approaching Officer Patterson, balling his fists, and then jogging in place like a boxer, until Officer Patterson used OC spray on Mr. Bruno, causing him to retreat. (Movants' Appx. 75 ¶¶ 45-47 - Patterson Aff.; 100:22-103:21 - Archer Dep.)

4.  The Officers issued dozens of commands to Mr. Melvin: to stop resisting, to lay down on the ground, to give up his hands, and to stop running. (Movants' Appx. 49:1-25 - Patterson Dep.; Ex. 1, Archer BWC 18:22, 18:46, 18:54, 19:16, 19:59, 20:08, 20:14, 20:16, 20:24, 20:29, 20:44, 20:48, 21:03, 21:05, 21:54, 22:08, 22:37, 23:12, 23:18, 23:22, 23:31, 23:38, 23:45, 24:47, 24:49, 24:57, 25:00)

5.  Mr. Melvin had ample opportunity to comply with the Officers' commands. (*Id.*)

6.  Mr. Melvin did not comply with the Officers' commands. (*Id.*)

7.  Mr. Melvin was erratic and irrational and possessed super-human strength and stamina, which the Officers interpreted as signs of drug use. (Movants' Appx. 21:16-22:17, 52:20-53:8 - Patterson Dep.; 76 ¶ 52 - Patterson Aff.; 83:23-84:18 - Archer Dep.)

8.  According to the Officers' training and experience, individuals on drugs can be unpredictable and, thus, a greater safety threat. (Movants' Appx. 76 ¶ 53 - Patterson Aff.; 132 ¶ 48 - Archer Aff.)

9.  By the time the Officers used a Taser on Mr. Melvin, they had been physically struggling with him for approximately two minutes. (Ex. 1, Archer BWC 17:58-19:54)

10. The Officers were fatiguing. (Movants' Appx. 50:21-51:9, 59:12-60:10, 66:13-67:9 - Patterson Dep.; 132 ¶ 49 - Archer Aff.)

11. The Officers had not searched Mr. Melvin, Mr. Bruno, Ms. Dorado, the juvenile or the apartment for weapons. (Movants' Appx. 34:8-9 - Patterson Dep.; 76 ¶ 56 - Patterson Aff.; 92:22-93:9 - Archer Dep.)

12. Officer Patterson feared that Mr. Melvin would overpower them and gain control of a weapon on his person, elsewhere in the apartment, or from the Officers' belts to harm them or the others. (Movants' Appx. 50:24-51:9, 66:16-67:9 - Patterson Dep.)

### 3.     Resisting or Evading Arrest

The third *Graham* factor also weighs in favor of the Officers' use of force:

1.   Before the Officers used physical force on Mr. Melvin, Officer Patterson told Mr. Melvin that he was being detained and commanded him to turn around and put his hands behind his back. (Movants' Appx. 42:4-12 - Patterson Dep.; Ex. 1, Archer BWC 18:21-18:54)

2.   Mr. Melvin responded, "No," pulled his arms away, and moved deeper into the apartment. (Movants' Appx. 49:1-8 - Patterson Dep.; Ex. 1, Archer BWC 18:21-18:54)

3.   Mr. Melvin twice tried to jump head first out of the window. (Movants' Appx. 75 ¶¶ 37, 42 - Patterson Aff.; 87:6-8, 118:8-16 - Archer Dep.; Ex. 1, Archer BWC 18:56-19:21)

4.   Mr. Melvin repeatedly invited Mr. Bruno to "help" him. (Ex. 1, Archer BWC 19:21, 19:26, 19:41, 19:57, 20:06, 20:50)

5.   After being tased by Officer Patterson, Mr. Melvin swatted the taser wires away, jumped up, and ran from the Officers. (Ex. 1, Archer BWC 21:18-21:35; Ex. 3, Patterson BWC2 2:43-2:59)

6.   After the foot chase, Mr. Melvin held one hand underneath his body. (Movants' Appx. 30:20-31:4 - Patterson Dep.; 138:16-139:4 - Evenson Dep.; 152:7-153:3 - Gonzalez Dep.)

