IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No: 20-cv-00991-CMA-MDB

ESTATE OF JEFFREY MELVIN,
Plaintiff,

v.

CITY OF COLORADO SPRINGS, COLORADO; et al.,
Defendants.

---

### CITY OF COLORADO SPRINGS' MOTION FOR SUMMARY JUDGMENT

---

Defendant City of Colorado Springs ("City") moves pursuant to Fed. R. Civ. 56 for summary judgment on Plaintiff's claim(s) against it.

### Introduction[1]

When ruling on the City's motion to dismiss, this Court found that Plaintiff's Amended Complaint adequately alleged claims under 42 U.S.C. § 1983 for failing to train its police officers on the use of force and anti-biased policing. (*See* Doc. 92 at 4-6) But the undisputed evidence shows that Plaintiff will be unable to prove such claims. The City far exceeded the minimum training requirements on use of force and anti-biased policing. Summary judgment should therefore enter for the City.

### Argument

**The Undisputed Facts Show That The City Trained Its Officers**

To prove a municipal liability claim under 42 U.S.C. § 1983, a plaintiff must show (1) that a municipal employee committed an underlying constitutional violation, (2) the

---

[1] According to CMA Civ. Practice Standard 7.1E(b)(1)(C), the pinpoint locations in the record for the material facts are provided in the formatted argument section, below.

1

existence of an official municipal policy or custom; (3) a direct causal link between the policy or custom and the injury alleged; and (4) "at least for claims of inadequate hiring, training, or other supervisory practices," deliberate indifference on the part of the municipality. *Waller v. City & Cty. of Denver*, 932 F.3d 1277, 1283-84 (10th Cir. 2020).

Where, as here, a municipal claim is based upon a failure to train, "[a] municipality's culpability for a deprivation of rights is at its most tenuous." *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

**I.     Use of Force Training**

    **A.     No Excessive Force By An Employee**

Plaintiff cannot prove that a City employee's use of force violated Mr. Melvin's constitutional rights. (*See* Doc. 123 at 4-18) On this basis alone, the City's motion for summary judgment should be granted. *See City of Los Angeles v. Heller,* 475 U.S. 796, 799 (1986) (*per curiam*) (no municipal liability where the named individual defendant "inflicted no constitutional harm"); *Curley v. Village of Suffern,* 268 F.3d 65, 71 (2d Cir. 2001) ("Following *Heller,* we have recognized that a municipality cannot be liable for inadequate training or supervision when the officers involved in making an arrest did not violate the plaintiff's constitutional rights.").

    **B.     No Policy Of Failing To Train On The Use Of Force**

Plaintiff likewise cannot prove that the City failed to train its police officers on the use of force. The undisputed evidence shows as follows:

1.     Officers Daniel Patterson and Joshua Archer (the "Individual Defendants") were Colorado Springs Police Department ("CSPD") police recruits in the 66th CSPD Training

Academy class that ran from October 2016 through April 2017.[2] (Movt's Appx. at 4 ¶ 5 – Van Ooyen Aff.)

2. The City trained its police recruits, including the Individual Defendants, in Arrest Control. Arrest Control refers to the actions taken by a peace officer to take physical custody of a suspect. (Movt's Appx. at 4 ¶¶ 5-6 – Van Ooyen Aff.)

3. The City's Arrest Control training encompasses classroom and physical instruction on the use of force—both legal limitations and practical applications. For example, sub-topics in Arrest Control include use of force considerations, where recruits learn law and policies governing the use of force; de-escalation techniques; personal weapons and other potential hazards; alternatives to the use of deadly force, including the TASER and Oleoresin Capsicum ("OC") Spray; balance and movement; search and handcuffing; control techniques; custodial care; retention and retrieval of weapons; ground tactics; and impact weapons, such as the Monadnock Expandable Baton. (Movt's Appx. at 4-5 ¶ 6 – Van Ooyen Aff.)

4. POST[3] establishes the standards for peace officer training and certification. (Movt's Appx. at 7 ¶ 9 – Van Ooyen Aff.)

5. In 2016, POST required 64 hours to be devoted to Arrest Control training of police recruits. CSPD exceeded that requirement by devoting 100 hours to it. (Movt's Appx. at 7-8 ¶ 10 – Van Ooyen Aff.)

