**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.: 20-cv-00991-CMA-MDB

ESTATE OF JEFFREY MELVIN,

     Plaintiff,

v.

CITY OF COLORADO SPRINGS, COLORADO, *et al.*,

     Defendants.

---

**PLAINTIFF'S RESPONSE TO MOTION FOR SUMMARY JUDGMENT [Doc. 150]**

---

## I. INTRODUCTION

On April 26, 2018, Colorado Springs Police Department ("CSPD") Officers Patterson and Archer ("Individual Defendants") killed Jeffrey Melvin. Individual Defendants met Melvin, a Black man, when they were responding to a reported disturbance at an apartment building; Melvin was a visitor who arrived after them and for whom they had no reason to believe had committed any offense, posed a danger to anyone, or was armed. Individual Defendants pepper sprayed him in the face and deployed a Taser on him between *5 and 8* times in 2 minutes, causing Melvin's death. Individual Defendants' use of force was excessive, but fully consistent with the training Defendant Colorado Springs ("the City") provided to CSPD officers. Despite knowing of the dangers of repeated (and/or simultaneous) Taser deployments on the same individual and CSPD's history of using force discriminatorily against Black people, the

City recklessly failed to adequately train its officers on Tasers and avoiding biased policing. Because disputed issues of material fact exist regarding whether the City thus is liable for the constitutional violation, this Court must deny it summary judgment.

## II. RESPONSE TO THE CITY'S STATEMENT OF UNDISPUTED FACTS ("RSUF")

A municipality is liable for constitutional torts if the municipality's policy, including training, caused a constitutional injury. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-94 (1978). To show municipal liability, Plaintiff must establish (1) that a municipal employee committed a constitutional violation,[1] and (2) that a municipal policy was the moving force behind the constitutional deprivation. *Myers v. Okla. Cty. Bd. of Cnty. Commr's*, 151 F.3d 1313, 1316 (10th Cir. 1998).[2]

## <u>Use of Force Training</u>

1-13.   **Admit**.

14.   **Admit in part. Deny** to the extent that Sgt. Van Ooyen's conclusory assertion, which does not cite to any evidence produced (and is inadmissible),[3] implies

---

[1] For the reasons in Plaintiff's response to Individual Defendants' motion for summary judgment, a reasonable jury could find that at least one of them committed a constitutional violation. *See* [Doc. 144]. However, even were this Court to grant Individual Defendants' motion based on qualified immunity, Colorado Springs' motion for summary judgment would not automatically be granted because municipalities are not entitled to qualified immunity. *See, e.g.*, *Hinton v. City of Elwood*, 997 F.2d 774, 783 (10th Cir. 1993). Because a reasonable jury could find that the Individual Defendants violated Melvin's Fourth Amendment rights, this prong of *Monell* is satisfied.

[2] Plaintiff has brought only one claim against the City: excessive force under the Fourth Amendment. *See* [Doc. 30], Am. Compl. Racially disparate use of force is not a separate claim, but rather evidence of Defendant's inadequate training and deliberate indifference.

[3] "Rule 56 permits parties at summary judgment to produce their evidence by means of affidavit….Yet, at the same time,…the Rule does nothing to intimate 'hearsay testimony that would be inadmissible at trial' somehow becomes admissible simply by being 'included in an affidavit to defeat summary judgment.'…To the contrary, Rule 56 expressly prescribes that a summary judgment affidavit must 'be made on personal

that Melvin acted like the abstract "individual" described.

15.     **Admit**.

16.     **Admit**.

17.     **Admit in part. Deny** to the extent that Sgt. Van Ooyen's conclusory assertion, which does not cite to any evidence produced (and is inadmissible), implies that Bruno acted like the abstract "other individual[]" described.

18.     **Admit**.

19.     **Admit in part. Deny** to the extent that Sgt. Van Ooyen's conclusory assertion, which does not cite to any evidence produced (and is inadmissible), implies that Melvin's conduct or intent were consistent with the abstract "individual" described.

20.     **Admit**.

21.     **Admit in part. Deny** to the extent that Sgt. Van Ooyen's conclusory assertion in, which does not cite to any evidence produced (and is inadmissible), implies that Melvin's conduct was consistent with the abstract "individual" described.

22-28.  **Admit**.

