**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Christine M. Arguello**

Civil Action No. 20-cv-00991-CMA-STV

ESTATE OF JEFFREY MELVIN, by and through its personal representative Jeffrey
Melvin Sr.,

      Plaintiff,

v.

CITY OF COLORADO SPRINGS, COLORADO,
DANIEL PATTERSON, in his individual capacity, and
JOSHUA ARCHER, in his individual capacity,

      Defendants.

---

**ORDER DENYING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

---

This matter is before the Court on (1) individual Defendants Daniel Patterson and

Joshua Archer's Motion for Summary Judgment (Doc. # 123); and (2) Defendant City of

Colorado Springs's Motion for Summary Judgment (Doc. # 150). For the following

reasons, the Court denies the Motions.

**I.      BACKGROUND**

This is a 42 U.S.C. § 1983 case arising from the death of Jeffrey Melvin and

brought by his estate ("Plaintiff"). (Doc. # 1.) Unless otherwise indicated, the following

material facts are undisputed.

A.    **EVENTS OF APRIL 26, 2018**

On April 26, 2018, at approximately 12:31 a.m., Colorado Springs Police Officers Archer and Patterson ("Individual Defendants" or the "Officers") responded to a report of a disturbance in an apartment building. (Doc. # 144-1 at 10.)[1] The alleged disturbance was a "cold" disturbance, meaning that it had already occurred and was not ongoing. (*Id.* at 38–39.) Dispatch informed the Officers that people were fighting in an apartment below the reporting party, no known weapons were involved, and the description of the suspect was unknown. (*Id.* at 69.)

When the Officers arrived at the building, Mr. Melvin was walking out and let the Officers into the apartment complex. (Doc. # 123-6 at 5.) The Officers did not know who Mr. Melvin was at the time. (*Id.*) The Officers knocked on the door of apartment 211 and spoke with its occupant, Jordan Bruno. (Doc. # 123-1, Archer BWC at 00:00–01:31.) When Mr. Bruno opened the door, he was holding a liquor bottle and stated that he had been drinking. (*Id.* at 00:06–00:20.) Mr. Bruno told the Officers that he had a "physical fight" with his "homeboys," but he "kicked them both out" and they left. (*Id.* at 00:30– 00:43; 01:10–01:32.) The Officers asked if anyone was injured, and Mr. Bruno responded no and said that he was just with his "two homegirls" in the apartment. (*Id.* at 01:06–1:32.)

---

[1] When citing to the appendices provided by the parties in support of their summary judgment motions, the Court cites to the docket number (*e.g.*, Doc. # 144-1) and the page number of the appendix, using the numbering system applied by the party (*e.g.*, Doc. # 144-1 at 10, using Resp't's App.0010 as the applicable page number).

Mr. Bruno was cooperative and allowed the Officers to come into his apartment. (*Id.* at 01:26–01:58; Doc. # 144-1 at 6, 42.) He provided the Officers with his ID. (Doc. # 123-2, Patterson BWC 1 at 01:35–01:46.) In the living room of the apartment, a female juvenile ("A.S.") was sitting on the floor and an adult female, Nancy Dorado, was sitting on the sofa with the TV on. (*Id.* at 01:48–02:06.) Officer Patterson asked if anyone was hurt and if the two females were okay, and both of them responded that they were fine. (*Id.* at 02:09–02:20; 02:40–02:46.) Neither A.S. nor Dorado displayed signs of distress. (*Id.* at 02:20–02:45.) A.S. told the Officers that she was 16 years old, that her legal guardian, who was her grandmother, resided in Texas, and that her father and uncle lived in Colorado Springs. (*Id.* at 03:23–03:27; Doc. # 123-1, Archer BWC at 03:28–03:50.)

Defendants assert that the Officers perceived the apartment to be "sparsely furnished" as if it was not being lived in. (Doc. # 123 at 8.) However, Plaintiff disputes this assertion and notes that the apartment contained, among other things, a couch, a lamp, a TV, a bicycle, a bed, a dresser, a night table, a closet full of clothes, shelves that contained toiletries and towels in a hallway, and a shower curtain and shower products in the bathroom. (Doc. # 144 at 3.) Further, when the Officers asked Mr. Bruno how long he had lived in the apartment, Mr. Bruno said he had lived there about three or four weeks. (Doc. # 123-2, Patterson BWC 1 at 06:02–06:12.) Defendants also assert that A.S. was wearing "a tight-fitting, lacy, low cut tank top" and was "provocatively dressed." (Doc. # 123 at 1, 8.) Plaintiff disputes "Defendants' attempt to sexualize A.S. by labeling her as 'provocatively dressed'" and notes that A.S. was also wearing

sweatpants. (Doc. # 144 at 4.) The body worn camera shows A.S. wearing sweatpants, a tank top, and a blanket wrapped around her shoulders. *See, e.g.*, (Doc. # 123-2, Patterson BWC 1 at 11:30–13:20.)

The Officers spent approximately the next 16 minutes speaking with Mr. Bruno, A.S., and Ms. Dorado. Officer Archer testified in his deposition that during this time, "everyone had been pretty cooperative and things were pretty calm." (Doc. # 144-1 at 42.) Officer Patterson explained to the three occupants of the apartment that he was asking questions and needed to get in contact with A.S.'s parents because it was about 1:00 a.m. and she was 16 years old in an apartment with two adults. (Doc. # 123-2, Patterson BWC 1 at 07:55–08:20.) Mr. Bruno explained that he knew A.S. through a friend from high school. (*Id.* at 08:05–08:15.) A.S. provided a phone number for her father, but no one answered when Officer Patterson called the number. (*Id.* at 08:20–09:16; 10:40–11:08.)

Officer Patterson then asked A.S. to come talk with him in the hallway. (*Id.* at 11:15–11:25.) A.S. stated that she was living with Ms. Dorado at the time, denied being a runaway, and said she would call her uncle who also lives in Colorado Springs. (*Id.* at 11:30–13:20.) A.S. then returned inside the apartment and told Officer Archer that she got in touch with her uncle, who said that he would come pick her up but it would take about 15 minutes. (Doc. # 123-1, Archer BWC at 16:00–16:24.) A.S. also asked Officer Archer if she could "smoke a bowl" of marijuana. (*Id.* at 17:04–17:12.)

