FILED
**United States Court of Appeals**
**Tenth Circuit**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

**December 11, 2023**

_____

**Christopher M. Wolpert**
**Clerk of Court**

ESTATE OF JEFFREY MELVIN, by and
through its personal representative Jeffrey
Melvin Sr.,

    Plaintiff - Appellee,

v.

CITY OF COLORADO SPRINGS,
COLORADO; DANIEL PATTERSON, in
his individual capacity; JOSHUA
ARCHER, in his individual capacity,

    Defendants - Appellants.

No. 23-1070
(D.C. No. 1:20-CV-00991-CMA-MDB)
(D. Colo.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **BACHARACH**, **BRISCOE**, and **McHUGH**, Circuit Judges.
_____

In April 2018, Officers Daniel Patterson and Joshua Archer (the "Officers")

responded to a "cold disturbance" at an apartment unit in a building in Colorado Springs,

Colorado. The Officers spent approximately sixteen minutes questioning three

individuals at the unit. A fourth individual, Jeffrey Melvin, then entered the apartment

building while Officer Patterson was standing alone in the hallway outside the unit and

---

[*] This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel. It may be cited, however, for its
persuasive value consistent with Federal Rule of Appellate Procedure 32.1 and
Tenth Circuit Rule 32.1.

Officer Archer was inside the unit. After a brief interaction with Officer Patterson, Mr. Melvin ran into the unit and closed and locked the door, separating Officer Patterson from Officer Archer, Mr. Melvin, and three other individuals in the apartment. Officer Patterson reentered the unit shortly thereafter, at which point he ordered Mr. Melvin to turn around and put his arms behind his back. Mr. Melvin refused, and the Officers began to yell and grab at him. A struggle followed, during which the Officers tried and were unable to handcuff Mr. Melvin. During the struggle, the Officers cumulatively deployed eight Tasers over the course of under two minutes, although the exact number that made contact with Mr. Melvin is unclear. After the final Taser deployment, Mr. Melvin ran out of the apartment and left the building, at which point he collapsed and was handcuffed. Mr. Melvin was transported to the hospital, where he was pronounced dead a few days later.

Mr. Melvin's estate brought suit in the District of Colorado against the Officers in their individual capacities and the City of Colorado Springs (the "City") in April 2020. The Officers and City both moved for summary judgment before the district court. The district court denied their motions, holding with respect to the Officers' motion that they were not entitled to qualified immunity. The Officers and the City appealed. We reverse the district court's denial of the Officers' motion for summary judgment, and we decline to exercise pendant appellate jurisdiction over the City's appeal.

## I.      BACKGROUND

### A.      *Factual History*

On April 26, 2018, Officers Patterson and Archer responded to a "cold disturbance," meaning the disturbance was not ongoing, at Unit 211 of an apartment building in Colorado Springs, Colorado. Earlier that evening, an upstairs neighbor had called the police to report the disturbance, but the caller did not provide a description of the suspect. When the Officers arrived at the apartment building, Mr. Melvin was exiting and opened the door so the Officers could enter the building. Officers Patterson and Archer then proceeded to Unit 211.

Jordan Bruno answered the apartment door holding a liquor bottle, told the Officers that he had been drinking, and confirmed there had been a physical fight with his "homeboys," whom he kicked out of the apartment. App. at 507. Mr. Bruno allowed the Officers to enter the apartment and shared that the only other individuals in Unit 211 were his "homegirls," Nancy Dorado and A.S., a sixteen-year-old female. *Id.* at 507–08. The Officers questioned the occupants for approximately sixteen minutes. The occupants indicated that no one was hurt during the disagreement and that there were no continuing problems or concerns. None of the occupants indicated whether the fight involved Mr. Melvin.

During their questioning, the Officers expressed concern about A.S. being alone in an apartment at one o'clock in the morning with two unrelated adults. A.S. provided a number she claimed was her father's, although no one answered the phone when Officer

Patterson called. A.S. then spoke privately with Officer Patterson in the hallway, telling him she would call her uncle to pick her up. A.S. subsequently reentered the apartment.

Officer Patterson remained in the hallway and saw Mr. Melvin approach the exterior door to the complex. Officer Patterson asserts that he opened the door for Mr. Melvin and asked Mr. Melvin if he was going to Unit 211. According to Officer Patterson, Mr. Melvin denied going to Unit 211, then ran to Unit 211, opened the door, entered, and slammed the door shut behind him while locking it. Officer Patterson's body-camera was not recording during this interaction. Officer Patterson yelled "Josh" through the door to alert Officer Archer, who was still inside Unit 211. *Id.* at 510.