7.   The Officers issued dozens of commands to Mr. Melvin to stop resisting, to lay down on the ground, to give up his hands, and to stop running. Mr. Melvin had ample opportunity to comply but did not. (*See* s*upra* Part I.C.2 at p. 16 ¶¶ 4-6)

8.   Except for the single, five-second period that he experienced NMI, Mr. Melvin actively resisted or evaded detention from the time that Officer Patterson commanded him to turn around and place his hands behind his back until the time that officers were able to get him into handcuffs. (Ex. 1, Archer BWC 18:20-25:08)

9.  It took four police officers approximately thirty-five seconds to force Mr. Melvin's wrists into handcuffs. (Movants' Appx. 140:1-5, 141:9-18, 142:5-11; 143:7-20 - Evenson Dep.; 147 ¶ 4-Evenson Aff.; 150:2-151:18, 154:20-156:12 - Gonzalez Dep.; 160 ¶ 4-Gonzalez Aff.; Ex. 4, Evenson BWC 0:59-1:41; Ex. 5, Gonzalez BWC 0:06-43)

"No reasonable jury could conclude that [Mr. Melvin] was not actively resisting arrest from the moment Officer [Patterson] first tried to handcuff him until his eventual handcuffing by multiple police officers." *Edwards*, 841 Fed. App'x at 85.

## II.   No Clearly Established Right

### A.  Seizure

"In the context of a qualified immunity defense on an unlawful … arrest claim, [the Court is to] ascertain whether a defendant violated clearly established law 'by asking whether there was "arguable probable cause" for the challenged conduct.'" *Stonecipher v. Valles*, 759 F.3d 1134, 1141 (10th Cir. 2014) (citation omitted). "Arguable probable cause is another way of saying that the officers' conclusions rest on an objectively reasonable, even if mistaken, belief that probable cause exists." *Id*.

Plaintiff cannot meet his burden to show that at the time of the incident, the law was clearly established that the Officers *lacked* arguable probable cause to believe that Mr. Melvin had committed Obstructing a Peace Officer (Colo. Rev. Stat. § 18-8-104(1)(a)). *See United States v. Baldwin*, 745 F.3d 1027, 1035 (10th Cir. 2014) (affirming conviction of an individual who used his vehicle as an "obstacle" for attempting to obstruct a police officer); *Anderson v. City of Colo. Springs*, No. 20-cv-02032-RBJ, 2022 WL 910952, at *4 (D. Colo. Mar. 29, 2022) ("Tenth Circuit caselaw does not make clear" whether the plaintiff's conduct "constituted an obstacle to law enforcement within the [obstruction]

statute's definition.") Existing caselaw supports the finding that the Officers had arguable

probable cause to arrest Mr. Melvin for obstruction. (*See supra* Part I.A.1 at 5-6)

Nor can Plaintiff meet his burden to show that it was clearly established that the

circumstances failed to give the Officers "arguable reasonable suspicion" to detain Mr.

Melvin in relation to the physical fight, the juvenile, and his entry into the apartment. (*See*

*supra* Part 1.A.2 at 6-10) *Leon v. Summit Cty.*, 755 Fed. App'x 790, 794 (10th Cir. 2018).

### B.  Handcuffing

Plaintiff will be unable to identify any relevant case law clearly establishing that the

Officers violated Mr. Melvin's constitutional rights simply by seeking to handcuff him. *See*

*A.M.*, 830 F.3d at 1155; *Novitsky*, 491 F.3d at 1254.