---

[2] The City relies on the Affidavits of Sgt. Van Ooyen, Lt. David, Lt. Hutchison, and Lt. Farmer because Plaintiff did not take a 30(b)(6) deposition of the City.
[3] POST stands for the Peace Officer Standards and Training. POST is a unit of the Criminal Justice Section of the Colorado Attorney General's Office. (Movt's Appx. at 7 ¶ 9 – Van Ooyen Aff.)

6.POST reviewed and approved the Arrest Control materials that the City utilized to train recruits in the 66th CSPD Training Academy class. (Movt's Appx. at 8 ¶ 11 – Van Ooyen Aff.)

7.Recruits were tested in Arrest Control topics. To pass the course, the recruits were required to attain scores as follows:

| | |
|---|---|
| CSPD Arrest Control Program Written Test | 85% |
| CSPD Arrest Control Program Practical Test | 75% |
| Use of Force Written Test | 85% |
| TASER User Certification Written Test | 90% |
| TASER User Certification Practical Test | Must complete all skills to an acceptable level based on the instructor's assessment. |
| CSPD OC User Course Written Test | 80% |
| CSPD OC User Course Practical Test | Must complete all skills to an acceptable level based on the instructor's assessment. |

(Movt's Appx. at 8 ¶ 12 – Van Ooyen Aff.; *id.* at 17 ¶ 11 – David Aff.)

8.The Individual Defendants both passed the CSPD Academy's Arrest Control program. (Movt's Appx. at 8 ¶ 13 – Van Ooyen Aff.; *id.* at 18 ¶ 12 – David Aff.)

9.The City trained recruits that an officer's use of force is situation-specific. Officers must apply Arrest Control concepts on a case-by-case basis, often in tense, uncertain and rapidly evolving situations. (Movt's Appx. at 9 ¶¶ 14-15 – Van Ooyen Aff.)

10.The City trained recruits that an officer's presence is the lowest level of force, because the mere presence of a police officer in uniform, without more, can deter criminal behavior or defuse a situation. (Movt's Appx. at 9 ¶ 16 – Van Ooyen Aff.)

4

11. The City trained recruits that an officer's verbal communication with an individual likewise can deter criminal conduct or prevent a situation from escalating. Telling someone to "calm down" in a calm, non-aggressive tone is a de-escalation technique officers can employ. (Movt's Appx. at 9 ¶ 17 – Van Ooyen Aff.)

12. The City trained recruits to strive to maintain a tactical advantage during encounters with the public, for their own safety and the safety of others. One way that officers gain a tactical advantage is by outnumbering the threats. For example, an officer is at greater risk of injury when facing a resistant person alone, in a one-versus-one fight, than when there are two or more officers on scene to attempt to control an individual. An officer fighting one-on-one also would be justified in using a greater amount of force to overcome the person, which greater force might be able to be avoided by two or more officers on scene to control the person physically. The advantage of numbers—more law enforcement officers than potential threats—thus, promotes safety. Consequently, if officers are separated such that a two-versus-one fight becomes a one-versus-one fight, the officers should, if it is practical and safe to do so, try to reunite with one another and face the threat together. In addition, when the ratio of officers to potential threats decreases, individuals who were compliant may see an opportunity to defeat the police and, thus, no longer remain compliant. (Movt's Appx. at 9-10 ¶ 18 – Van Ooyen Aff.)

13. The City trained recruits that it is ideal to issue verbal commands to an individual from a distance of four to six feet, so that they can assess the person's level of compliance before employing physical force techniques. Tight quarters, such as in a narrow corridor, lessen an officer's ability to assess compliance before going hands-on with a person to control them. (Movt's Appx. at 10 ¶ 19 – Van Ooyen Aff.)

14. The City trained recruits that when conducting an investigation, they should control and make the scene safe first and then investigate, because officers cannot ask questions and listen to witnesses' answers when there are distractions, interruptions, and hindrances to their information gathering and threats to their safety. An individual who deliberately enters the scene of an investigation, separates officers, behaves unpredictably, and fails to converse calmly with officers is both a hindrance to and has become part of the officer's investigation. The person also is a safety risk and must be controlled so that the investigation can continue. (Movt's Appx. at 10 ¶ 20 – Van Ooyen Aff.)