29.     **Deny**. Defendant Archer testified that he did ***not*** receive follow-up training on Tasers as an active CSPD officer. Resp't's App. at 0006-7 - Archer dep. 177:19-

---

knowledge, set forth facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated.' Fed. R. Civ. P. 56(e)(1)….So it is that, although evidence presented in the form of an affidavit at summary judgment can be 'converted' in form into live testimony at trial, the content or substance of the affidavit must be otherwise admissible, and any hearsay contained in a summary judgment affidavit remains hearsay, beyond the bounds of the court's consideration." *Johnson v. Weld Cty.*, 594 F.3d 1202, 1210 (10th Cir. 2010) (citation omitted). Much of the City's employees' affidavits are hearsay because the affiants do not have personal knowledge that CSPD officers are actually trained in these exact specifics; certainly, no evidence is cited showing that these specifics were part of the City's training.

178:15.

30.     **Admit in part.** Lt. David does not cite to any evidence produced that supports his assertion or shows Individual Defendants received such annual training.

31.     **Admit in part**. Lt. David makes this conclusory assertion, but he does not cite any evidence defining the term "effective" or showing when a use of force objectively should allow the officers to detain the subject. Officers are not adequately trained to determine whether a use of force was "effective" or not (as explained below, the evidence showed that CSPD officers focused only on whether the tasing achieved neuromuscular incapacitation and did not otherwise recognize that the tasing could have affected the subject). *See infra* AMF ¶¶ 15-19.

32.     **Admit in part**. **Deny** to the extent that Lt. David's conclusory assertion, which does not cite to any evidence (and is inadmissible), implies that Melvin acted like the abstract "individual" described.

33.     **Admit in part.** *See supra* RSUF ¶ 31.

34-35.   **Admit in part**. Lt. David makes these conclusory statements, but he does not cite to any evidence produced in discovery that defines the terms "effective" or "sufficient effect." *See supra* RSUF ¶ 31; *see also infra* AMF ¶¶ 15-19.

36.     **Admit in part**. Lt. David makes this conclusory assertion, but he does not cite to any evidence that defines the term "good connection" or "active[] resist[ance]." **Deny** to the extent that Lt. David's conclusory assertion, which does not cite to any evidence, implies that Melvin "actively resist[ed]."

37-38.   **Admit**.

39.     **Deny.** Former CSPD Chief Pete Carey, who was Chief when Individual

Defendants killed Melvin, testified that CSPD officers are not taught to handcuff a person within the period of neuromuscular incapacitation ("NMI") after a Taser deployment. Rather, officers should wait until after NMI is over before attempting to handcuff the subject. Resp't's App. at 0021 - Carey dep. 99:22-100:17.

40.   **Admit in part**. **Deny** to the extent that Lt. David's conclusory assertion, which does not cite to any evidence (and is inadmissible), implies that Melvin acted like the abstract "individual" described such that Individual Defendants had any objective reason to believe Melvin had access to a weapon.

41-42. **Admit**.

43.   **Deny**. Testimony shows that regardless of any written "policy" or training materials, CSPD officers were not trained to seriously consider 3 Taser deployments or 15 seconds of tasing as a real limit. For instance, Defendant Archer testified that "there wasn't like any specific number saying that this is the exact amount of times you can tase someone….[T]here was no set limit on the amount of times [an officer could] tase someone."  *Id.* at 0010 - Archer dep. 257:10-21, 258:7-21. Current CSPD Chief Adrian Vasquez, who at the time was Deputy Chief and oversaw the internal affairs ("IA") investigation into Individual Defendants' conduct, testified that CSPD policy allowed for multiple tasings, beyond even the 8 deployments Individual Defendants used against Melvin, until the tasings cause a change in the subject's behavior. *Id.* at 0029-30 - Vasquez dep. 72:9-75:2. CSPD Officer Evenson, who arrived at the scene of the incident after the tasings, testified he was trained to use "reasonable" efforts to minimize the number and duration of tasings, but he did not testify that CSPD trained officers to try to limit tasings to 15 seconds or 3 deployments nor define "reasonable" efforts. *Id.* at

0038-40 - Evenson dep. 78:10-23, 81:14-22, 87:14-88:8.

44.     **Admit**.

45.     **Admit in part**. **Deny** to the extent that Sgt. Van Ooyen's conclusory assertion, which does not cite to any evidence (and is inadmissible), implies that Melvin acted like the abstract "individual" described.

46-47. **Admit**.

### Anti-Biased Policing Training

48-58. **Admit**.