While Officer Patterson was out in the hallway on a phone call, he saw Mr. Melvin at the exterior door of the apartment building. (Doc. # 123-6 at 37–38.) Officer

Patterson opened the door for him and asked Mr. Melvin if he was going to apartment 211. Individual Defendants assert, and Plaintiff disputes, that Mr. Melvin said no, then "immediately ran" to apartment 211, opened the door, entered the apartment, "slammed the door shut," and locked it.[2] (*Id.* at 74; *see also id.* at 37–41.) Officer Patterson, from the hallway, screamed "Josh" to alert Officer Archer, who was still inside the apartment. (*Id.* at 74.)

Officer Archer's body worn camera footage captured when Mr. Melvin arrived in the apartment. (Doc. # 123-1, Archer BWC at 17:57–18:15.) Officer Archer immediately ordered Mr. Melvin away from the door, and Mr. Melvin complied, expressing surprise and asking, "Who's Josh?" (*Id.*) Mr. Melvin moved away, and Mr. Bruno assisted in unlocking the door. (*Id.* at 18:10–18:17.) At most, approximately 5-10 seconds passed before Mr. Melvin moved away from the door, and less than 20 seconds passed before the door was unlocked and Officer Patterson was able to re-enter the apartment. *See* (*Id.* at 17:58–18:17.)

Officer Patterson re-entered the apartment and immediately ordered Mr. Melvin to turn around and put his hands behind his back. (*Id.* at 18:17–18:25.) The Officers began yelling and grabbing for Mr. Melvin in the entryway. (*Id.* at 18:25–18:34.) The scene quickly became chaotic. When Mr. Melvin did not turn around and put his hands behind his back, the Officers grabbed his arms and struggled with him further into the

---

[2] Although almost all of above the described events are captured by the Officers' body worn camera footage, there does not appear to be any video of Officer Patterson letting Mr. Melvin into the building, their communication, or Mr. Melvin "running" to the apartment and "slamming" the door closed. Plaintiff disputes Officer Patterson's characterization of these events on the basis that there is no video showing the events. (Doc. # 144 at 5.)

apartment. (*Id.* at 18:30–18:52.) Officer Patterson grabbed Mr. Melvin's arm and chest and pointed his OC canister (pepper spray) at Mr. Melvin. (*Id.* at 18:44–18:59.) The Officers struggled with Mr. Melvin for a little over a minute, during which time at least one Officer and at times both of them had hands on Mr. Melvin. (*Id.* at 18:30–19:49.) Individual Defendants concede that Mr. Melvin did not initiate any physical contact; he never attempted to hit, kick, bite, or spit at the Officers; and he never threatened anyone. (Doc. # 144 at 11; Doc. # 153 at 2.) The parties dispute whether Mr. Melvin "twice tried to jump head first out of the second story window of the apartment" during the struggle. *Compare* (Doc. # 123 at 15) *with* (Doc. # 144 at 6). Body worn camera footage shows that Mr. Melvin held on to the windowsill while resisting and attempted to put his foot up near the windowsill. (Doc. # 123-1, Archer BWC at 18:56–19:21.) Mr. Melvin also repeatedly yelled for Mr. Bruno to "help" him. (*Id.* at 19:21, 19:26, 19:41, 19:57, 20:06, 20:50.) Officer Patterson used his OC spray on Mr. Bruno after Mr. Bruno reportedly jogged in place and balled his fists, which Officer Patterson "interpreted as pre-attack indicators."[3] (Doc. # 123-6 at 75, 100–03.)

After struggling with Mr. Melvin for a little over one minute, Officer Patterson ordered Officer Archer to tase Mr. Melvin. (Doc. # 123-1, Archer BWC at 19:48–53.) Officer Archer deployed a Taser cartridge at Mr. Melvin for a 5-second Taser cycle while Officer Patterson was holding him, and Mr. Melvin made a sound of pain. (*Id.* at 19:52–19:57.) Less than 5 seconds later, Officer Archer deployed a second Taser cartridge at

---

[3] The body worn camera footage does not show Mr. Bruno's actions immediately before he is sprayed.

Mr. Melvin for another 5 seconds. (*Id.* at 20:02–20:07.) Mr. Melvin cried out in pain and said he had asthma. (*Id.*) 20 seconds later, while Officer Patterson was holding Mr. Melvin's arms behind his back, Officer Archer tased him a third time by sending 5 seconds of charge through the already connected probes. (*Id.* at 20:27–20:32.) Mr. Melvin again reacted in pain. (*Id.*) 12 seconds later, while Officer Patterson was holding Mr. Melvin's hands behind his back with one arm and had his second arm around the front of Mr. Melvin's neck, Officer Archer deployed his Taser for a fourth 5-second cycle. (*Id.* at 20:44–20:49.) 11 seconds later, Officer Archer tased Mr. Melvin a fifth time while Officer Patterson continued to hold him and struggle with him on the ground. (*Id.* at 21:00–21:05.)

Less than 15 seconds later, Officer Patterson pushed Mr. Melvin away from him and deployed OC spray into Mr. Melvin's face. (*Id.* at 21:15.) Mr. Melvin attempted to flee and ran towards the entryway of the apartment. (*Id.* at 21:17–21:25.) Officer Patterson deployed his first Taser cartridge at Mr. Melvin and then immediately deployed his second Taser cartridge one second later. (*Id.* at 21:19–21:28.) The effect of the Taser forced Mr. Melvin to the ground and incapacitated him for 5 seconds. (*Id.*)

Mr. Melvin then stood up, batted the Taser wires away from him, and ran from the apartment. (*Id.* at 21:28–21:37.) The Officers chased Mr. Melvin outside and down the street, where he collapsed about 35 seconds later. (*Id.* at 21:35–22:09.) During the time that he was being held down by the Officers, Mr. Melvin said things like, "You're killing me. You're honestly killing me"; "I can't breathe"; You've gotta get off. You've gotta get off"; and "I've honestly got asthma." (*Id.* at 22:07–23:20.) While Mr. Melvin lay

with an arm underneath his body, Officer Patterson struck Mr. Melvin in the abdomen area twice with his elbow to force him to put his hands behind his back. (Doc. # 123-6 at 29–31.) Mr. Melvin was then handcuffed.