Officer Archer immediately ordered Mr. Melvin to step away from the door, and Mr. Melvin complied while expressing surprise and asking, "Who's Josh?" *Id.* Mr. Bruno helped unlock the door, and Officer Patterson reentered the apartment. Less than twenty seconds had transpired between Mr. Melvin's entry and Officer Patterson's reentry. When Officer Patterson reentered the apartment, he immediately ordered Mr. Melvin to turn around and put his hands behind his back. When Mr. Melvin did not comply, the Officers began yelling and grabbing at him. The Officers and Mr. Melvin struggled further into the apartment. The body-worn camera footage from the struggle reveals that Officer Patterson stated, "You're going to get hurt if you don't stop." Archer Body-Worn Camera Footage ("BWC") at 18:25–18:30. At some point during the initial struggle, Officer Patterson also stated "You're being detained, so you need to stop." Patterson BWC 2 at 0:10–0:12.

Officer Patterson grabbed Mr. Melvin's arm and chest and pointed his OC canister (i.e., pepper spray) at Mr. Melvin. Officers Patterson and Archer then struggled to physically restrain Mr. Melvin for approximately one minute, during which time at least one Officer had hands on Mr. Melvin. The Officers concede that Mr. Melvin "did not initiate any physical contact; he never attempted to hit, kick, bite, or spit at the Officers; and he never threatened anyone." App. at 511. During the Officers' physical attempt to detain Mr. Melvin, Mr. Melvin was holding onto the windowsill and attempted to put his foot on the windowsill at least once. The Officers assert Mr. Melvin was attempting to jump out of the window, but the Estate of Mr. Melvin (hereinafter, "the Estate") asserts Mr. Melvin was only trying to pull away from the Officers. As the Officers grappled with Mr. Melvin, he repeatedly asked Mr. Bruno for help, while Mr. Bruno watched and reportedly "jogged in place and balled his fists." *Id.* Officer Patterson reported that he perceived Mr. Bruno was about to join the physical altercation and used his OC spray on Mr. Bruno.

After struggling physically with Mr. Melvin for approximately one minute, Officer Patterson directed Officer Archer to use his Taser on Mr. Melvin. Officer Archer deployed the first Taser cartridge at Mr. Melvin for five seconds and then, five seconds later, deployed a second Taser cartridge for five seconds. Mr. Melvin cried out in pain both times. After the second Taser deployment, Mr. Melvin told the Officers he had asthma.

Twenty seconds after the first two cartridges were deployed, while Officer Patterson was holding Mr. Melvin's arms behind his back, Officer Archer tased

5

Mr. Melvin a third time for five seconds. Mr. Melvin again reacted in pain. Twelve seconds after the third deployment, while Officer Patterson was holding Mr. Melvin's hands behind his back with one arm and had his second arm around Mr. Melvin's neck, Officer Archer deployed the Taser for a fourth five-second cycle. Eleven seconds after the fourth deployment, Officer Archer tased Mr. Melvin a fifth time while Officer Patterson continued to hold Mr. Melvin and struggle with him on the ground.

Less than fifteen seconds after Officer Archer deployed his fifth and final Taser cartridge, Officer Patterson pushed Mr. Melvin away and deployed his OC spray in Mr. Melvin's face. Mr. Melvin began to flee the apartment. The body-worn camera footage shows that Officer Patterson yelled "Stop or you're getting tased." Archer BWC at 21:18–19. Officer Patterson then deployed his first Taser cartridge at Mr. Melvin, before immediately deploying a second cartridge. The effect of the Taser caused Mr. Melvin to fall to the ground where he laid incapacitated for approximately five seconds.[1]

Mr. Melvin then stood, batted away the Taser wires, and ran out of the building.[2] The Officers chased Mr. Melvin for approximately thirty-five seconds before he

---

[1] The district court order at issue in this appeal does not specify which of these two Taser deployments caused Mr. Melvin's incapacitation. The Officers argue that Officer Patterson perceived his first Taser deployment to miss Mr. Melvin.

[2] According to an Internal Affairs review memorandum prepared regarding Officer Archer's and Officer Patterson's Taser use during this struggle, Officer Patterson also deployed a third Taser, representing the eighth total deployment, for one second, five seconds after the second cycle was complete. The memorandum notes "[b]oth graphs show that the use of the ARC switch was so brief there was no data collected and clearly

collapsed outside the building with one arm underneath his body. The Officers continued to attempt to handcuff Mr. Melvin. Officer Patterson struck Mr. Melvin in the abdominal area twice to force Mr. Melvin to put his hands behind his back. Mr. Melvin said things like "You're killing me. You're honestly killing me"; "I can't breathe"; "You've gotta get off. You've gotta get off"; and "I've honestly got asthma." App. at 512. Officers Blake Evenson and Richard Gonzalez then arrived at the scene and were able to handcuff Mr. Melvin after struggling to get both his arms free for approximately one minute— nearly seven minutes after Mr. Melvin entered the apartment.