### C.  Force

In the Tenth Circuit, it is clearly established that

- "[U]sing a taser without providing an adequate warning against a misdemeanant who had ceased actively resisting [is] unconstitutional." *Emmett v. Armstrong*, 973 F.3d 1127, 1139 (10th Cir. 2020).
- "[T]he use of disproportionate force to arrest an individual who is not suspected of committing a serious crime and who poses no threat to others constitutes excessive force." *Perea v. Baca*, 817 F.3d 1198, 1204 (10th Cir. 2016).
- "[O]fficers may not continue to use force against a suspect who is effectively subdued." *Id.*

But none of these principles apply to this case:

1.  The Officers reasonably believed that Mr. Melvin posed a threat to the safety of those

present, and potentially had committed felonies including burglary, trespass, human

trafficking of a minor for sexual servitude, procurement of a child for sexual exploitation,

and contributing to the delinquency of a minor. (*See supra* Part I.A.2 at 6-10)

2.  The Officers warned Mr. Melvin before deploying their tasers. (Movants' Appx. 76-77

¶¶ 58, 66 - Patterson Aff.; Ex. 1, Archer BWC at  19:47-20:02, 21:18)

3.   Except for the single, five-second period that he experienced NMI, Mr. Melvin actively resisted or evaded detention from the time that Officer Patterson commanded him to turn around and place his hands behind his back until the time that officers were able to get him into handcuffs. (Ex. 1, Archer BWC 18:20-25:08)

4.   All force ceased once Mr. Melvin was handcuffed. (Movants' Appx. 79 ¶ 84 - Patterson Aff.; 135 ¶ 83 - Archer Aff.; 147 ¶ 3 - Evenson Aff.; 160 ¶ 3 - Gonzalez Aff.)

Plaintiff may complain about the number of times that the Officers deployed their tasers on Mr. Melvin, but on scene, without the vision of 20/20 hindsight, the Officers reasonably believed that Mr. Melvin only had been tasered once. (Movants' Appx. 3:3-4:9, 24:10-25:9, 26:6-23, 27:23-28:20, 32:9-33:25, 57:6-58:19, 59:12-60:10, 61:17-65:5 - Patterson Dep.; 105:1-108:11, 109:3-111:1, 112:10-113:14, 114:3-10 - Archer Dep.; Ex. 1, Archer BWC 19:47-21:31) Moreover, the Tenth Circuit has "not set a specific limit on the number of times an arrestee may be tased within a given time interval." *Perea*, 817 F.3d at 1205 n.4. *See also Waters v. Coleman*, 632 Fed. App'x 431, 438-39 (10th Cir. 2015); *Wilson v. City of Lafayette*, 510 Fed. App'x 775, 777-778 (10th Cir. 2013).

## Conclusion

The Court should grant the Individual Defendants' Motion for Summary Judgment and dismiss this action with prejudice.[3]

---

[3] The remaining claim against the City of Colorado Springs (*see* Doc. 92) necessarily fails with a finding that the Individual Defendants did not violate Mr. Melvin's constitutional rights. *See City of Los Angeles v. Heller,* 475 U.S. 796, 799 (1986) (*per curiam*) (no municipal liability where the named individual defendant "inflicted no constitutional harm"); *Curley v. Village of Suffern,* 268 F.3d 65, 71 (2d Cir. 2001) ("Following *Heller,* we have recognized that a municipality cannot be liable for inadequate training or supervision when the officers involved in making the arrest did not violate the plaintiff's constitutional rights.").

Respectfully submitted this 11th day of August, 2022

OFFICE OF THE CITY ATTORNEY OF THE
CITY OF COLORADO SPRINGS, COLORADO
Wynetta Massey, City Attorney


*/s/ Anne H. Turner*
Anne H. Turner, Assistant City Attorney
30 S. Nevada Ave., Suite 501
Colorado Springs, Colorado 80903
Telephone:  (719) 385-5909
anne.turner@coloradosprings.gov

Attorneys for Defendants


## CERTIFICATE OF SERVICE (CM/ECF)

I hereby certify that on the 11th day of August, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following email addresses:

dkillmer@kln-law.com
lorshan@kln-law.com
rallison@kln-law.com


*/s/Terry JoHansen*
Terry JoHansen
Litigation Paralegal