15. The City trained recruits that when an individual refuses to obey verbal commands to turn around and put their arms behind their back, officers may attempt to employ an escort hold, which if successful, would allow the officer to pull the individual off balance, partially control their movement, and progress to other control holds if needed. An effective escort hold can allow the officer to prevent an individual from hitting the officer, to prevent the individual from getting away, and to stand in a position of advantage. If two officers are present, they each can attempt an escort hold on the individual, one officer on each side. (Movt's Appx. at 10-11 ¶ 21 – Van Ooyen Aff.)

16. The City trained recruits that if they are unable to control the individual with an effective escort hold, the officer should create distance to the individual and attempt to use a different control technique. Taking out OC spray and threatening to use it on the individual is one such control technique that could be tried when an escort hold is ineffective. (Movt's Appx. at 11 ¶ 22 – Van Ooyen Aff.)

17. The City trained recruits that when an individual is resistive to police officers, other individuals in the vicinity who previously were cooperative and calm can become a potential threat, causing officers to fear that they too may become resistive or combative. While an officer is directing their attention to the resisting individual, others may take advantage of the opportunity to attack the police. If other individuals approach the struggle, the safety threat to the officers and others increases. (Movt's Appx. at 11 ¶ 23 – Van Ooyen Aff.)

18. The City trained recruits that police officers follow a Safety Priority hierarchy to influence their decision-making in critical incidents where lives are at stake. In order of priority, they are: hostage, innocent citizens in the danger area, law enforcement, and suspect. Officers adhere to the Safety Priority when—where all other persons' safety is not in immediate peril—they prevent a suspect from jumping head-first out of a second story window, because the suspect's life still is a priority. (Movt's Appx. at 11 ¶ 24 – Van Ooyen Aff.)

19. The City trained recruits that an individual who is actively resisting being handcuffed by police who invites other persons to "help" them in the fight for control threatens officer safety because it can put the officers at a tactical disadvantage. It shows the individual's intent to decrease the ratio of officers to threats from, for example, two officers to one threat to two officers to two threats. The invitation to "help" forces the officers to divert some of their attention away from the resisting individual to another individual who may enter the fight. (Movt's Appx. at 11-12 ¶ 25 – Van Ooyen Aff.)

20. The City trained recruits to adjust their conduct to a person's actions, not necessarily to what the person is saying, because verbal statements can be untrue.

Officers should not cease using force on an actively resisting suspect just because he tells them, "Ok, I'll stop." The resisting individual's actions must show that they, in fact, no longer are resisting or attempting to flee from the officers before the use of force should be decreased. Actions speak louder than words. (Movt's Appx. at 12 ¶ 26 – Van Ooyen Aff.)

21.     The City trained recruits that pre-attack indicators include approaching, taking a boxer's stance with fists clenched, and jogging in place. They are signs that an individual is preparing and wants to fight you. (Movt's Appx. at 12 ¶ 27 – Van Ooyen Aff.)

22.     The City trained recruits that handcuffing a non-compliant individual should try to be done on the ground, with the suspect on their stomach in an arm lock. When a suspect is standing, the officer has significantly less control over the suspect. The suspect still is able to utilize their legs to kick the officer or try to push the officer off balance. When the officer has the suspect on the ground in the "grounded bar hammer," the officer can control the suspect's movements and safely apply handcuffs. (Movt's Appx. at 12 ¶ 28 – Van Ooyen Aff.)

23.     The City trained recruits on officer fatigue in a practical scenario, teaching them that physical fitness is important to their job performance and safety and that a prolonged physical fight for longer than two minutes is very dangerous. In the training scenario, the recruits are told that they are being sent to an industrial park to back-up a fellow officer who just called out a suspicious person over the radio. The recruit pulls their vehicle up to the CSPD Training Academy, gets out, and the other officer then immediately calls for "Help, Code 3" over the radio. The recruit must do twenty pushups, run around the exterior of the CSPD Training Academy (a distance of approximately 100 yards), do twenty more

pushups, and then run into the building (simulating physical exertion). Inside, the recruit sees one actor in a padded fight suit fighting with their fellow officer (also an actor). The fellow officer simulates getting knocked out by the attacker. The recruit then must grapple with the alleged attacker for two minutes. It is a very dangerous situation for the officer. During training, many recruits had their firearms taken off their belts by the attacker. They lost their fine motor skills, some gross motor skills, and some vomited. Being in a fight for two minutes after physically exerting oneself is utterly exhausting. (Movt's Appx. at 12-13 ¶ 29 – Van Ooyen Aff.)