### III.  STATEMENT OF ADDITIONAL DISPUTED MATERIAL FACTS ("AMF")

### *Individual Defendants committed excessive force against Melvin*.

1.      Within two minutes of encountering Melvin, who had committed no crime, had no weapon, and objectively posed no threat to anyone, Individual Defendants began deploying their Tasers against Melvin, leading to a total of 8 Taser deployments. *See* [Doc. 144], *Response to Individual Defendants' MSJ*, pp. 9-14.

2.      Even though both Individual Defendants were holding Melvin, Patterson ordered Archer to tase Melvin. *See* Resp't's App. at 0046 - Archer BWC 19:48-19:53.

3.      Defendant Archer deployed his first Taser cartridge at Melvin while Patterson was holding onto Melvin. *See id.* at 19:52-19:57.

4.      Melvin made a sound of pain at the beginning of this 5-second Taser cycle and called for help; this deployment indisputably had "a good connection." *Id.*; *see also id.* at 0047 - Patterson BWC 2 1:17-1:22; *id.* at 0061 - IA Taser memo 14.

5.      Archer testified: "Although my first taser deployment on Melvin was ineffective in causing 'neuromuscular incapacitation (NMI)['], Melvin did react by gritting

his teeth during the five-second deployment." *Id.* at 0079 Archer Disc. Responses 11.

6.      Less than 5 seconds after the end of the first Taser cycle, Archer deployed his second Taser cartridge for 5 more seconds; Melvin cried out in pain and explained that he had asthma. This deployment also had a "good connection." *Id.* at 0046 - Archer BWC at 20:02-20:07; 0047 - Patterson BWC 2 1:27-1:32; 0063 - IA Taser memo 16.

7.      20 seconds later, while Patterson was holding Melvin's arms behind his back, Archer tased him a third time for 5 seconds while Melvin jerked and grimaced in pain. As this third deployment "still [had] a good connection" and clearly caused Melvin pain, the second deployment also would have connected, since the third used the same probes. *Id.* at 0046 - Archer BWC 20:27-20:32; 0064 - IA Taser memo 17.

8.      After 12 more seconds, while Patterson was holding Melvin's hands behind his back and had an arm around Melvin's neck, Archer tased Melvin a fourth time for 5 seconds. *Id.* at 0046 - Archer BWC 20:44-20:49; 0064 - IA Taser memo 17.

9.      About 11 seconds later, while Patterson continued to hold Melvin, Archer tased him a fifth time. *Id.* at 0046 - Archer BWC 21:00-21:05; 0066 - IA Taser memo 19.

10.     During this minute-long period of 5 tasings, Melvin repeatedly cried for help and begged, "you can't do this!" *Id.* at 0046 - Archer BWC 19:52-21:05.

11.     Less than 15 seconds after Archer's fifth Taser deployment, Patterson pushed Melvin away from him and deployed OC (pepper spray) into Melvin's face. *Id.* at 0099 Incident Reports 6; 0047 - Patterson BWC 2 2:40; 0046 - Archer BWC 21:15.

12.     To escape Defendants' violence, Melvin attempted to flee. 5 seconds after deploying OC, Patterson deployed his Taser, and then, without waiting to evaluate its effects, deployed his second Taser cartridge a second after. *Id.* at 0055-56 - IA Taser

memo 8-9; 0046- Archer BWC 21:19-21:25; 0047 - Patterson BWC 2 2:43-2:48.

13.     At least one of the deployments connected with Melvin's upper torso, forced Melvin to the ground, and incapacitated him for five seconds. *See id.*

14.     Thus, relying only on CSPD's own IA report, there were 8 Taser deployments, *Id.* at 0049 - IA Taser Memo 2, and "there were a total of four [Taser] cartridges and eight prongs that made connection and five deployments with good connections," at the very least. *Id.* at 0110 - Alpert Report 5 (citing IA Taser Memo).

15.     Individual Defendants testified that they kept deploying their Tasers because their previous Taser deployments were not "effective."  *See id.* at 0003 - Archer dep. 167:11-20; 0117, 0119 - Patterson dep. 36:3-15, 175:3-20.

16.     The City trains its officers that an "effective" Taser deployment achieves "neuromuscular incapacitation" ("NMI"). *See id.* at 0052 - IA Taser Memo 5; 0006 - Archer dep. 180:17-24; 0117 - Patterson dep. 35:8-13; 0031-32 - Vasquez dep. 100:4-22, 108:1-11.

17.     Taser deployments can cause significant pain on the subject even when the taser does not obtain neuromuscular incapacitation. *Id.* at 0113 - Alpert Report 8.