Throughout the encounter with Mr. Melvin in the apartment and on the street, the Officers issued dozens of commands to Mr. Melvin: to stop resisting, to lay down on the ground, to give up his hands, etc. (Doc. # 123 at 16.) Plaintiff admits that during certain parts of the encounter, Mr. Melvin had time to follow certain commands. (Doc. # 144 at 6.) However, Plaintiff disputes that Mr. Melvin had time or ability to comply with commands before every separate Taser deployment or use of force, particularly given the rapid sequence of the deployments and that, at times, the Officers were holding him so tightly that it was impossible for him to move to comply. (Doc. # 144 at 6–7.) The parties also dispute whether Mr. Melvin was "erratic and irrational and possessed super-human strength and stamina." *Compare* (Doc. # 123 at 16), *with* (Doc. # 144 at 7). Plaintiff contends that other than attempting to leave the apartment, Mr. Melvin did not behave erratically or irrationally. (Doc. # 144 at 7.)

After being handcuffed, Mr. Melvin was transported to the hospital. He was pronounced dead on May 2, 2018, at age 27. (Doc. # 144-1 at 105.) The coroner determined that the manner of Mr. Melvin's death was homicide and that Mr. Melvin "died as a result of complications of sickle cell trait and extreme exertion during confrontation with police and associated *Taser* deployment." (*Id.*) A blood test from the morning Mr. Melvin arrived at the hospital indicated that he was negative for all illicit substances. (*Id.* at 111.)

B.      **TASER CONNECTIONS**

It is undisputed that in the time period of less than two minutes described above, Officer Archer deployed his Taser 5 times, Officer Patterson deployed his Taser 3 times, and Officer Patterson sprayed Mr. Melvin with OC spray. (Doc. # 123 at 12.) However, the parties dispute (1) how many of these Taser deployments had a "good connection" or were "effective" and (2) whether the Officers reasonably believed that only one Taser deployment was effective. *Compare, e.g.*, (Doc. # 123 at 12–13), *with* (Doc. # 144 at 5–6), *and* (Doc. # 174 at 4.) Defendants contend that Taser downloads analyzed after the incident in an internal memorandum ("IA Memo") showed a total of 8 Taser deployments, with only 4 having "good connections." (Doc. # 153 at 3) (citing Doc. # 146-1 at 2, 8–19). Plaintiff, however, argues that the same IA Memo indicates that "there were a total of four [Taser] cartridges and eight prongs that made connection and five deployments with good connections." (Doc. # 144 at 13) (citing Doc. # 144-1 at 97). In addition, Defendants define an "effective Taser deployment" as "one which causes neuromuscular incapacitation ("NMI") or otherwise enables officers to handcuff the individual." (Doc. # 123 at 13.) Accordingly, Defendants contend that the Officers reasonably believed that only one of their Taser deployments was "effective" (the second Taser deployment by Officer Patterson and seventh overall) because Mr. Melvin "actively resisted during all other Taser deployments." (*Id.*) Plaintiff disputes that a Taser deployment under this definition is "ineffective" because "it still can inflict excruciating pain." (Doc. # 144 at 5–6). Plaintiff also disputes that any reasonable officer would have

believed that only one deployment had a "good connection" or "produced any effect" because Mr. Melvin was clearly in pain due to several of the deployments. (*Id.* at 6.)

## C.    TRAINING[4]

Individual Defendants Patterson and Archer were Colorado Springs Police Department ("CSPD") police recruits in the CSPD Training Academy class that ran from October 2016 through April 2017. (Doc. # 150 at 2–3.) In conducting training of recruits, Defendant City of Colorado Springs ("the City") follows the standards established by Peace Officer Standards and Training ("POST"), a unit of the Colorado Attorney General's Office. (Doc. # 150-1 at 7.) In 2016, CSPD devoted 100 hours to Arrest Control training, over the 64 hours required by POST. (*Id.*) Both Officers Patterson and Archer passed the CSPD Academy's Arrest Control Program. (*Id.* at 8.)

The City trained and certified recruits on the use of a Taser according to materials created by TASER International, Inc./AXON Enterprise, Inc. (Doc. # 150 at 9.) The training included use of the 220-page TASER PowerPoint, voluntary Taser exposures, and Taser manipulations, draws, and scenarios. (*Id.* at 10.) The City asserts that it also trained its sworn officers on Taser use annually, which included instruction, the TASER/AXON annual update PowerPoint, and live Taser cartridge deployment under practical scenarios. (*Id.*) Plaintiff disputes that the City adequately trained its officers on Tasers annually and notes that Defendant Archer testified that he did not

---

[4] The Court has fully considered all of the facts asserted in the parties' respective briefing. (Docs. # 150, 165.) In the interest of brevity, the Court confines its recitation herein to the material facts relevant to its analysis of Plaintiff's inadequate training municipal liability claim.

recall having training specifically related to Taser use after the academy. (Doc. # 165 at 3; Doc. # 165-1 at 6.)

The parties appear to dispute certain national standards regarding Taser application. However, both parties cite guidelines established by the Police Executive Research Forum ("PERF") as "nationally accepted standards" for policing. The 2011 Electronic Control Weapon Guidelines, set forth by PERF and The Office of Community Oriented Policing Services ("COPS") within the Department of Justice, advise that repeated or multiple Taser applications may increase risk of death. (Doc. # 174-1 at 104.) The guidelines state:

> Personnel should be trained to use [a Taser] for one standard cycle (five seconds) and then evaluate the situation to determine if subsequent cycles are necessary. Training protocols should emphasize that multiple applications or continuous cycling of [a Taser] resulting in an exposure longer than 15 seconds (whether continuous or cumulative) may increase the risk of serious injury or death and should be avoided.

(Doc. # 174-1 at 109.) The Guidelines further provide that "[a]ny subsequent applications should be independently justifiable, and the risks should be weighed against other force options." (*Id.* at 111.)

The City trained its officers that when using a Taser on a person, "the officer should deploy the TASER and then observe the person's reaction to determine whether the deployment was effective in causing neuromuscular incapacitation ("NMI") or otherwise enabling an officer to handcuff the person." (*Id.* at 11.) Further, the City trained its officers that "where an officer deploys the TASER at a person and the person continues to actively resist, does not exhibit the effects of NMI, and continues to talk during the 5-second deployment, then the officer should conclude that the TASER

11

deployment was ineffective, and that the TASER may not have a good connection with the person." (*Id.*) The City trained its officers that Taser deployment was justified when a subject displayed "active resistance," and its policy defines active resistance as:

> Physically evasive movements to defeat an officer or marshal's attempt to control, including, but not limited to, bracing, tensing, pushing, flailing arms, running away, or verbally signaling an intention to avoid or prevent being taken into or retained into custody. Active Resistance also includes attempting to avoid apprehension and failing to comply with an officer or marshal's order to reveal themselves from concealment or surrender. Walking away may be considered active resistance if the person continues to walk away from an officer or marshal after having been given a lawful order or having been told the person is under arrest.