After Mr. Melvin was handcuffed, he was transported to the hospital. While Mr. Melvin was in the hospital, Officer Patterson charged him with "resisting/interference with [a] public official" due to Mr. Melvin allegedly "obstructing the investigation" into the initial disturbance. *Id.* at 418–19. Mr. Melvin was pronounced dead on May 2, 2018. The autopsy report ruled that Mr. Melvin's death was a homicide and that he "died as a result of complication of sickle cell trait and extreme exertion during confrontation with police and associated *Taser* deployment." *Id.* at 381, 513. A blood test, taken upon Mr. Melvin's arrival at the hospital, demonstrated that Mr. Melvin was not on any illicit drugs at the time.

---

shows there was not a good connection for either cartridge" during this eighth Taser deployment. App. at 407. Neither the district court opinion nor the parties' appellate briefs discusses the circumstances under which the eighth Taser was deployed.

### B.       Procedural History

The Estate filed a lawsuit against the City and the Officers in April 2020. The

Estate's operative complaint, brings claims against the Officers in their individual

capacities, alleging violations of Mr. Melvin's Fourth and Fourteenth Amendment rights

to be free from excessive force resulting in death. The Estate also brought a municipal

liability claim against the City for failure to train, supervise, and discipline its employees.

The Officers filed a motion for summary judgment asserting qualified immunity in

August 2022 and the City filed a motion for summary judgment in November 2022. The

district court denied the Officers' and the City's individual motions for summary

judgement. The Officers and the City timely appealed.

## II.       JURISDICTION

The Officers assert that we have jurisdiction to review the district court's denial of

qualified immunity under the collateral order doctrine. They also request that we review

the district court's denial of the City's motion for summary judgment under pendent

appellate jurisdiction. We will consider the district court's denial of qualified immunity

to the Officers, but we decline to exercise pendent appellate jurisdiction over the City's

appeal.

### A.       Interlocutory Jurisdiction

Generally, we have appellate jurisdiction to review "final decisions of the district

courts of the United States." 28 U.S.C. § 1291. "Orders denying summary judgment are

ordinarily not appealable final decisions for purposes of § 1291." *Duda v. Elder*, 7 F.4th

899, 909 (10th Cir. 2021) (quotation marks, brackets, and ellipses omitted). Under the

collateral order doctrine, however, we may also review "decisions that are conclusive on the question decided, resolve important questions separate from the merits, and are effectively unreviewable if not addressed through an interlocutory appeal." *Id.* (quotation marks omitted). This doctrine allows us to review interlocutory appeals from "the denial of qualified immunity to a public official to the extent it involves abstract issues of law." *Id.* (quotation marks and ellipses omitted) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985)).

We have appellate jurisdiction over the Officers' appeal of the denial of qualified immunity under the collateral order doctrine. In this interlocutory posture, however, we generally lack jurisdiction to review factual disputes, "including the district court's determination . . . that the evidence could support a finding that particular conduct occurred." *Vette v. K-9 Unit Deputy Sanders*, 989 F.3d 1154, 1162 (10th Cir. 2021) (internal quotation marks omitted). Accordingly, "if a district court concludes a reasonable jury could find certain specified facts in favor of the plaintiff, . . . we must usually take them as true—and do so even if our own de novo review of the record might suggest otherwise as a matter of law." *Lynch v. Barrett*, 703 F.3d 1153, 1159 (10th Cir. 2013) (quotation marks omitted). As a result, we generally have jurisdiction to review denials of qualified immunity based on a finding of material issues of fact only "if [that] review would [not] require second-guessing the district court's determinations of

evidence sufficiency." *Ralston v. Cannon*, 884 F.3d 1060, 1067 (10th Cir. 2018) (second alteration in original).[3]

### B.   *Pendent Appellate Jurisdiction*

"Pendent appellate jurisdiction allows us to exercise jurisdiction over an otherwise nonfinal and nonappealable lower court decision [if it] overlaps with an appealable decision." *Paugh v. Uintah Cnty.*, 47 F.4th 1139, 1171 (10th Cir. 2022), *cert. denied sub nom. Anderson v. Calder*, 143 S. Ct. 2658 (2023) (internal quotation marks omitted) (alterations in original). A pendent appellate claim is "inextricably intertwined" with a reviewable claim on collateral appeal "only if the pendent claim is coterminous with, or subsumed in, the claim before the court on interlocutory appeal—that is, when the appellate resolution of the collateral appeal *necessarily* resolves the pendent claim as well." *Moore v. City of Wynnewood*, 57 F.3d 924, 930 (10th Cir. 1995). "In other words,