24. The City trained recruits that the longer a physical struggle to detain a suspect goes on, the greater the risk of physical injury to the suspect and the officer. If hands-on techniques to detain the suspect are not working, officers should utilize other tools, such as OC spray and/or the TASER, to attempt to accomplish detention. Use of tools such as OC spray and the TASER, if effective, can limit the length of a physical struggle and, consequently, limit the risk of injury and increase safety to both the officer and the individual. (Movt's Appx. at 13 ¶ 30 – Van Ooyen Aff.)

25. As a result, the City trained recruits that officers should use reasonable force early and aggressively with an actively resisting suspect so that they can get control of the situation as soon as possible and avoid the need to escalate to a higher level of force. (Movt's Appx. at 13 ¶ 31 – Van Ooyen Aff.)

26. The City trained and certified recruits on the use of a TASER according to materials created by TASER International, Inc./AXON Enterprise, Inc. (Movt's Appx. at 16 ¶ 7 – David Aff.)

27. POST reviewed and approved of all of the TASER training materials utilized with CSPD police officers and recruits. (Movt's Appx. at 17 ¶ 8 – David Aff.)

28. The City trained police recruits with the 220-page TASER PowerPoint (MELVIN-DEFS 000725-946), voluntary TASER exposures, and TASER manipulations, draws, and scenarios. Such scenarios included drawing and/or using a TASER on a wanted subject, an initially non-compliant but then compliant subject, a completely non-compliant subject, a subject who started to get up after being tased, and cuffing a subject under power, for example. (Movt's Appx. at 17 ¶ 9 – David Aff.; *id.* at 22-243)

29. The City trained its sworn officers on TASER annually. (Movt's Appx. at 18 ¶ 13 – David Aff.)

30. The City's yearly in-service TASER training of sworn officers consisted of instruction, the TASER/AXON annual update PowerPoint, and live TASER cartridge deployment under practical scenarios. (Movt's Appx. at 18 ¶ 14 – David Aff.)

31. The City trained its police officers and recruits to use the least amount of force necessary to enable them to detain a subject. They are to observe a subject's response to a use of force to determine whether it was effective. If a force type isn't enabling officers to detain the subject, officers should conclude that the force is ineffective and try a different force option. (Movt's Appx. at 18 ¶¶ 15-16 – David Aff.)

32. The City trained its police officers and recruits that where officers have tried their presence, verbal commands, soft control techniques such as an escort hold, and threatened the use of OC spray, but none of the use of force options have enabled them to get a subject into handcuffs, a TASER is an acceptable force option. (Movt's Appx. at 18-19 ¶ 17 – David Aff.)

33. The City trained its police officers and recruits that when using a TASER on a person, the officer should deploy the TASER and then observe the person's reaction to determine whether the deployment was effective in causing neuromuscular incapacitation ("NMI") or otherwise enabling an officer to handcuff the person. (Movt's Appx. at 19 ¶ 18 – David Aff.)

34. The City trained its police officers and recruits that the effectiveness of a TASER deployment depends most on the probe spread. A deployment from seven to fifteen feet from the target is optimal to achieving an effective deployment. If the probes connect with the subject but are too close together or don't split the person's beltline, for example, then the TASER may have limited effectiveness. It may cause pain but not cause the person to stop resisting, for example. (Movt's Appx. at 19 ¶ 19 – David Aff.)

35. The City trained its police officers and recruits that in close quarters, where an officer is unable to distance him- or herself from the subject to attain optimal probe spread, the officer should deploy the first TASER cartridge and, if it is not producing NMI or compliant behavior from the subject, may quickly deploy the TASER's second cartridge, ideally to a different area of the subject's body. Despite lacking ideal probe spread, the TASER may produce sufficient effect with four probes deployed into the subject. (Movt's Appx. at 19 ¶ 20 – David Aff.)