18.     Even when a Taser deployment had a "good connection" and was obviously making contact with Melvin (and causing him substantial pain), Defendant's training meant that they refused to concede it was "effective," and thus they kept repeatedly tasing Melvin. *See, e.g.*, *id.* at 0007-8 - Archer dep. 189:3-192:3, 193:20-196:14; *see also id.* at 0034 - Vasquez dep. 157:10-158:14.

19.     Patterson testified that he was trained to use a Taser for NMI, and pain compliance was not effective nor the goal. *Id.* at 0119-120 - Patterson dep. 176:5-13,

180:14-181:5.

20.     Thus, although Archer's tasings caused Melvin significant pain, Individual Defendants were trained to ignore it and continue tasing him. For example, Patterson testified that "Melvin stated, 'Ahhh!' with respect to two of the tasings, indicating that he felt discomfort from the deployment. But only one taser deployment was effective in causing neuromuscular incapacitation." *Id.* at 0137 - Patterson Disc. Responses 12.

21.     Accepted national guidelines for police state that "[t]raining protocol should emphasize that multiple applications or continuous cycling of [a Taser] resulting in an exposure longer than 15 seconds (whether continuous or cumulative) increase the risk of serious injury or death and should be avoided." *Id.* at 0112 - Alpert Report 7.

22.     CSPD's own training provided that the more and longer deployments of a Taser on one individual, the higher the medical risks, including death, with "15 seconds of [Taser] exposure (multiple applications or continuous)" noted "as a significant safety point." *Id.* at 0164-165 - CSPD Taser Training 9-10; *see also generally id.*at 1-16.

23.     Chief Vasquez testified that "safety concerns" was one of the factors that Defendant trained its officers to take into consideration regarding "repeated uses of a Taser on the same…subject." *Id.* at 0033 - Vasquez dep. 137:19-25; *see also id.* at 0023 - Carey dep. 126:4-15 (same).

24.     Yet such training was so deemphasized (to the extent it was actually given at all) that Archer testified that he was ***not trained*** it was unsafe for someone to be tased more than 3 times (addressing 3 Taser deployments of 5 seconds each, totaling fifteen seconds of exposure). *Id.* at 0010 - Archer dep. 258:7-18; *see also* RSUF ¶ 43.

25.     CSPD training allowed officers to exceed 3 tasings with "additional

justification": "Each trigger pull on the [Taser]…is…a separate use of force and…justification must be present …. Additional justification is required for deploying the [Taser] more than 3 times on a single individual." *Id.* at 0175 - Taser Policy 4.

26.     However, "additional justification" is never defined, and apparently relies solely on officer discretion on whether to continue to tase a subject. CSPD also did not provide training on how to determine what conduct justified the initial 3 tasings versus what conduct by the subject would justify further Taser deployments. *See id.*

27.     CSPD Taser training is thus weaker and inconsistent with accepted police practices, which limit Taser deployments to 3. "Officers are or should be trained not to deploy a Taser more than three times…as it is well known that Taser exposure raises health risks and can cause death." *See id.* at 0112-113 - Alpert Report 7-8.

28.     Further, CSPD trained its officers that Taser deployment was justified when a subject displayed "active resistance," but "active resistance" is defined so limitlessly that almost any action or statement could qualify:

> Active Resistance [is] [p]hysically evasive movements to defeat an officer or marshal's attempt to control, including, but not limited to, bracing, tensing, pushing, flailing arms, running away, or verbally signaling an intention to avoid or prevent being taken into or retained in custody. Active Resistance also includes attempting to avoid apprehension and failing to comply with an officer or marshal's order to reveal themselves from concealment or surrender. Walking away may be considered active resistance if the person continues to walk away from an officer or marshal after having been given a lawful order or having been told the person is under arrest.

*Id.* at 0173 - Taser Policy 2; *see also id.* at 0011 - Archer dep. 262:7-264:14 (testifying that Individual Defendants were authorized to use multiple Taser deployments because Melvin was actively resisting). This City training authorizes the use of excessive force by Taser when such use is constitutionally prohibited.

29.     Indeed, training on justification for repeated Taser deployments was so broad that Patterson explained during his IA interview that his justification for using his Taser after Archer had tased Melvin five times was because Patterson was "tired"—even though at the time Patterson used his Taser, Melvin was not struggling with the officers and was "was running towards the front door" of the apartment. *Id.* at 0181 - IA Case Summary 3. "Going to a Taser so early in a confrontation is known as the 'Lazy Cop Syndrome' and is unreasonable." *Id.* at 0113 - Alpert Report 8.