(Doc. # 165 at 10; Doc. # 167-3 at 173.) Plaintiff contends that this definition is so broad that "almost any action or statement could qualify" as active resistance and that the City training therefore authorizes the use of excessive force by Taser when such use is constitutionally prohibited. (Doc. # 165 at 10.)

The City asserts that it trained its police officer and recruits that they should try to limit a person's time under the power of a Taser to a total of 15 seconds or three cycles, but 15 seconds "is not a hard limit" and "[t]he circumstances can provide the added justification to deploy a TASER on a person more than three times." (Doc. # 174 at 5; Doc. # 150-1 at 21.) "Additional justification" is not defined in CSPD policy. (Doc. # 174 at 5.) Plaintiff disputes that CSPD officers were trained to seriously consider three Taser deployments or 15 seconds of tasing as a real limit. (Doc. # 165 at 5.) Defendant Archer testified in his deposition that "there wasn't like any specific number saying that this is the exact amount of times you can tase someone." (Doc. # 165-1 at 10.) He further testified, "I don't recall anything stating that it was unsafe to tase someone past three

times. The only thing I recall from that policy was the number three was in there, and then there were exceptions to going past that number, but there was no set limit on the amount of times you can tase someone." (*Id.*) Current CSPD Chief Adrian Vasquez, who at the time was Deputy Chief and oversaw the internal affairs investigation into the Officers' conduct, testified that it is reasonable for officers to deploy a Taser "multiple times" depending on the officer's assessment of the situation. (*Id.* at 27, 30.)

With respect to the encounter in this case, an internal investigation stated that Officer Archer "was unable to clearly articulate his reasons for deploying his taser other than Officer Patterson had told him to." (Doc. # 167-4 at 2.) Both Officers also testified that they thought the number of Taser deployments was significantly less than 8: Officer Archer testified at his deposition that he thought he deployed his own Taser three times and Officer Patterson deployed his Taser once. (Doc. # 165-1 at 4–5.) Officer Patterson testified that he was not specifically aware of how many times Officer Archer deployed his taser, and he stated in a Use of Force Report filed on the day of the encounter that he "tazed [Mr. Melvin] once" and "[a]nother officer attempted to taze him twice but was unsuccessful." (*Id.* at 122–23; Doc. # 167 at 202.) CSPD Chief Peter Carey testified that with respect to the encounter in this case, the Officers needed to evaluate each deployment regarding whether it was effective, meaning whether it achieved NMI, but he did not believe that the 8 Taser deployments used in this case was unreasonable or outside of the policy. (Doc. # 165-1 at 20–21.)

The Officers testified that that they used their Tasers on Mr. Melvin in accordance with the training that CSPD provided. (Doc. # 165-1 at 9, 90–91, 152.) The

Officers' supervisors, current Chief Vasquez and former Chief Carey, also testified that the Officers acted according to CSPD training. (*Id.* at 17–22; 27–28.) Further, the City's investigation into the Officers' conduct exonerated both their use of force and specifically their use of Tasers. (Doc. # 167-6 at 212.)

## D.   PROCEDURAL HISTORY

Plaintiff initiated this lawsuit on April 8, 2020. (Doc. # 1.) In the Amended Complaint, Plaintiff asserts one claim of excessive force in violation of the Fourth Amendment against Officers Patterson and Archer in their individual capacities and against the City of Colorado Springs. (Doc. # 30 at 15.) Individual Defendants Patterson and Archer filed their Motion for Summary Judgment on August 11, 2022 (Doc. # 123), and Defendant City of Colorado Springs filed its Motion for Summary Judgment on November 21, 2022 (Doc. # 150). Both motions are fully briefed and ripe for review. (Docs. ## 144, 146, 153, 165, 167, 174.)

## II.   <u>LEGAL STANDARD</u>

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it is essential to the proper disposition of the claim under the relevant substantive law. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). A dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee, Okla.*, 119 F.3d 837, 839 (10th Cir. 1997). When reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the

non-moving party. *See id.* However, conclusory statements based merely on conjecture, speculation, or subjective belief do not constitute summary judgment evidence. *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact and entitlement to judgment as a matter of law. *Id.* In attempting to meet this standard, a movant who does not bear the ultimate burden of persuasion at trial does not need to disprove the other party's claim; rather, the movant need simply point out to the Court a lack of evidence for the other party on an essential element of that party's claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Once the movant has met its initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Id.* Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler*, 144 F.3d at 671. Stated differently, the party must provide "significantly probative evidence" that would support a verdict in his favor. *Jaramillo v. Adams Cnty. Sch. Dist. 14*, 680 F.3d 1267, 1269 (10th Cir. 2012). "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671.

## III.   DISCUSSION

### A.   INDIVIDUAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

First, the Court will address Individual Defendants Patterson and Archer's argument that they are entitled to qualified immunity and summary judgment on Plaintiff's excessive force claim. (Doc. # 123 at 4.)

1.   Applicable Law

"Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). When a section 1983 defendant raises a qualified immunity defense, the plaintiff bears the burden of overcoming it. *Simpson v. Little*, 16 F.4th 1353, 1359 (10th Cir. 2021). "At summary judgment, the plaintiff must (1) raise a genuine issue of material fact that the defendant violated a federal constitutional or statutory right, and (2) show the right was clearly established at the time of the defendant's violative conduct." *Id.*

Claims that police used excessive force during a seizure are analyzed under the Fourth Amendment's reasonableness standard. *See Huff v. Reeves*, 996 F.3d 1082, 1089 (10th Cir. 2021). Whether force was objectively reasonable turns on (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight. *Graham v. Connor*, 490 U.S. 386, 396 (1989). The Court must consider the totality of the circumstances and apply the factors "from the perspective of

a reasonable officer on the scene, rather than with the 20/20 vision of hindsight,"

keeping in mind "that police officers are often forced to make split-second judgments—

in circumstances that are tense, uncertain, and rapidly evolving—about the amount of

force that is necessary in a particular situation." The totality of the circumstances

analysis also includes assessing whether an officer unnecessarily created the use of

force. *Jiron v. City of Lakewood*, 392 F.3d 410, 415 (10th Cir. 2004) ("The

reasonableness of the use of force depends not only on whether the officers were in

danger at the precise moment that they used force, but also on whether the officers'

own 'reckless or deliberate conduct during the seizure unreasonably created the need

to use such force.'" (quoting *Sevier v. City of Lawrence, Kan.*, 60 F.3d 695, 699 (10th

Cir. 1995))).