---

[3] This jurisdictional limitation is subject to two exceptions: if the district court does not "identify the particular charged conduct that it deemed adequately supported by the record," and "when the 'version of events' the district court holds a reasonable jury could credit 'is blatantly contradicted by the record.'" *Lewis v. Tripp*, 604 F.3d 1221, 1225–26 (10th Cir. 2010) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). The Officers do not argue either of these exceptions apply in their opening brief, *see* Appellants' Br. at 3 ("Defendants acknowledge that the Court, again, must accept as true the facts that the District Court concluded a reasonable jury could find when answering this question."), but do argue the exceptions apply in their reply brief. "[W]e generally do not consider arguments made for the first time on appeal in an appellant's reply brief and deem those arguments waived." *United States v. Leffler*, 942 F.3d 1192, 1197 (10th Cir. 2019). "[T]o allow an appellant to raise an argument for the first time in a reply brief would be manifestly unfair to the appellee who, under our rules, has no opportunity for a written response." *Id.* (internal quotation marks omitted). This rule "also protects us from issuing an improvident or ill-advised opinion because we did not have the benefit of the adversarial process." *Id.* at 1197–98 (internal quotation marks omitted). Thus, the Officers have waived any argument that either of these exceptions applies.

if a municipality's appeal 'overlaps' with an individual defendant's appeal challenging the denial of qualified immunity, we may exercise pendent appellate jurisdiction over the municipality's appeal." *Paugh*, 47 F.4th at 1171. However, "[p]endent appellate jurisdiction is a matter of discretion, not of right," *Walter v. Morton*, 33 F.3d 1240, 1242 (10th Cir. 1994), "[a]nd we must exercise this discretion sparingly," *Paugh*, 47 F.4th at 1171.

The Officers ask that we exercise pendent appellate jurisdiction over the district court's denial of the City's summary judgment motion. They argue the City's appeal is inextricably intertwined with the Officers' appeal "because a finding that the individual did not violate the plaintiff's constitutional rights necessarily resolves the claim against the municipality." Appellants' Br. at 4. Because we do not resolve the constitutionality of the Officers' conduct on appeal, resolution of the Officers' appeal does not resolve the pendent municipal liability claims. Thus, we do not exercise pendent appellate jurisdiction over the City's appeal.

### III.     DISCUSSION

The Officers appeal the district court's conclusion that they are not entitled to qualified immunity. They challenge the court's holding that a reasonable jury could conclude they used excessive force and thus violated Mr. Melvin's Fourth Amendment rights during their struggle with him. They also argue the court erred when it concluded they violated Mr. Melvin's clearly established rights. We agree that the district court erred when it held the Officers violated a clearly established right and we therefore conclude the Officers are entitled to qualified immunity.

11

### A.      Standard of Review

"[W]e have jurisdiction over an appeal from the denial of qualified immunity only [t]o the extent [the] appeal turns on an abstract issue of law." *Perea v. Baca*, 817 F.3d 1198, 1202 (10th Cir. 2016) (internal quotation marks omitted) (alterations in original). With respect to the abstract issues of law brought before us, "[w]e review de novo the district court's denial of summary judgment to [the Officers] on qualified immunity grounds." *Andersen v. DelCore*, 79 F.4th 1153, 1162 (10th Cir. 2023).

### B.      Legal Standard

"Government defendants sued under § 1983 in their individual capacities have qualified immunity: 'government officials are not subject to damages liability for the performance of their discretionary functions when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Brown v. Montoya*, 662 F.3d 1152, 1164 (10th Cir. 2011) (quoting *Buckley v. Fitzsimmons*, 509 U.S. 259, 268 (1993)). Thus, "[o]nce an individual defendant asserts qualified immunity, the plaintiff carries a two-part burden to show: (1) that the defendant's actions violated a federal constitutional or statutory right, and, if so, (2) that the right was clearly established at the time of the defendant's unlawful conduct." *Gutierrez v. Cobos*, 841 F.3d 895, 900 (10th Cir. 2016) (internal quotation marks omitted).