36. The City trained its police officers and recruits that where an officer deploys the TASER at a person and the person continues to actively resist, does not exhibit the effects of NMI, and continues to talk during the 5-second deployment, then the officer should conclude that the TASER deployment was ineffective, and that the TASER may not have a good connection with the person. (Movt's Appx. at 19 ¶ 21 – David Aff.)

37. The City trained its police officers and recruits that once an officer deploys both of the TASER cartridges into the desired target, the officer should use the arc switch, which re-activates all deployed probes, rather than pull the trigger, which re-activates only the second cartridge's probes. Pulling the TASER's trigger after the deployment of the second cartridge is a lesser use of force than pressing the arc switch if one or both probes from the first cartridge are in contact with the subject. (Movt's Appx. at 19-20 ¶ 22 – David Aff.)

38. The City trained its police officers and recruits that deploying a TASER on a subject who is running away from the officer can be a good option because the back is the preferred target for a TASER. Factors to consider before using a TASER when a subject is fleeing are the landing surface (carpeted floor vs concrete) and how fast the subject is fleeing (full sprint vs just starting to flee or slowing down after initial sprint). (Movt's Appx. at 20 ¶ 23 – David Aff.)

39. The City trained its police officers and recruits that officers may attempt to handcuff the subject during the TASER deployment (otherwise known as cuffing under power). The officer deploying the TASER should not be the one to attempt to handcuff the subject under power, because the TASER wires may become tangled or break connection. (Movt's Appx. at 20 ¶ 24 – David Aff.)

40. The City trained its police officers and recruits that officers must be extremely careful when approaching a subject who is being tased to attempt to handcuff them during the TASER deployment. If the person being tased has access to a weapon, they could use it on the approaching officer if the TASER deployment is ineffective or as soon as the cycle ceases. (Movt's Appx. at 20 ¶ 25 – David Aff.)

41. The City trained its police officers and recruits that officer positioning in close quarters may make attempting to cuff a subject during the 5-second TASER deployment impossible. (Movt's Appx. at 20 ¶ 26 – David Aff.)

42. The City trained its police officers and recruits that once a subject has been tased and is on the ground due to NMI, the officer should use verbal commands like, "Stay on the ground, or you'll get tased again." If the subject begins to stand up and not comply with the officer's verbal commands, the officer should use the TASER's arc switch immediately, to reenergize the TASER probes. The opportunity to utilize the TASER to detain the subject is lost if the subject is able to dislodge the probes and break the connection to the TASER. (Movt's Appx. at 20-21 ¶ 27 – David Aff.)

43. The City trained its police officers and recruits that they should try to limit a person's time under the power of a TASER to a total of fifteen seconds or three cycles, but fifteen seconds is not a hard limit. The circumstances can provide the added justification to deploy a TASER on a person more than three times. (Movt's Appx. at 21 ¶ 28 – David Aff.)

44. The City trained recruits that in a physical struggle with a suspect, officers can use personal strikes—a knee in the leg, a slap in face, a body slam, punches, and/or strikes—to stun a suspect and enable them to get the suspect into the non-compliant handcuffing position. (Movt's Appx. at 13 ¶ 32 – Van Ooyen Aff.)

45. The City trained recruits that foot chases are extremely dangerous for officers. If the suspect is armed with a firearm, they easily can turn and shoot at the chasing officer. The suspect also can lead the officer into dark, dangerous places familiar to the suspect

and unfamiliar to the officer, perhaps where weapons or other threats exist. (Movt's Appx. at 14 ¶ 33 – Van Ooyen Aff.)

46. The City trained recruits that if a suspect is in a semi-prone position holding an arm underneath their torso, an officer can use elbow strikes to the suspect's ribs to try to dislodge the arm or to cause the suspect to release their arm for handcuffing. They can also use techniques taught in the arrest control program to pry the suspect's arm(s) from under their body and place the suspect in the "non-compliant handcuffing position (grounded bar-hammer)". (Movt's Appx. at 14 ¶ 34 – Van Ooyen Aff.)

47. The City trained recruits that once a prone suspect is handcuffed, they should be rolled onto their side and then pulled into an upright, seated position. (Movt's Appx. at 14 ¶ 35 – Van Ooyen Aff.)