30.     Chief Carey testified that Individual Defendants needed to evaluate each deployment regarding whether it was effective, meaning whether it achieved NMI. Chief Carey could not explain what further evaluation should have taken place to determine whether Individual Defendants could keep tasing Melvin after 3 deployments. Chief Carey testified that there was some amount of force that would have been unreasonable for Individual Defendants to use, but he could not explain why 8 Taser deployments—5 more than the presumptive limit—did not meet that criterion. *See id.* at 0020-21, 0023 - Carey dep. 94:18-95:7, 96:4-97:1, 99:4-8, 126:4-15; *see also id.* at 0034 - Vasquez dep. 158:10-160:3 (providing similar testimony).

31.     Due to CSPD's vague and almost meaningless (and hence inadequate) training, Archer, who deployed his Taser 5 times, could not explain his justification "other than Officer Patterson had told him to." *Id.* at 0180 - IA Case Summary 2.

32.     Individual Defendants' training permitted them to be so indifferent as to the amount of times they tased a single individual that when they killed Melvin, they did not even know how many times they alone or together deployed their Tasers; they both testified, wrongly, they thought the number of deployments was significantly less than 8.

*See id.* at 0004-5 - Archer dep. 171:1-13, 174:7-18; 0118, 0122-123 - Patterson dep. 140:1-21, 275:16-276:12, 305:4-306:10; *see also id.* at 0202 - Patterson UOF Report 1 (stating that he tased Melvin only once and Archer had tased Melvin only twice).

### *Individual Defendants violated the Constitution pursuant to CSPD training.*

33.     Individual Defendants unjustified and repeated use of the Taser on Melvin, *see id.* at 0114 - Alpert Report 9, was pursuant to Defendant's training.

34.     Individual Defendants testified that in their Taser use on Melvin, they acted according to the training CSPD provided. *See id.* at 0009 - Archer dep.203:6-9; 0090-91 - Archer Disc. Responses 22-23; 0152 - Patterson Disc. Responses 27.

35.     Individual Defendants' supervisors, current Chief Vasquez and former Chief Carey, also testified that Individual Defendants acted according to CSPD training.

36.     Chief Carey testified that as Chief, he was the final policymaker for police policies, including on use of force. *Id.* at 0015-16 - Carey dep. 11:17-12:16, 13:16-14:5.

37.     Chief Carey testified that the investigation into Individual Defendants' conduct by IA was objective and thorough. Chief Carey agreed with its conclusions that Individual Defendants acted appropriately, reasonably, and within CSPD policy. *Id.* at 0017-22 - Carey dep. 32:18-19, 66:13-14, 74:15-75:3, 94:18-97:19, 107:6-11.

38.     Chief Vasquez likewise testified that the use of force, including the Taser deployments, was reasonable and fully consistent with CSPD training. *Id.* at 0027-28 - Vasquez dep. 25:1-16, 49:9-16.

39.     The City's investigation into Individual Defendants' conduct exonerated both for their use of force and specifically their use of Tasers, meaning Defendant found that their conduct was pursuant to CSPD training. *Id.* at 0212 - IA Decision Letter.

40.     CSPD did not provide any additional or different training on Taser usage because of Melvin's death. *See, e.g.*, *id.* at 0041 - Evenson dep. 106:15-107:13.

41.     Likewise, after an external evaluation commissioned by CSPD—the "Transparency Matters" report— found that CSPD's use of force against Black people was disparate as compared to use of force against white people, no further training was provided. Indeed, CSPD gave officers the option whether to even review the report. *See, e.g.*, *id.* at 0042-43 - Evenson dep. 109:13-110:6, 114:4-23, 112:5-22, 117:2-4.

42.     The Transparency Matters report evaluated CSPD's uses of force from January 2017 through December 2020. *Id.* at 0223 - Transparency Matters Presentation 10. The report concluded that "Black arrestees [were] 1.3X more likely to have UOF [against them by CSPD] relative to White arrestees," showing that a disparity—"[a] difference in outcomes across groups…in policing"—existed. *Id.* at 0225, 237 - Transparency Matters Presentation 12, 24.

43.      The Transparency Matters report found that "Black individuals had force used against them at a ratio that was 4.75 times greater than White use of force compared to the White population ratio." *Id.* at 0280 - Pacey Report 6 (quoting Transparency Matters report).