> 2.   <u>Violation of a Constitutional Right</u>

Applying the *Graham* factors to the circumstances of this case, the Court finds

that Plaintiff has presented a triable issue as to whether the Officers unreasonably used

excessive force in violation of Mr. Melvin's rights under the Fourth Amendment.

> a.   *Severity of the Crime*

With respect to the first *Graham* factor, the severity of the crime, Individual

Defendants argue that they reasonably suspected Mr. Melvin of a multitude of felonies

and other crimes, including "burglary, trespass, human trafficking of a minor for sexual

servitude, procurement of a child for sexual exploitation, and contributing to the

delinquency of a minor." (Doc. # 123 at 15.) "Reasonable suspicion accrues when an

officer possesses a 'particularized and objective basis for suspecting criminal conduct

under the totality of the circumstances.'" *United States v. Cortez*, 965 F.3d 827, 834 (10th Cir. 2020) (quoting *United States v. Pettit*, 785 F.3d 1374, 1379 (10th Cir. 2015)). Upon carefully reviewing the undisputed facts in this case, the Court agrees with Plaintiff that the suspicions asserted by Individual Defendants are speculative at best and fall well short of objective reasonableness.

First, the Court finds it implausible that the Officers had reasonable suspicion to believe that Mr. Melvin was involved in illegal conduct concerning A.S. The Court is skeptical that the Officers had reasonable suspicion of any illegal conduct involving A.S., particularly given that she provided a reasonable explanation for her presence, she was not in distress and said she was okay, and she told the Officers that she would call her uncle to come pick her up. Even if the Court were to accept Individual Defendants' disputed assertions that A.S. was "provocatively dressed" and that the apartment was "sparsely furnished" so as to suggest it was a brothel used for sex trafficking, (Doc. # 123 at 1, 8), there is no evidence that *Mr. Melvin* had any association with A.S. *See United States v. Cortez*, 449 U.S. 411, 417–18 (1981) ("[D]etaining officers must have a particularized and objective basis for suspecting the **particular person** stopped of criminal activity." (emphasis added)). Because there is no evidence connecting Mr. Melvin and A.S., the Court finds that the Officers lacked any basis to suspect Mr. Melvin of any crimes, let alone significant felonies, involving A.S.

The Court also finds that there is insufficient evidence to support Individual Defendants' asserted suspicions of felony burglary, felony trespass, assault, and harassment. (Doc. # 123 at 6–7.) Aside from the Officers observing Mr. Melvin exit the

building earlier when he opened the door to allow them in, there is no evidence linking Mr. Melvin to the fight that had occurred in apartment 211. The officers had no description of the individuals that Mr. Bruno had "kicked out," either from Mr. Bruno or dispatch. Moreover, when Mr. Melvin entered the apartment, none of the three individuals in apartment 211 made any statements identifying Mr. Melvin as a person who had been in a fight or kicked out earlier. To the contrary, the body worn camera shows that Mr. Bruno reacted calmly to Mr. Melvin's arrival, with no signs of surprise or distress at his entrance.

For similar reasons, the Court finds that it was not reasonable to suspect Mr. Melvin of felony trespass and felony burglary for entering apartment 211 without Mr. Bruno's permission. Even accepting as true Individual Defendants' disputed assertion that Mr. Melvin "lied" to Officer Patterson that he was going to apartment 211 and "then immediately ran to apartment number 211, opened its door, entered the apartment, and slammed the door shut," (Doc. # 123-6 at 74), the Court finds that such conduct alone does not support reasonable suspicion for felony burglary and felony trespass. A person commits felony burglary when he "knowingly unlawfully enters" a dwelling "with intent to commit therein a crime" or "assaults or menaces any person."[5] Colo. Rev. Stat. § 18-4-202. Mr. Bruno's apparent acceptance of Mr. Melvin's arrival, without any reaction of alarm or surprise, undercuts any "suspicion" that Mr. Melvin entered apartment 211 unlawfully or without permission. Moreover, the evidence does not support reasonable

---

[5] Felony trespass also requires a person to knowingly and unlawfully enter or remain in a dwelling of another. Colo. Rev. Stat. § 18-4-502(1)(a).

suspicion that Mr. Melvin entered with intent to commit a crime or assault or menace any person.

At most, even viewing the facts in the light most favorable to the Officers, Mr. Melvin's conduct merely demonstrated his intent to avoid Officer Patterson and enter apartment 211. *See Cortez*, 965 F.3d at 835 (observing that courts "routinely discount individuals' reactions to encountering law enforcement when they can be easily explained as the type of common response triggered by a police interaction"). Individual Defendants argue that this conduct, at minimum, created reasonable suspicion that Mr. Melvin was obstructing a peace officer or interfering with their active investigation. Colorado law provides that a "person commits obstructing a peace officer . . . when, by using or threatening to use . . . an obstacle, such person **knowingly** obstructs, impairs, or hinders the enforcement of the penal law or the preservation of the peace by a peace officer." Colo Rev. Stat. § 18-8-104(1)(a) (emphasis added). The Court is skeptical that it was reasonable to suspect Mr. Melvin of obstruction or interference when he "ran" from Officer Patterson and locked the door to apartment 211, particularly because (1) there is no evidence that Mr. Melvin was aware that Officer Archer was inside the apartment at the time, and (2) the evidence is disputed whether Mr. Melvin had any reason to believe that apartment 211 was involved in an investigation such that "locking" Officer Patterson out would obstruct or interfere with Officer Patterson's work as a peace officer. Further, any suspicion of "obstruction" is belied by the fact that Mr. Melvin quickly complied with Officer Archer's order and moved away from the door, allowing

Officer Patterson to re-enter. Any "obstruction" was therefore temporary and quickly remedied.