"[J]udges of the district courts and the courts of appeals are in the best position to determine the order of decisionmaking that will best facilitate the fair and efficient disposition of each case." *Pearson v. Callahan*, 555 U.S. 223, 242 (2009). We can

"decid[e] which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236. Thus, "[w]e may resolve a case on the second prong alone if the plaintiff fails to show a right was clearly established." *Gutierrez*, 841 F.3d at 900.

Under the second prong, ordinarily, "[i]t is clearly established that specific conduct violates a constitutional right when Tenth Circuit or Supreme Court precedent would make it clear to every reasonable officer that such conduct is prohibited." *Perea*, 817 F.3d at 1204. "However, because excessive force jurisprudence requires an all-things-considered inquiry with 'careful attention to the facts and circumstances of each particular case,' there will almost never be a previously published opinion involving exactly the same circumstances." *Casey v. City of Federal Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Thus, our analysis is not "a scavenger hunt for prior cases with precisely the same facts" and is instead an "inquiry of whether the law put officials on fair notice that the described conduct was unconstitutional." *Id.*; *see also Truman v. Orem City*, 1 F.4th 1227, 1235 (10th Cir. 2021) ("[A] prior case need not be exactly parallel to the conduct here for the officials to have been on notice of clearly established law."). All the same, "[t]he Supreme Court has cautioned circuit courts 'not to define clearly established law at a high level of generality,' but to focus on 'whether the violative nature of particular conduct is clearly established.'" *Perea*, 817 F.3d at 1204 (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)).

### C.     Analysis

The district court concluded the Estate had "presented a triable issue as to whether the Officers unreasonably used excessive force in violation of Mr. Melvin's rights under the Fourth Amendment." App. at 522. The district court then determined that the alleged conduct violated a clearly established right. In reaching its conclusion the right was clearly established, the district court relied on our decisions in *Casey v. City of Federal Heights*, *Perea v. Baca*, and *Cavanaugh v. Woods Cross City*, 625 F.3d 661 (10th Cir. 2010), explaining that "the critical issue in this case arises from the multiple, repeated deployments of a Taser against Mr. Melvin in quick succession and under circumstances in which it is disputed whether he had adequate time or ability to comply with orders and avert the next Taser deployment." App. at 532.

Because the Estate has failed to meet its burden to show the constitutional right at issue was clearly established, we resolve this appeal on the second prong alone. We evaluate each of the cases upon which the Estate and the district court relied and conclude that none of them established the right at a sufficient level of particularity to put every reasonable officer on notice that the subject conduct violated Mr. Melvin's constitutional rights. Nor have we identified any precedent in our independent research to clearly establish that the Officers' conduct violated Mr. Melvin's right against excessive force. Thus, the Estate has not carried its burden and the Officers are entitled to qualified immunity.

1.      **Tenth Circuit Precedent**

Our precedent does not clearly establish that the Officers' conduct violated

Mr. Melvin's rights. We have explicitly chosen "not [to] set a specific limit on the

number of times an arrestee may be tased within a given time interval." *Perea*, 817 F.3d

at 1205 n.4. Instead, our precedent has drawn a clear line between subdued detainees and

individuals who are not subdued. We have also clearly differentiated between individuals

who are tased after they have been informed they are being detained or arrested and have

been instructed to stop resisting, and those who have received no such information or

instruction. Mr. Melvin was not subdued, he was informed that he was being detained,

and he was instructed to stop resisting. As a result, the Estate has failed to demonstrate

that the Officers' conduct violated Mr. Melvin's clearly established rights.

a.      *Casey v. City of Federal Heights*

In *Casey*, Mr. Casey improperly removed a court file from a courthouse while he

briefly obtained something from his truck in the parking lot. 509 F.3d at 1279. The court

clerk informed Mr. Casey that he could not remove the file from the building. *Id.* As he

returned to the building, an officer moved to intercept him, told Mr. Casey to return to his

truck, and asked Mr. Casey for the court file, but did not take the file when Mr. Casey

held it out. *Id.* at 1280. Mr. Casey moved around the officer, at which point the officer

grabbed Mr. Casey's arm and put it in a painful armlock. *Id.* Mr. Casey moved his arm

without breaking the officer's grip and started walking to the courthouse, at which point

the officer jumped on Mr. Casey's back. *Id.* The officer never told Mr. Casey that he was

under arrest, and never advised him to stop resisting. *Id.* A second officer arrived on the

scene, concluded Mr. Casey needed to be controlled, and fired her Taser at him. *Id.* Other officers arrived, brought Mr. Casey to ground, and handcuffed him tightly, then repeatedly banged his face in the concrete. *Id.* After he was on the ground, another officer tased him. *Id.* Mr. Casey testified that he continued trying to get up. *Id.* Regarding the first officer who tased Mr. Casey, we noted "[t]he absence of any warning—or of facts making clear that no warning was necessary—makes the circumstances of this case especially troubling." *Id.* at 1285. The officer who tased Mr. Casey "gave [him] no opportunity to comply with her wishes before firing her Taser." *Id.*