### C. No Causation Of Mr. Melvin's Injury

"The [municipality's] official position must operate as the moving force behind the violation, and the plaintiff must demonstrate a direct causal link between the action and the right violation. That is, would the injury have been avoided had the employee been trained under a program that was not deficient in the identified respect?" *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1318 (10th Cir. 2002) (internal citations and quotations omitted).

In this case, Plaintiff cannot meet his burden to show that any deficiency in officer training caused the violation of Mr. Melvin's constitutional rights.

### D. No Deliberate Indifference

Deliberate indifference is shown when "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that policymakers of the city can reasonably be said to have been deliberately indifferent to

the need." *City of Canton v. Harris*, 489 U.S. 378, 390 (1989). City policymakers must also be "on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights . . . ," *Connick*, 563 U.S. at 61, in order for the City to be deliberately indifferent. Accordingly, "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Id.* at 62. "[W]here a plaintiff seeks to impose municipal liability on the basis of a single incident, the plaintiff must show the particular illegal course of action was taken pursuant to a decision made by a person with authority to make policy decisions on behalf of the entity being sued." *Jenkins v. Wood,* 81 F.3d 988, 994 (10th Cir. 1996). "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 410 (1997).

In this case, there is no evidence of a pattern of similar constitutional violations that would have put City policymakers on notice of the need for more or different training on the use of force. Nor is there evidence that a policymaker directed the conduct of the Individual Defendants in this case.

## II. Anti-Bias Policing Training

### A. No Racial Discrimination By An Employee

Plaintiff does not even *claim* that the officers discriminated against Mr. Melvin on the basis of his race, in violation of his equal protection rights. (*See* Doc. 144 at 1-2 ("The Estate has brought only one claim: excessive force under the Fourth Amendment."); Doc. 48 at 15 ("Plaintiff's Amended Complaint contains no Equal Protection Claims.").

Summary judgment should therefore enter for the City on Plaintiff's claim that it failed to train its officers in anti-biased policing.

### B.     No Policy Of Failing To Train On Anti-Biased Policing

In any event, Plaintiff cannot prove that the City failed to train its police officers or recruits on anti-biased policing. The undisputed evidence shows as follows:

48.    In 2016, POST required the City to devote eight hours of police recruit training to Law Enforcement Ethics and Anti-Bias Policing. (Movt's Appx. at 247 ¶ 21 – Hutchison Aff.)

49.    The City exceeded that requirement by devoting twelve hours to Law Enforcement Ethics and Anti-Bias Policing training and two additional hours to Implicit Bias training. (Movt's Appx. at 245-246 ¶¶ 4-12, at 247 ¶ 21 – Hutchison Aff.; *id.* at 266-267; *id.* at 335 ¶ 7 – Farmer Aff.)

50.    The City trained the police recruits on Anti-Biased Policing using a fifty-page PowerPoint created by the Anti-Defamation League and POST and with a community panel discussion. (Movt's Appx. at 247-248 ¶¶ 22-28 – Hutchison Aff.; *id.* at 284-333)

51.    The City was not required by law, by POST or by CALEA[4] to train police recruits on Implicit Bias in 2016-2017. (Movt's Appx. at 335 ¶ 7 – Farmer Aff.)

52.    The City nonetheless began training its police recruits and sworn officers on Implicit Bias in 2016-2017. (Movt's Appx. at 335 ¶¶ 5-7 – Farmer Aff.)

---

[4] CALEA stands for the Commission on Accreditation for Law Enforcement Agencies, Inc. CALEA-accredited law enforcement organizations satisfy more onerous training standards. CSPD has been CALEA-accredited continuously since 1991. (Movt's Appx. at 335 ¶ 7 n.2 – Farmer Aff.)

53. Law enforcement training materials on Implicit Bias did not exist at the time. For example, POST, CALEA, IACP, Police Executive Research Forum (PERF) or like organizations had not published recommended standards or materials for Implicit Bias training of police officers or recruits. (Movt's Appx. at 336 ¶ 9 – Farmer Aff.)