44.     The Transparency Matters report also found that "[s]ome [of its] survey respondents' [CSPD Officers'] attitudes and perceptions about force [were] counter to the principles of de-escalation training"; "officers…raised concerns regarding their current use of force training"; and out of "[s]urvey respondents" "74% wanted more training related to use of force" and "80 -90% of officers perceived they should receive additional training on…[u]se of non-lethal weapons" and "de-escalation." *Id.* at 0267,

0269 - Transparency Matters Presentation 54, 56. The report's author's recommended that CSPD "[e]nhance agency culture that emphasizes, reinforces, and rewards the use of de-escalation," *id.* at 58, and "continue to work internally and externally to continually monitor and reduce racial/ethnic disparities in use of force." *Id.* at 0278-279 - Pacey Report 4-5 (quoting Transparency Matters report).

45.     Plaintiff's expert in statistics further broke down the data from the Transparency Matters report and concluded that "*all other factors being equal*, black arrestees were 34% to 35% more likely to have force used against them relative to white arrestees," a difference that was "statistically significant": "There [was] strong statistical evidence of disparate treatment of blacks with regard to CSPD's use of force," and "[t]he statistical results can be interpreted as there being less than 1 in 100,000 chance that the conclusion of disparate treatment is incorrect or occurred due to randomness." *Id.* at 0277-278, 0281 - Pacey Report 3-4, 7. Thus, "an individual being black was a statistically significant factor in the likelihood of being subject to 'use of force' during an encounter with a [CSPD] officer." *Id.* at 0275, 0279 - Pacey Report 1, 5.

46.     In sustaining Plaintiff's objection to the magistrate judge's report and recommendation on Defendant's motion to dismiss, this Court concluded Plaintiff had pled a plausible municipal liability claim. [Doc. 92] at 2. This Court determined that what was alleged in the complaint, if true, "would demonstrate that the City of Colorado Springs failed to adequately train its police officers": that "[Individual Defendants] exceeded constitutional limitations on the use of force by applying excessive force to an unarmed man who was not suspected of any crime…; that the use of force arose under a usual, recurring situation with which police officers must deal – namely, a routine

response to a domestic disturbance…; that the officers' conduct was linked to a lack of adequate training on the issue of racially biased policing…; and that inadequate training demonstrates deliberate indifference on the part of the City." *Id.* at 6. In so concluding, this Court emphasized:

> [A] showing of specific incidents which establish a pattern of constitutional violations is not necessary to put the City on notice that its training program is inadequate. Rather, evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, is sufficient to trigger municipal liability.

*Id.* at 6 (quoting *Allen v. Muskogee*, 119 F.3d 837, 842 (10th Cir. 1997)).

## IV. STANDARD OF REVIEW

Summary judgment is only warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Kennett v. Bayada Home Health Care, Inc.*, 135 F. Supp. 3d 1232, 1236 (D. Colo. 2015) (Arguello, J.) (quoting Fed. R. Civ. P. 56(a)). "A dispute is 'genuine' if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party." *Id.* (quoting *Allen*, 119 F.3d at 839). This Court must view all evidence in a light most favorable to plaintiff and draw all reasonable inferences in plaintiff's favor. *See Mares v. Conagra Poultry Co.*, 971 F.2d 492, 494 (10th Cir. 1992).

## V. ARGUMENT

### A. Defendant provided inadequate training on the use of a Taser and racially disparate policing.

Almost all of Defendant's asserted undisputed facts relate to showing that Defendant provided *some* training on use of force, use of a Taser, and racial bias. Plaintiff does not dispute that Defendant provided *some* training in these areas; rather,

the disputed issue of material fact is whether Defendant provided *adequate* training relative to the circumstances present in this case. Individual Defendants' conduct and the evidence in this case, including witness testimony, establishes that the City trained its officers to fixate primarily on neuromuscular incapacitation and to keep deploying their Tasers against the subject if NMI did not occur, regardless of the pain inflicted on the subject of the tasing, or the serious health risks of continued tasings. The evidence shows that Defendant recklessly trained its officers to repeatedly use their Taser against someone, even if that person was in pain and knowing that repeated Taser deployments were dangerous, until NMI was achieved. Further, the City trained its officers that the repeated tasings could be justified by essentially any reason they wanted, as shown by Patterson's testimony that he deployed his Taser after 5 deployments by Archer because Patterson was getting tired and Melvin was attempting to leave—and Defendant's later determination that a 6th, 7th, and 8th Taser deployment supported by this justification was consistent with its policy and training.