The Court is doubtful that the Officers had a particularized and objective basis for suspecting Mr. Melvin of any criminal activity when Officer Patterson re-entered the apartment and immediately attempted to detain him. However, even if the Court were to find that the Officers has reasonable suspicion of "obstruction," obstructing a peace officer is only a class 2 misdemeanor. Colo. Rev. Stat. § 18-8-104(4). The Tenth Circuit has made clear that a "minor offense—at most—support[s] the use of minimal force." *Perea v. Baca*, 817 F.3d 1198, 1203 (10th Cir. 2016). The first *Graham* factor therefore weighs in Plaintiff's favor.

> b.    *Immediate Threat*

The Court finds that the second *Graham* factor, whether Mr. Melvin posed an immediate threat to the safety of the officers or others, also weighs in Plaintiff's favor. There is no evidence showing that Mr. Melvin posed an immediate threat to the safety of himself or others before the Officers attempted to detain him. *See* (Doc. # 123 at 15–16.) He did not issue any verbal or physical threats, the Officers did not observe him carrying any weapons, and he was not physically aggressive towards anyone. Instead, "any threat posed stemmed from [Mr. Melvin] resisting arrest" *after* Officer Patterson ordered him to turn around and put his hands behind his back and he failed to comply. *Perea*, 817 F.3d at 1203. Mr. Melvin's "physical reaction to an unexplained arrest is properly considered under the third *Graham* factor." *Id.*

c.    *Resisted Arrest or Attempted to Flee*

The third factor, whether Mr. Melvin resisted arrest or attempted to flee, weighs in favor of the use of some force during the period in which Mr. Melvin was resisting. "However, the relevant inquiry is whether the taser use was reasonable and proportionate given [Mr. Melvin's] resistance." *Id.*; *see also Cortez v. McCauley*, 478 F.3d 1108, 1126 (10th Cir. 2007) ("[T]he excessive force inquiry evaluates the use of force used in a given arrest or detention against the force reasonably necessary to effect a lawful arrest or detention under the circumstances of the case."). The Court finds that a reasonable jury could conclude that the Officers' actions in deploying their tasers 8 times in less than two minutes violated Mr. Melvin's rights under the Fourth Amendment.

The Court notes that the Officers became "hands on" with Mr. Melvin almost immediately after he entered the apartment. The body worn camera shows that when Officer Patterson re-entered the apartment, he ordered Mr. Melvin to turn around and put his hands behind his back. (Doc. # 123-1, Archer BWC at 18:18–18:30.) Within seconds of making that order, when Mr. Melvin failed to immediately comply, the Officers began grabbing at Mr. Melvin's arms and jacket and struggling with him deeper into the apartment. (*Id.*; Doc. # 123-3, Patterson BWC 2 at 00:00–00:08). It is undisputed that during approximately the next minute, Mr. Melvin resisted arrest, struggled with the Officers, and failed to comply with repeated commands to stop, to get down, and to put his hands behind his back. He also called for help from Mr. Bruno. Based on these facts, and assuming without deciding that the detention was lawful, the

use of *some force* was reasonable to subdue and detain Mr. Melvin. *See, e.g.*, *Perea*, 817 F.3d at 1203 (acknowledging that "use of some force against a resisting arrestee may be justified").

However, Mr. Melvin did not resist or fight back in such a way to place the officers in immediate danger or otherwise justify the severe force ultimately used. *See id.* (observing that resistance of "thrashing and swinging a crucifix" did not justify the "severe response" of being tased 10 times in two minutes). Individual Defendants concede that Mr. Melvin did not initiate any physical contact; he never attempted to hit, kick, bite, or spit at the Officers; and he never threatened anyone. (Doc. # 144 at 11; Doc. # 153 at 2.) Further, Individual Defendants' assertion that Mr. Melvin also "twice tried to jump head first out of the window," which was on the second floor of the apartment building, is disputed. (Doc. # 123 at 17.) The body worn camera shows that Mr. Melvin put his foot up near the window, but a reasonable jury could determine that this conduct was simply part of Mr. Melvin's physical resistance to being arrested and not an attempt to "jump head first out of the window." The body worn camera shows that Mr. Melvin's resistance was not aggressive or violent toward the Officers or anyone else in the apartment; he merely used his body movements to resist being handcuffed and attempted to flee from the Officers. *See Bryan v. MacPherson*, 630 F.3d 805, 830 (9th Cir. 2010) (acknowledging that "resistance" is  not "a binary state" of "either completely passive or active"; rather, it "runs the gamut from the purely passive protestor who simply refuses to stand, to the individual who is physically assaulting the officer").

Even if the detention was lawful and the first Taser deployment was justified by the physical struggle and Mr. Melvin's resistance to being handcuffed, the Court finds that the repeated Taser deployments over the next 90 seconds—several of which occurred within mere seconds of each other, allowing little time for Mr. Melvin to recover and comply with orders—were not justified by the totality of the circumstances based upon the undisputed facts. A reasonable jury could determine that the Officers' repeated Taser deployments in such quick succession against a resisting but non-violent arrestee were violative of Mr. Melvin's rights under the Fourth Amendment. Moreover, the Court finds that there are genuine disputes of material fact precluding summary judgment with respect to the 8 Taser deployments, including but not limited to (1) whether the Officers reasonably perceived only one of the Taser deployments to be "effective"; (2) how many of the Taser deployments had a "good connection"; and (3) whether Mr. Melvin had adequate time or ability to comply with the Officers' orders prior to each Taser deployment. A reasonable jury could also find that the Officers unreasonably and immediately escalated the situation at several critical junctures, thus creating the need to use force and causing Mr. Melvin to instinctively attempt to flee from repeated Taser shocks. *See Smith v. Ray*, 781 F.3d 95, 104 (4th Cir. 2015) (observing that force may be excessive "based on the simple fact that the officer took a situation where there was obviously no need for the use of any significant force and yet took an unreasonably aggressive tack that quickly escalated it to a violent exchange when the suspect instinctively attempted to defend himself"); *Andersen v. City of Colorado Springs*, No. 20-cv-02032-RBJ, 2022 WL 910952, at *6 (D. Colo. Mar. 29, 2022) (finding that "the

totality of the officer's actions also show that he created the need to use force by escalating the interaction at every turn").