This case does not clearly establish that the Officers' conduct violated Mr. Melvin's rights. We noted in *Casey* that the force used was "all without warning or explanation." *Id.* Mr. Casey was never informed that he was being detained or instructed to stop resisting, he was not violent, and he was not fleeing (instead, Mr. Casey was trying to get back to the courthouse). *Id.* at 1283. Mr. Melvin, on the other hand, was informed that he was being detained, was instructed to stop resisting, was attempting to flee, and was tased by officers who had been present throughout the physical struggle. The differences between *Casey* and this case are significant enough that *Casey* did not clearly establish the violative nature of the Officers' conduct with respect to Mr. Melvin.

### b.   *Perea v. Baca*

In *Perea*, officers were called to perform a welfare check on Mr. Perea and, after finding and pursuing him, pushed Mr. Perea off his bicycle. 817 F.3d at 1201. "The officers did not tell [Mr.] Perea why they were following him or why he was being seized, and they never asked [Mr.] Perea to halt or stop." *Id.* After pushing Mr. Perea off

his bicycle, the officers attempted to detain him while Mr. Perea struggled, thrashed, and swung a crucifix. *Id.* One of the officers instructed the other to tase Mr. Perea. *Id.* After the first Taser deployment was ineffective, the officer tased Mr. Perea nine additional times, for a total of ten deployments in less than two minutes. *Id.* At some point, the officers were able to get Mr. Perea on the ground, on his stomach, with both officers on top of him, effectively subduing him. *Id.* We concluded the officers had behaved unreasonably, noting that Mr. Perea was tackled for, at most, a traffic violation, he posed no threat before the officers initiated the arrest, and the officers then tased him repeatedly despite not explaining what they were doing or why they were attempting to subdue him. *Id.* at 1203–04. "Most egregiously, they continued tasering [Mr.] Perea after he was effectively subdued and brought under the officers' control." *Id.* at 1204. We concluded that "[i]t is—and was at the time of [Mr.] Perea's death—clearly established law in the Tenth Circuit that the use of disproportionate force to arrest an individual who is not suspected of committing a serious crime and who poses no threat to others constitutes excessive force." *Id.* at 1204. "More specifically, it is likewise clearly established that officers may not continue to use force against a suspect who is effectively subdued." *Id.*

As the Officers point out, our focus in *Perea* was primarily on the conduct that took place after Mr. Perea was subdued. We affirmed the district court because "there was sufficient evidence in the record for a reasonable fact finder to conclude that the officers continued to taser [Mr.] Perea after he was subdued" and "our precedent is clear that continued use of force after an individual has been subdued is a violation of the Fourth Amendment." *Id.* at 1205. We also "d[id] not set a specific limit on the number of

times an arrestee may be tased within a given time interval." *Id.* at 1205 n.4. Thus, while *Perea* makes very clear that the use of a Taser *after an individual is effectively subdued* violates the Fourth Amendment, the Estate does not argue, and the district court did not conclude, that Mr. Melvin was subdued at any time that the Taser was used.[4] *Perea* therefore does not clearly establish that the Officers' use of the Taser on the unsubdued Mr. Melvin violated the Fourth Amendment.

   c.    *Cavanaugh v. Woods Cross City*

   In *Cavanaugh*, officers responded to a non-emergency call placed by Ms. Cavanaugh's husband requesting assistance in finding Ms. Cavanaugh after a domestic dispute. 625 F.3d at 662. The officers were informed that Ms. Cavanaugh had consumed alcohol and pain medication and left the home with a knife. *Id.* at 663. Ms. Cavanaugh later returned to the house and was clearly not holding a knife, as noted by an officer at the house. *Id.* As she drew near the house, Ms. Cavanaugh veered off the walkway toward the front door, cutting across the lawn, walking quickly but not running.