54. A staff instructor at the CSPD Training Academy created a PowerPoint to use when training police officers and recruits on Implicit Bias from her study of materials including:

   a. Producing Bias-Free Policing: A Science-Based Approach, by Dr. Lorie Fridell;

   b. Blink, by Malcolm Gladwell;

   c. Blindspot: Hidden Biases of Good People, by Mahzarin R. Banaji and Anthony G. Greenwald;

   d. Reducing Intergroup Bias: The Common Ingroup Identity Model, by Samuel L. Gaertner and John F. Dovidio (2000);

   e. Understanding Bias: A Resource Guide, Community Relations Services Toolkit for Policing, U.S. Department of Justice Community Relations Service;

   f. Diversity Activities Resource Guide;

   g. Shooter Bias Study, conducted by Correll, Park, Judd, & Wittenbrink, published in the Journal of Personality and Social Psychology (2002);

   h. Shoot/Don't Shoot Study, conducted by Peruche and Plant (2005, 2006); and

   i. Project Implicit, Harvard University.

(Movt's Appx. at 336 ¶¶ 8, 10 – Farmer Aff.; *id.* at 339-398)

17

55. The City trained its police officers and recruits that research shows that everyone has implicit biases. But research also shows that implicit biases can be reduced and controlled. (Movt's Appx. at 337 ¶¶ 11-12 – Farmer Aff.)

56. The City trained its police officers and recruits that individuals can reduce implicit biases through the contact hypothesis, which suggests that positive interpersonal contact between groups can reduce prejudice. Thus, the City encouraged recruits to seek out situations where they could have positive contact and interactions with marginalized populations. (Movt's Appx. at 337 ¶ 13 – Farmer Aff.; *id.* at 380)

57. The City trained its police officers and recruits that to control implicit biases, the individual first must become aware of them. During the training, recruits and officers were asked a series of questions about their comfort with race, gender, sexuality, disability, weight, and age in social situations. They were asked to reflect on their responses with the aim of then being able to consciously control their conduct. (Movt's Appx. at 337 ¶ 14 – Farmer Aff.; *id.* at 382-390)

58. The City trained its police officers and recruits that goals of the CSPD include procedural justice and legitimacy. CSPD delivers procedural justice when its citizens are treated fairly and with proper respect. It acts with legitimacy when the citizens feel that the police should be deferred to, complied with, and trusted. (Movt's Appx. at 337-38 ¶ 15 – Farmer Aff.; *id.* at 393)

59. The City trained its police officers and recruits that one of the ways that police officers can deliver procedural justice and achieve legitimacy is to make decisions with neutrality. Decisions based on factual information and a person's actions rather than their

characteristics evidences such neutrality. (Movt's Appx. at 338 ¶ 16 – Farmer Aff.; *id.* at 394)

### C. No Causation Of Mr. Melvin's Injury

In this case, Plaintiff cannot meet his burden to show that a deficiency in the City's training on anti-biased policing or implicit bias caused the violation of Mr. Melvin's constitutional rights.

### D. No Deliberate Indifference

In this case, there is no evidence of a pattern of similar constitutional violations that would have put City policymakers on notice of the need for more or different training on anti-biased policing or implicit bias. Nor is there evidence that a policymaker directed the conduct of the officers in this case.

Plaintiff has not presented evidence of a failure to train employees "in specific skills needed to handle recurring situations, thus presenting an obvious potential for constitutional violations." *Barney v. Pulsipher*, 143 F.3d 1299, 1308 (10th Cir. 1998). The City's motion for summary judgment should therefore be granted.

## Conclusion

The Court should grant the City of Colorado Springs' Motion for Summary Judgment.

Respectfully submitted this 21st day of November, 2022

        OFFICE OF THE CITY ATTORNEY OF THE
        CITY OF COLORADO SPRINGS, COLORADO
        Wynetta P. Massey, City Attorney

        */s/ Anne H. Turner*
        Anne H. Turner, Assistant City Attorney
        Martha E. McKinney, Senior Attorney
        30 S. Nevada Ave., Suite 501
        Colorado Springs, Colorado 80903
        Telephone:  (719) 385-5909
        Facsimile:  (719) 385-5535
        anne.turner@coloradosprings.gov
        martha.mckinney@coloradosprings.gov

        Attorneys for Defendants

## CERTIFICATE OF SERVICE (CM/ECF)

I hereby certify that on the 21st day of November, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following email addresses:

dkillmer@kln-law.com
lorshan@kln-law.com
rallison@kln-law.com

        */s/Amy McKimmey*
        Amy McKimmey
        Legal Secretary