Defendant repeats the phrase "failure to train" and points to its written policy and training materials in support, but at the very least an issue of disputed fact is raised to the extent the evidence shows that CSPD officers' training on the ground was markedly different than what was provided in the written materials. The testimony and Individuals' conduct in this case shows how they were *really* trained, and such training was inadequate and dangerous regarding Taser usage, and failed to effectively combat racial bias in CSPD's officers' use of force. City employees' affidavits stating exactly what assertions about training Defendant believes it needs to defend itself from liability are "textbook example of conclusoriness. What is needed in an affidavit of this sort are

facts, reasons, observations, and explanations—in a word, evidence—not sweeping conclusions." *Reese v. Anderson*, 926 F.2d 494, 499 (5th Cir. 1991) "At the summary judgment stage, [courts] require evidence—not absolute proof, but not mere allegations either." *Id.* The City's affidavits amount to little more than mere allegations because they lack evidentiary support showing that such asserted training in fact was how CSPD officers were trained, and more specifically, how Archer and Patterson were trained.

Courts have held that a policy or custom may be inferred from the conduct of a municipality after an incident when no steps are taken to reprimand the officer involved or otherwise respond to plainly unconstitutional conduct. *See, e.g.*, *McRorie v. Shimoda*, 795 F.2d 780, 784 (9th Cir. 1986) ("Policy or custom may be inferred" if officials "took no steps to reprimand or discharge" wrongdoers, "or if they otherwise failed to admit [their] conduct was in error.").[4] Approval of an officer's unconstitutional conduct provides compelling evidence that the officer's conduct was indeed engaged in pursuant to official municipal policy and training. While a municipality could rebut the assumption that conduct conformed with municipality training by, for example, disciplining or terminating the officer for such conduct, when, instead, the municipality approves of and defends the officer's conduct, a powerful inference is raised that the conduct conformed

---

[4] *See also, e.g.*, *Cordova v. Aragon*, 569 F.3d 1183, 1194 (10th Cir. 2009); *accord Henry v. County of Shasta*, 137 F.3d 1372, 1372 (9th Cir. 1998) ("[P]ost-event evidence is not only admissible for purposes of proving the existence of a municipal defendant's policy or custom, but may be highly probative with respect to that inquiry."); *Foley v. City of Lowell*, 948 F.2d 10, 14 (1st Cir. 1991) ("[A]ctions taken subsequent to an event are admissible if…they provide reliable insight into the policy in force at the time of the incident."); *Bordanaro v. McLeod*, 871 F.2d 1151, 1166-67 (1st Cir. 1989) (holding that "[p]ost-event evidence can shed some light on what policies existed in the city on the date of an alleged deprivation of constitutional right"); *Grandstaff v. City of Borger*, 767 F.2d 161, 171 (5th Cir. 1985) ("Subsequent acceptance of dangerous recklessness by the policymaker tends to prove [its] preexisting…policy.").

with and was engaged in pursuant to municipal policy and training.

Thus, that Individual Officers' unconstitutional conduct was consistent with CSPD's training may be inferred from the fact that the City "took no steps to reprimand or discharge" Individual Defendants, and instead found their conduct was indeed pursuant to policy and training. *Id.* The City exonerated Individual Defendants of any wrongdoing related to their use of force. Had Individual Defendants acted outside of policy or training, they would have been disciplined. This approval of Individual Officers' conduct, and testimony that their conduct was pursuant to training, is sufficient to maintain the City as a defendant. *See City of Canton v. Harris*, 489 U.S. 378, 389-91 (1989); *Moore v. Miller*, 2014 U.S. Dist. LEXIS 72452, at *27 (D. Colo. May 28, 2014)(Kane, J.)("[I]f Defendant Police Officers testify that they acted in accordance with their training and it is found that they committed constitutional violations, the reasonable inference is that, had the City implemented a different training policy on the use of force, [plaintiff] would not have been subjected to the…force used."); *Ortega v. City & Cty. of Denver,* 944 F. Supp. 2d 1033, 1039 (D. Colo. Feb. 6, 2013)(Martinez, J.) (same). Generally, "the existence or nonexistence of…a policy, practice, or custom is a question of fact for the jury." *Ward v. City of Hobbs*, 398 F. Supp. 3d 991, 1039 (D.N.M. 2019).

## B. Defendant's inadequate training caused, and constituted deliberate indifference to, Melvin's constitutional injury.