For these reasons, the Court finds that the *Graham* factors weigh in favor of Plaintiff and that Plaintiff has established a triable issue as to whether Individual Defendants violated Mr. Melvin's rights under the Fourth Amendment. *Simpson*, 16 F.4th at 1359. It will be up to the jury to resolve the genuine disputes of material fact and determine whether the Officers' conduct was unconstitutional under the totality of the circumstances.

      3.    <u>Clearly Established</u>

The Court must next address whether it was clearly established that the Officers' actions constituted excessive force. "A clearly established right is one that is sufficiently clear that every reasonable officer would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quotations omitted). "A Supreme Court or Tenth Circuit decision on point or the weight of authority from other courts can clearly establish a right," *Halley v. Huckaby*, 902 F.3d 1136, 1144 (10th Cir. 2018), but a case directly on point is not required so long as "existing precedent [has] placed the statutory or constitutional question beyond debate," *White v. Pauly*, 580 U.S. 73, 79 (2017); *see York v. City of Las Cruces*, 523 F.3d 1205, 1212 (10th Cir. 2008) (explaining that clearly established law "does not mean that there must be a published case involving identical facts; otherwise we would be required to find qualified immunity whenever we have a new fact pattern" (quotations omitted)). "The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is

required from prior case law to clearly establish a violation." *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007).

The Tenth Circuit has addressed the use of a Taser in several excessive force cases. In *Casey*, the Tenth Circuit held that "it is excessive to use a Taser to control a target without having any reason to believe that a lesser amount of force—or a verbal command—could not exact compliance." *Id.* at 1286. In *Perea*, the Tenth Circuit held that it was excessive for officers to use a Taser 10 times against a suspect, particularly after he was effectively subdued and brought under the officer's control. 817 F.3d at 1204. The court stated that it "is not reasonable for an officer to repeatedly use a taser against a subdued arrestee they know to be mentally ill, whose crime is minor, and who poses no threat to the officers or others." *Id.* It is also clearly established that officers may not use a Taser on a nonviolent misdemeanant who did not pose a threat and was not resisting or evading arrest without first giving a warning. *See Cavanaugh v. Woods Cross City*, 625 F.3d 661, 667 (10th Cir. 2010).

The Court acknowledges that the above cases are distinguishable in part because in each of the cases, the suspect was either subdued or not resisting arrest. In line with this precedent, if the Officers' attempt to detain Mr. Melvin was determined to be lawful, then Plaintiff likely could not show that it was clearly established that the Officers' *first* use of the Taser on Mr. Melvin in an attempt to subdue him was excessive. *See, e.g.*, *Perea*, 817 F.3d at 1203 (acknowledging that officers may use some force to effect an arrest of a misdemeanant); *Waters v. Coleman*, 632 F. App'x 431, 438 (10th Cir. 2015) (determining that an officer who used a Taser twice on a resisting detainee

26

was entitled to qualified immunity). Nevertheless, the critical issue in this case arises from the *multiple*, *repeated* deployments of a Taser against Mr. Melvin in quick succession and under circumstances in which it is disputed whether he had adequate time or ability to comply with orders and avert the next Taser deployment. It is "clearly established law in the Tenth Circuit that the use of disproportionate force to arrest an individual who is not suspected of committing a serious crime and who poses no threat to others constitutes excessive force." *Perea*, 817 F.3d 1198; *see Fogarty v. Gallegos*, 523 F.3d 1147, 1160 (10th Cir. 2008). While there is no specific limit on the number of times an arrestee may be tased within a given time interval, the Court is satisfied that the above Tenth Circuit cases have clearly established that disproportionate use of a Taser on a nonviolent arrestee not suspected of a serious crime constitutes excessive force. *See Perea*, 817 F.3d at 1203 ("Repeated use of the taser exceeded the minimal force that would be proportional to Perea's crime.").[6]

In sum, the Court concludes that a reasonable officer would have understood that deploying a Taser 8 times in approximately 90 seconds at Mr. Melvin, under the circumstances of this case, was violative of the Fourth Amendment. Individual Defendants are not entitled to qualified immunity, and the Court denies their Motion for Summary Judgment (Doc. # 123).

---

[6] In *Perea*, the Tenth Circuit declined to "set a specific limit on the number of times an arrestee may be tased within a given time interval." 817 F.3d at 1205 n.4. However, the court stated that it was "deeply troubled by the sheer number of times the officers deployed the taser in under two minutes." *Id.*

**B.   THE CITY'S MOTION FOR SUMMARY JUDGMENT**

Next, the Court turns to the City's argument that it is entitled to summary

judgment on Plaintiff's municipal liability claim for failure to adequately train officers.

1.   Applicable Law

A plaintiff suing a municipality under 42 U.S.C. § 1983 for the actions of one of its

officers must prove (1) a municipal employee committed a constitutional violation, and

(2) a municipal policy or custom was the moving force behind the constitutional

deprivation. *Myers v. Okla. Cnty. Bd. of Cnty. Com'rs*, 151 F.3d 1313, 1318 (10th Cir.

1998) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). A municipal

policy or custom can take the form of "the failure to adequately train or supervise

employees, so long as that failure results from 'deliberate indifference' to the injuries

that may be caused." *Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010)

(internal quotation marks and citations omitted). The Tenth Circuit has established a

four-part test for a plaintiff to establish a municipality's liability for inadequate training on

the use of force:

> A plaintiff must show (1) the officers exceeded constitutional limitations on
> the use of force; (2) the use of force arose under circumstances that
> constitute a usual and recurring situation with which police officers must
> deal; (3) the inadequate training demonstrates a deliberate indifference on
> the part of the city towards persons with whom the police officers come
> into contact; and (4) there is a direct causal link between the constitutional
> deprivation and the inadequate training.

*Myers*, 151 F.3d at 1318 (quoting *Allen v. Muskogee*, 119 F.3d 837, 841 (10th Cir.

1997)).

2.    Analysis

Because the Court has found a triable issue as to whether the Officers exceeded constitutional limitations on the use of force, the Court finds that Plaintiff has established the first element of the failure to train claim for purposes of resolving the instant summary judgment motion. There also appears to be no dispute as to the second element that the use of force arose under circumstances that constitute a usual and recurring situation with which police officers must deal—in this case, a domestic disturbance. The Court therefore confines its discussion to the third and fourth elements of the failure to train claim.