---

[4] For the first time during oral argument, the Estate suggested Mr. Melvin was effectively subdued immediately prior to the fourth deployment of the Taser as reflected in Officer Archer's body-worn camera footage. Oral Argument at 25:52–28:05. But the district court appears to have concluded Mr. Melvin was not subdued. *See*, *e.g.*, App. at 531 (acknowledging that other cases "are distinguishable [from Mr. Melvin's case] in part because in each of the cases, the suspect was either subdued or not resisting arrest"). As noted, on interlocutory appeal, we generally lack jurisdiction to review factual disputes. *Vette v. K-9 Unit Deputy Sanders*, 989 F.3d 1154, 1162 (10th Cir. 2021). Although we are not so limited if "the 'version of events' the district court holds a reasonable jury could credit 'is blatantly contradicted by the record,'" *Lewis*, 604 F.3d at 1226 (quoting *Scott*, 550 U.S. at 380), that is not the case here. Our review of the footage relied upon by the Estate does not lead us to conclude that the record blatantly contradicts the district court's finding that Mr. Melvin was not effectively subdued.

*Id.* The officer followed Ms. Cavanaugh and discharged a Taser into her back without warning. *Id.* We concluded that the officer's use of force was not justified, noting that "a reasonable jury could conclude Ms. Cavanaugh had no reason to suspect that she was under arrest until after she was [t]asered," and that Ms. Cavanaugh was not fleeing. *Id.* a 665.

Significant differences between *Cavanaugh* and Mr. Melvin's circumstances limit the case's relevance. First, unlike Mr. Melvin, Ms. Cavanaugh was not fleeing, and was instead returning to her house. In addition, we have subsequently differentiated between Taser deployments without warning and in the absence of a struggle or notice of arrest, *e.g.*, *Lee v. Tucker*, 904 F.3d 1145, 1149–50 (10th Cir. 2018), and Tasers deployed without warning after the subject has been instructed to comply and warned that he will face arrest if he does not comply, *e.g.*, *Andersen*, 79 F.4th at 1167–69. Mr. Melvin's situation more closely resembles the latter. Mr. Melvin was instructed to turn around and put his hands behind his back before the first Taser deployment. The body-worn camera footage further reflects that Mr. Melvin was told, "You're being detained, so you need to stop." Patterson BWC 2 at 0:10–0:12. The Officers also attempted to use lesser degrees of force, such as grabbing Mr. Melvin, before they tased him. Thus, *Cavanaugh* did not clearly establish that the Officers' conduct violated Mr. Melvin's rights.

### d. *Lee v. Tucker*

The Estate also brings our attention to *Lee v. Tucker*. We published this case after Mr. Melvin's detention, so it cannot have clearly established that the Officers' conduct was unlawful at the time of that conduct. *See Gutierrez*, 841 F.3d at 900 (explaining that

the second prong requires a showing "that the right was clearly established *at the time of the defendant's unlawful conduct*" (emphasis added) (quotation marks omitted)). In addition, the Estate's argument faces the same problem as it does with respect to *Cavanaugh*: we concluded in *Lee* that there existed factual disputes regarding (1) whether Mr. Lee had been arrested or detained when the officers began using force on him and (2) whether the officers had ordered Mr. Lee to stay seated or move away from the kitchen. *Lee*, 904 F.3d at 1148. The same is not true here. The Officers ordered Mr. Melvin to turn around and put his hands behind his back, indicated he was being detained, and instructed him to stop resisting before they first deployed the Taser.

      *e.*    *Aldaba v. Pickens*

      The Estate also relies on *Aldaba v. Pickens*, a case in which we held that a hospital patient's refusal to comply with police orders to calm down and get on his knees merely constituted passive resistance. 777 F.3d 1148, 1158 (10th Cir. 2015). We explained that when an individual's resistance is passive, the excessive force analysis "turns to whether the officers' use of force was commensurate with [the subject's] level of resistance," and we concluded that the initial use of the Taser on Mr. Aldaba was unreasonable. *Id.*; *see also id.* at 1159. However, in light of *Mullenix v. Luna*, the Supreme Court subsequently vacated this opinion and remanded the case for reconsideration. *Pickens v. Aldaba*, 577 U.S. 972 (2015) (vacating and remanding). In *Mullenix*, the Court instructed courts of appeals "not to define clearly established law at a high level of generality" in the qualified immunity context. 577 U.S. at 12. Although the Supreme Court did not overrule *Aldaba*, this procedural history undercuts the Estate's argument that the conduct in

*Aldaba* was "clearly established" as violative, particularly given that we did not address the lawfulness of the conduct on remand. *Aldaba v. Pickens*, 844 F.3d 870, 871 (10th Cir. 2016) ("We do not decide whether [the officers] acted with excessive force.").