Deliberate indifference and causation are shown "when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998); *see also Cacioppo v. Town of Vail*, 528 F. App'x 929, 931 (10th Cir. 2013) (explaining that state

of mind and causation are shown if the constitutional violation was the inevitable consequence of the municipal defendant's policy or training). Deliberately indifferent training occurs "if a violation of federal rights is a 'highly predictable' or 'plainly obvious' consequence" of a municipality's inadequate training *Id*. Individual Defendants' wildly unreasonable force against Melvin, without probable cause or even reasonable suspicion that he had committed a crime, posed a danger to anyone, or was armed, shows woefully inadequate and dangerous training that was virtually certain to result in constitutional violations. Based on the City's training, its policymakers knew "to a moral certainty" that CSPD would use their Tasers, repeatedly, on one individual because the only understandable benchmark provided officers on when to stop tasing was when NMI was achieved. Defendant's own training materials, plus the testimony of its current and former Chief of Police, establishes that Defendant's knew this type of repeated Taser deployment was dangerous. Thus, the need to train officers differently in Taser usage was "'so obvious' that failure to do so could properly be characterized as 'deliberate indifference'" *City of Canton*, 489 U.S. at 390 n.10. Given the predictability officers in Individual Defendants' position would repeatedly deploy their Tasers against an individual like Melvin in violation of the Constitution, the City's "decision not to train the officers about constitutional limits on the use of [Tasers]…reflect[s] the city's deliberate indifference to the 'highly predictable consequence,' namely, violations of constitutional rights." *Connick v. Thompson*, 563 U.S. 51, 63-64 (2011) (citation omitted).

Likewise, Colorado Springs is liable because of its training regarding racially biased policing. *See Brown v. Gray*, 227 F.3d 1278, 1286 (10th Cir. 2000); *Moore v. Miller*, 2014 U.S. Dist. LEXIS 72452, *17-18 (D. Colo. May 28, 2014). As shown by the

Transparency Matters report, Defendant had actual or constructive knowledge of the risk that CSPD officers would disparately use force against a Black person and that its training was not working to prevent such. The pattern shown by these statistics, which started from over a year before Melvin's death, meant that the City had notice that different training was necessary, and its "continued adherence to an approach that [it] [knew] or should [have] know[n] ha[d] failed to prevent" or ha[d] caused "tortious conduct… establish[es] the conscious disregard for the consequences of [its] action…necessary to trigger municipal liability." *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397 404, 407 (1997). Defendant's "'policy of inaction' in light of notice that its [training] will cause constitutional violations" establishes liability. *Connick*, 131 S. Ct. at 1360.

Other courts have held very similar statistics show municipal liability for racially disparate use of force. *See Dunham v. Oliver*, 2019 U.S. Dist. LEXIS 186396 (S.D.N.Y. Oct. 28, 2019). *Dunham* addressed statistics that for a period of 5 years, African Americans stopped by the NYPD "were about 14% more likely…than whites to be subjected to the use of force." *Id.* at *24 (citation omitted). The court held this and other data and statistics sufficiently alleged municipal liability for excessive force and Equal Protection violations, showing New York permitted and tolerated the NYPD's use of disproportionate force against Black people. *Id.* at *23-25; *see also Burke v. City of Santa Monica*, 2011 U.S. Dist. LEXIS 165475, at *48-51 (C.D. Cal. Jan. 10, 2011) (holding that statistics may show disproportionate use force against people of color); *Giron v. City of Alexander*, 693 F.Supp.2d 904, 938-39 (E.D. Ark. 2010) (same).

## VI. CONCLUSION

Accordingly, Defendant's Motion for Summary Judgment must be denied.

Dated this 17th day of January 2023.

*s/ Darold W. Killmer*
Darold W. Killmer
Liana Orshan
Reid R. Allison
KILLMER, LANE & NEWMAN, LLP
1543 Champa Street, Suite 400
Denver, Colorado 80202
303-571-1000
303-571-1001 – facsimile
dkillmer@kln-law.com
lorshan@kln-law.com
rallison@kln-law.com
*Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 17th day of January 2023, I filed this **RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** via CM/ECF, which will generate a Notice of Electronic Filing to the following:

Anne Turner
Martha McKinney
City Attorney's Office
City of Colorado Springs
30 S. Nevada Ave., Suite 501
Colorado Springs CO 80903
Anne.Turner@coloradosprings.gov
Martha.mckinney@coloradosprings.gov

*s/ Charlotte Bocquin Scull*
Paralegal