The City first argues that Plaintiff cannot prove that the City failed to train its police officers on use of force. (Doc. # 150 at 2.) In support, the City points to its use of force training materials and policies and the training that Officers Patterson and Archer received at the academy. (*Id.* at 2–14.) Plaintiff does not dispute that the City "provided *some* training on use of force." (Doc. # 165 at 15.) However, Plaintiff disputes that this training was adequate or in line with national standards for policing that advise that officers should be trained on the dangers of using a Taser on an individual more than three times or for more than 15 seconds. (*Id.* at 15–16.)

The Court finds that summary judgment in favor of the City is not warranted as to whether the City's training on use of force and Taser use was adequate. Although CSPD's written materials provide that "[a]dditional justification is required for deploying [a Taser] more than 3 times on a single individual," (Doc. # 167-3 at 175), there is a genuine dispute of material fact as to whether Officers Patterson and Archer were

actually trained in accordance with this language. Indeed, Officer Archer testified that he did not recall "anything stating that it was unsafe to tase someone past three times" and that "there was no set limit on the amount of times you can tase someone." (Doc. # 165-1 at 10.) The Officers' supervisors, former Chief Carey and current Chief Vasquez, also testified that officers may repeatedly deploy their Tasers if the officers determine that each Taser use is independently justified after assessing the situation. (*Id.* at 20–21, 34.) Similarly, Carey and Vasquez affirmed that the 8 deployments used in this case were within policy and that the Officers' conduct was reasonable. (*Id.*) A reasonable jury could determine that CSPD did not adequately train the Officers on the dangers of repeated Taser deployments and instead trained Officers that repeated tasings are appropriate if "justified," with "additional justification" apparently undefined and left to the Officer's individual discretion.[7]

Further, the City trained its officers that a Taser deployment is "effective" if it achieves neuromuscular incapacitation. It is unclear whether CSPD trained its officers that the three deployments in the policy include only "effective" Taser deployments (using the NMI definition), or *any* Taser deployments, including those which clearly cause pain but do not achieve NMI. For example, Defendants in this case assert that the Officers reasonably believed that only one of the Taser deployments was "effective"/achieved NMI. The Court cannot discern if the Officers were trained to

---

[7] The personnel investigation states that Officer Archer "was unable to clearly articulate his reasons for deploying his taser other than Officer Patterson had told him to." (Doc. # 167-4 at 180.) Meanwhile, Officer Patterson deployed his Taser (after 5 deployments by Officer Archer) because Officer Patterson "was getting tired and his ability to continue the fight was decreasing" and Mr. Melvin was attempting to leave. (*Id.*)

therefore understand that Mr. Melvin was subject to only one of the three Taser "deployments" outlined in the policy, notwithstanding that several of the 7 other deployments clearly caused Mr. Melvin pain.

Accordingly, the Court finds that there are genuine disputes of material fact precluding summary judgment on the adequacy of the City's training, including but not limited to:

- whether  CSPD officers' training was markedly different than what was provided in the written materials;

- whether Officers Patterson and Archer were trained to seriously consider safety risks associated with 3 tasings or 15 seconds of cumulative or consecutive Taser deployment;

- whether the Officers were adequately trained on what "additional justification" is required for subsequent Taser deployments; and

- whether the Officers were trained that it was appropriate to use a Taser on an individual who was "actively resisting" according to a definition of "active resistance" that encompasses scenarios in which use of a Taser would be excessive force.

The Court also finds that Plaintiff has sufficiently demonstrated that the inadequate training demonstrates deliberate indifference on the part of the City toward persons with whom the police officers come into contact. For a failure to train claim, "a showing of specific incidents which establish a pattern of constitutional violations is not necessary to put the City on notice that its training program is inadequate." *Allen*, 119

F.3d at 842. Rather, the Tenth Circuit has held that "evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, is sufficient to trigger municipal liability." *Id.* In this case, the Officers stated that they acted in accordance with their training, and their supervisors, former Chief Carey and current Chief Vasquez, affirmed that the Officers acted reasonably and in accordance with CSPD training. It is undisputed that the Officers' use of force in their encounter with Mr. Melvin was exonerated by the City and that the City did not provide any additional or different training on Taser usage because of Mr. Melvin's death. (Doc. # 165 at 12–13; Doc. # 174 at 6.) Viewing the evidence in the light most favorable to Plaintiff, the Court concludes that a reasonable juror could find that the Officers "were trained to act recklessly in a manner that created a high risk of death" and that "the City could reasonably be said to have been deliberately indifferent" to the need for different training on Taser use. *Allen*, 119 F.3d at 844. Plaintiff has therefore satisfied the third element.

Finally, the Court finds that the fourth element—a causal link between the inadequate training and the constitutional violation—is also met in this case. Because the Officers testified that they acted in accordance with their training, a reasonable jury could determine that the Officers would not have used excessive force—*e.g.*, multiple, repeated Taser deployments—had they been trained differently. *See Ortega v. City & Cnty. of Denver*, 944 F. Supp. 2d 1033, 1039 (D. Colo. 2013) (finding the fourth element "easily satisfied" because "a reasonable juror could find that, had Denver implemented a

different training policy on the use of force, Plaintiffs would not have been subjected to the amount [of] force used in this case").

In sum, the Court finds that Plaintiff has met its burden with respect to each of the four elements of the failure to train claim. Summary judgment is therefore not appropriate, and the City's Motion must be denied.[8]

### IV.    CONCLUSION

For the foregoing reasons, the Court ORDERS as follows:

- Individual Defendants' Motion for Summary Judgment (Doc. # 123) is DENIED. Individual Defendants are not entitled to qualified immunity on Plaintiff's claim for excessive force under the Fourth Amendment.

- Defendant City of Colorado Springs's Motion for Summary Judgment (Doc. # 150) is DENIED.

DATED:   March 8, 2023

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
Senior United States District Judge

---

[8] The parties also dispute several facts relating to racially disparate use of force. Plaintiff asserts that "racially disparate use of force is not a separate claim, but rather evidence of Defendant's inadequate training and deliberate indifference." (Doc. # 165 at 2.) Defendants contend that such evidence is irrelevant to the excessive force claim and unfairly prejudicial because Plaintiff dropped its equal protection claim. (Doc. # 174 at 8–10.) The Court finds it unnecessary to address these arguments to resolve the instant summary judgment motion. If Plaintiff seeks to introduce evidence of racially disparate use of force, or if the City seeks to exclude such evidence, the parties may raise their arguments in a motion *in limine* or at trial.