## 2.   Out-of-Circuit Precedent

The Estate also relies on out-of-circuit precedent to support its position that the Officers' use of force violated Mr. Melvin's clearly established rights. In particular, the Estate argues that courts have differentiated between active, violent resistance and passive resistance, and that this precedent clearly establishes that the latter type of resistance does not justify the repeated use of a Taser. The Estate also asserts that Mr. Melvin's resistance was passive. But conduct violates a clearly established right "when *Tenth Circuit or Supreme Court precedent* would make it clear to every reasonable officer that such conduct is prohibited." *Perea*, 817 F.3d at 1204 (emphasis added). In addition, while "persuasive authority from other circuits may clearly establish the law in this circuit when that authority would have put a reasonable officer on notice that his or her conduct was unconstitutional," *Irizarry v. Yehia*, 38 F.4th 1282, 1293 (10th Cir. 2022), the Supreme Court has instructed that "[t]he dispositive question is 'whether the violative nature of *particular* conduct is clearly established,'" *Mullenix*, 577 U.S. at 12 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). "This inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Id.* (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)). The Court has emphasized that "[s]uch specificity is especially important in the Fourth Amendment context." *Id.*

The out-of-circuit cases upon which the Estate relies do not address the facts of Mr. Melvin's struggle with the Officers. The cases address officers' use of a Taser on an individual refusing to get out of a car and frustrating officers' attempts to remove her, *Mattos v. Agarano*, 661 F.3d 443, 437 (9th Cir. 2011); an individual wrapping himself around a stop sign post and preventing officers' attempts to pry his arms and legs off the post, *Estate of Armstrong v. Vill. of Pinehurst*, 810 F.3d 892, 896–97 (4th Cir. 2016); an individual backing away from an officer, *Shumate v. City of Adrian*, 44 F.4th 427, 435 (6th Cir. 2022); and an individual lying in the fetal position with his hands over his face, *Joseph v. Bartlett*, 981 F.3d 319, 326–27 (5th Cir. 2020). While these cases reflect that other circuits have differentiated between active and passive resistance and established that the use of a Taser in the latter case can constitute excessive force, factual differences exist between Mr. Melvin's resistance and the resistance in these cases. Mr. Melvin was attempting to flee and was subject to Taser deployments after the Officers initially attempted lower levels of force to detain Mr. Melvin. These facts meaningfully distinguish this case from the out-of-circuit decisions relied upon by the Estate, none of which addresses the particular conduct at issue here. Thus, contrary to the Estate's assertion, "[t]he consensus of persuasive authority from our sister circuits" does not "place[] the constitutional question in this case beyond debate." *Ullery v. Bradley*, 949 F.3d 1282, 1294 (10th Cir. 2020) (internal quotation marks omitted).

The Estate has failed to demonstrate that the unlawfulness of the Officers' conduct was clearly established at the time of the conduct. As a result, the Estate has failed to carry its burden to overcome the Officers' assertion of qualified immunity.

## IV.      CONCLUSION

The Officers are entitled to qualified immunity because it was not clearly established that their conduct violated Mr. Melvin's Fourth Amendment rights. We therefore REVERSE the denial of the Officers' motion for summary judgment. We also decline to exercise pendent appellate jurisdiction over the City's appeal.

Entered for the Court


Carolyn B. McHugh
Circuit Judge

UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

Byron White United States Courthouse
1823 Stout Street
Denver, Colorado 80257
(303) 844-3157
Clerk@ca10.uscourts.gov

Christopher M. Wolpert
Clerk of Court

Jane K. Castro
Chief Deputy Clerk

December 11, 2023

Martha Ellen McKinney
Anne Turner
Colorado Springs City Attorney's Office
30 South Nevada Avenue, Suite 501
Colorado Springs, CO 80903

RE:     **23-1070, Estate of Jeffrey Melvin v. City of Colorado Springs, et al**
Dist/Ag docket: 1:20-CV-00991-CMA-MDB

Dear Counsel:

Enclosed is a copy of the order and judgment issued today in this matter. The court has entered judgment on the docket pursuant to Fed. R. App. P. Rule 36.

Pursuant to Fed. R. App. P. Rule 40(a)(1), any petition for rehearing must be filed within 14 days after entry of judgment. Please note, however, that if the appeal is a civil case in which the United States or its officer or agency is a party, any petition for rehearing must be filed within 45 days after entry of judgment. Parties should consult both the Federal Rules and local rules of this court with regard to applicable standards and requirements. In particular, petitions for rehearing may not exceed 3900 words or 15 pages in length, and no answer is permitted unless the court enters an order requiring a response. *See* Fed. R. App. P. Rules 35 and 40, and 10th Cir. R.35 and 40 for further information governing petitions for rehearing.

Please contact this office if you have questions.

Sincerely,

Christopher M. Wolpert
Clerk of Court

cc:      Reid R. Allison
           Darold W. Killmer
           Liana Gerstle Orshan


CMW/jjh