**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.: 20-cv-00991-CMA-MDB

ESTATE OF JEFFREY MELVIN,

      Plaintiff,

v.

CITY OF COLORADO SPRINGS, COLORADO,

      Defendant.

_____

**FINAL PRETRIAL ORDER**

_____

## 1.  DATE AND APPEARANCES

The virtual telephonic Final Pretrial Conference in this matter took place on

February 14, 2024, at 1:15 p.m.  Appearances of counsel were as follows:

| | |
|---|---|
| For Plaintiff: | Darold W. Killmer |
| | Liana G. Orshan |
| | Reid R. Allison |
| | KILLMER LANE, LLP |
| | 1543 Champa Street, Suite 400 |
| | Denver, CO 80202 |
| | Phone: 303-571-1000 |
| | Emails: dkillmer@killmerlane.com; |
| | lorshan@killmerlane.com |
| | rallison@killmerlane.com |
| | |
| For Defendants: | Anne H. Turner |
| | Martha McKinney |
| | Office of the City Attorney of the |
| | City of Colorado Springs |
| | 30 S. Nevada Ave., Suite 501 |

Colorado Springs CO 80903
(719) 385-5909
Anne.Turner@coloradosprings.gov
Martha.mckinney@coloradosprings.gov

## 2.  JURISDICTION

Jurisdiction is invoked pursuant to 28 U.S.C. § 1331. Jurisdiction supporting

Plaintiff's claim for attorneys' fees and costs is conferred by 42 U.S.C. § 1988.

## 3.  CLAIMS AND DEFENSES

**Plaintiff**:

**Unconstitutional conduct by CSPD officers killed Jeffrey Melvin.**

On the night of April 26, 2018, CSPD Officers Daniel Patterson and Joshua

Archer responded to a report of a disturbance at the Remington Apartments on 3341

East Fountain Boulevard. A resident reported that he had heard what sounded like a

fight in the unit below his. Officers Patterson and Archer made their way to apartment

211, on the floor below, to investigate. At that point, Officers Patterson and Archer

believed that whatever disturbance had occurred previously was no longer occurring.

Jordan Bruno rented unit 211 and greeted the officers at the door.  Mr. Bruno

was friendly and accommodating, inviting the officers into his unit.  He explained that an

altercation had occurred earlier between him and a friend, but the situation was under

control and that his friend had since left. He said that there were no continuing problems

or concerns.  Mr. Bruno and the others in his apartment displayed no aggression or

hostility toward the officers.  During their investigation, the occupants of the unit treated

the officers with respect, answered every question asked of them, and never gave the

officers reason to fear for their safety or believe criminal activity was occurring in the unit. Officers Patterson and Archer did not search the occupants or the apartment at this time.

After approximately 18 minutes of Officers Patterson and Archer warrant-checking and speaking with the occupants, they had no probable cause or reasonable suspicion to believe that any of the occupants had committed, were committing, or were going to commit any crime. Around that time, Jeffrey Melvin arrived at the apartment. Mr. Melvin, surprised by one of the officers' presence in the hallway, hastily entered Mr. Bruno's unit and closed the door behind him. Officer Archer, who unbeknownst to Mr. Melvin was inside of the apartment, ordered Mr. Melvin away from the door, and Mr. Melvin immediately complied with the order. The door was then opened, and Officer Patterson entered the unit.

Officer Archer began aggressively yelling at Mr. Melvin to turn around and put his hands behind his back while simultaneously grabbing at him. Mr. Melvin had done nothing wrong to warrant this detainment.  Officers Archer and Patterson had no reasonable suspicion, probable cause, or legitimate reason to believe that Mr. Melvin had committed any crimes or posed a danger to them or others, and at no point during the encounter did they objectively develop any reasonable suspicion, probable cause, and/or reason to believe Mr. Melvin posed a danger to them or others. All the officers knew was that Mr. Melvin was a young Black man who did not immediately submit to their baseless and unreasonable assault and detention. At no point during the encounter did Officers Patterson and Archer tell Mr. Melvin he was under arrest.

Mr. Melvin repeatedly insisted that the officers had the wrong person, and he tried to move away from them. It is undisputed that Mr. Melvin did not start struggling with Officers Patterson and Archer until after Patterson had put his hands on him. He repeatedly pleaded for the officers to calm down and stop manhandling him. Officers Patterson and Archer were aggressively yelling and grabbing for Melvin, and at one point Patterson grabbed Melvin's arm and chest and pointed his OC canister at Melvin, while threatening him. At no point during the encounter did Mr. Melvin attempt to hit, kick, or otherwise attack Officers Patterson and Archer, and he made and posed no threats to them or anyone else. Further, Officers Patterson and Archer had no legitimate reason to believe Mr. Melvin had a weapon. Nor did they have any reason to believe Mr. Melvin was the individual involved in the previous fight that Mr. Bruno had told them about.

Officer Patterson then commanded Officer Archer to "tase [Melvin]" even though both Defendants were holding onto him at the time. Defendants never warned Melvin that if he did not comply they were going to tase him, and Patterson's command to Archer, even if heard by Melvin, did not provide him enough time to comply before being tased. Officer Archer fired the first Taser prongs into Mr. Melvin's flesh less than two minutes after their initial innocuous encounter, creating an excruciatingly painful five-second burst of electricity into and through Mr. Melvin's body. Officer Patterson was still holding onto Mr. Melvin when Officer Archer deployed his taser. Melvin made a sound of pain at the beginning of this 5-second Taser cycle and called for help. Per Defendant

Colorado Springs' own investigation, this deployment indisputably had "a good connection."

Less than 5 seconds after the end of the Taser cycle, Archer deployed his second Taser cartridge at Melvin for another 5 seconds; Melvin cried out in pain and explained that he had asthma. This deployment also had a "good connection."

20 seconds later, while Patterson was holding Melvin's arms behind his back, Archer tased Melvin a third time, sending 5 seconds of charge through the already connected probes, while Melvin jerked and grimaced in pain. As this third deployment "still [had] a good connection" and clearly caused Melvin pain, the second deployment also would have connected with Melvin, since the third used the same probes embedded in Melvin.

After 12 more seconds, during which Patterson was holding Melvin's hands behind his back with one arm and had his second arm around the front of Melvin's neck, Archer deployed his Taser for a fourth 5-second cycle. About 11 seconds later, while Patterson continued to hold Melvin, Archer tased him a fifth time.

During this minute-long period of 5 tasings, Melvin repeatedly cried for help and begged, "you can't do this!" Less than 15 seconds after Archer's fifth Taser deployment, Patterson pushed Melvin away from him and deployed OC (pepper spray) into Melvin's face.

To escape Officers Patterson and Archer's violence, Melvin attempted to flee. Approximately five seconds after deploying the OC, Patterson deployed his first Taser cartridge at Melvin, and then, without waiting to evaluate its effects, immediately

deployed his second Taser cartridge one second later. While it is difficult to differentiate the first deployment from the second deployed one second later, at least one of the deployments connected with Melvin's upper torso, forced Melvin to the ground, and incapacitated him for five seconds.

Thus, per Defendant Colorado Springs' own reports, "there were a total of four [Taser] cartridges and eight prongs that made connection and five deployments with good connections." Accepted national guideline for police state that "[t]raining protocol should emphasize that multiple applications or continuous cycling of [a Taser] resulting in an exposure longer than 15 seconds (whether continuous or cumulative) increase the risk of serious injury or death and should be avoided." However, Defendant Colorado Springs did not train its officers to take seriously from the limits on tasing someone more than three times or for longer than 15 seconds.

After regaining the use of his muscles, and fearing for his life due to his asthma, Melvin stood up, batted away some of the Taser wires from his skin, and escaped the apartment, with Officers Patterson and Archer giving chase.

After running down the street a short way and about 35 seconds after leaving the apartment, Melvin collapsed. Officers Patterson and Archer then held Melvin down, and he repeatedly cried things like, "You're honestly killing me"; "I can't breathe. You've gotta get off. You've gotta get off"; I can't breathe!; "I've honestly got asthma!"

Melvin was in obvious distress, and after handcuffing, he began slurring his words and clearly needed medical attention. The repeated electrocutions, use of

chemical weapons, and the associated struggle inflicted by the law enforcement officers had taken a devastating toll on Melvin's body.

Paramedics transported Melvin to the hospital. Hospital staff immediately declared a full trauma on admission. Doctors placed Melvin in a medically induced coma to try and save his life. Tragically, he never woke up. Jeffrey Melvin was pronounced dead on May 2, 2018, at age 27.

The coroner determined that the manner of Melvin's death was homicide, and Melvin "died as a result of complications of sickle cell trait and extreme exertion during confrontation with police and associated *Taser* deployment."  Blood drawn the morning he arrived at the hospital tested negative for all illicit substances.

While Melvin was in a coma, Patterson charged him with the municipal code violation of "resisting/interference with a public official" based on Melvin's alleged "obstructing the investigation" into the reported disturbance.

Officers Patterson and Archer, under the color of law and in their capacities as CSPD law enforcement officers, violated Melvin's Fourth Amendment right to be free from excessive force. Their use of a multiple Taser deployments was disproportional to the offenses for which Officers Patterson and Archer had reasonable suspicion or probable cause to believe Melvin had committed—if any—and he presented no threat or risk to the officers or anyone else, nor was there an immediate need to apprehend Mr. Melvin. Officers Patterson and Archer used a disproportionate amount of force compared to the potential harm of Melvin fleeing the scene, thus violating Mr. Melvin's constitutional rights.

**<u>Defendant Colorado Springs is municipally liable for Officers Patterson and Archer's unconstitutional actions and has a custom and practice of using excessive force.</u>**

Defendant Colorado Springs approved of Officer Patterson and Officer Archer's conduct. It did not terminate or discipline either Defendant Patterson or Defendant Archer, or even counsel them for their actions. Both the Chief of the Department at the time of Mr. Melvin's killing and the current Chief of CSPD have testified that Individual Defendants acted within policy and pursuant to their training. CSPD provided no additional training to any CSPD officers related to Melvin's death. Rather, Defendant Colorado Springs' official position was that Officers Patterson and Archer's conduct was appropriate, consistent with, and engaged in pursuant to all approved policies, practices, and training of CSPD. Defendant Colorado Springs' failure to discipline or further train Officers Patterson and Archer for their use of excessive force against Melvin is part of CSPD's custom and practice to encourage and condone the use of excessive force, especially against people of color. Colorado Springs' ratification of unconstitutional conduct by CSPD officers shows that officers carried out such misconduct under Colorado Springs' policies and regimen of training and supervision, and that such conduct was customary within CSPD.

Defendant Colorado Springs provided inadequate and predictably and inevitably dangerous training on Tasers. CSPD officers' conduct and deposition testimony from witnesses in the case shows that CSPD trained officers, including Officers Patterson and Archer, to deploy a Taser against one individual repeatedly and for sustained period of time, despite the obvious and known risks of repeated tasings.

Defendant Colorado Springs could have and should have pursued reasonable and adequate methods for training and supervising CSPD officers, including Officers Patterson and Archer, in not exceeding the safety limits for taser deployment, but it failed to do so. Because Defendant Colorado Springs failed to adequately train CSPD officers, including Defendants, it was inevitable that someone in the same position as Melvin would be subject to violations of their constitutional rights.

Further, Defendant Colorado Springs fostered "a policy of inaction" in the face of knowledge that CSPD officers were disproportionately using force against people of color, which makes up the functional equivalent of a decision by Colorado Springs itself to violate the Constitution. Defendant Colorado Springs's "policy of inaction" and policies, customs, or practices in failing to train properly and supervise its employees were a moving force and proximate cause of Officers Patterson and Archer's violation of Mr. Melvin's constitutional rights.

Defendant Colorado Springs' conduct, as described, deprived Melvin of the rights, privileges, liberties, and immunities secured by the Constitution of the United States of America, and caused him other damages.

Officers Patterson and Archer's acts or omissions caused Mr. Melvin damages because he suffered physical and mental pain, humiliation, fear, anxiety, loss of enjoyment of life, loss of liberty, privacy, and sense of security and individual dignity, and death, among other injuries, damages, and losses.

**Defendant**:   All that remains of this case is a single-incident failure to train claim against the City of Colorado Springs ("City"), where municipal liability truly is at its most

tenuous. The claim is premised on Plaintiff's contention that the City failed to train its police officers to deploy a Taser at an individual no more than three times—regardless of the crime the person is suspected of committing, the threat they pose, or whether they are actively resisting or attempting to evade arrest. But neither the Constitution, nor national policing guidelines, require a police officer to abandon the Taser as a use of force tool after three trigger pulls. For many reasons, Plaintiff will be unable to prove the elements of the failure to train claim, namely, that the Officers violated Melvin's constitutional rights, that the City's Taser training was unconstitutional, that the City was deliberately indifferent to the need for more or different Taser training, and that the City's training caused the violation of Melvin's constitutional rights.

On Thursday, April 26, 2018, at approximately 12:31 a.m., Colorado Springs Police Officers Daniel Patterson and Joshua Archer were investigating a disturbance at apartment number 211 at the Remington Apartments in central Colorado Springs. The apartment's tenant (Jordan Bruno, a 26-year-old male) described to Officers a violent, physical fight he had with another male who had refused to leave his apartment. Officers also found in the apartment two unrelated females: one 34 years old; the other just a week past her sixteenth birthday, scantily clad and quietly sitting in a corner. The Officers were actively investigating the connection between the individuals and the circumstances of the physical fight which had occurred and attempting to find a local relative who could come pick up the juvenile.

While Officer Patterson was in the hallway outside the apartment finishing a phone call and Officer Archer was inside the apartment with the three individuals, Melvin

appeared at the apartment building's exterior door. Officer Patterson recognized Melvin from when the Officers arrived on scene; Melvin had been exiting the building, thereby letting the two Officers into the building. Officer Patterson opened the door for Melvin and asked him if he was going to apartment 211. Melvin said, "No," but then he bolted, running away from Officer Patterson straight into apartment 211. Officer Patterson made chase, but Melvin slammed the door shut, locked it, and then leaned against it with his body weight from the inside. Officer Patterson tried to open the door but couldn't. He shouted, "Josh!" to alert Officer Archer to Melvin's presence inside the apartment. The two Officers found themselves separated: one locked outside the apartment, one inside, alone with Melvin and the three other individuals in the highly suspicious, potentially dangerous circumstances.

Inside the apartment, Officer Archer ordered Melvin away from the door and opened it for Officer Patterson. Melvin paced around the apartment's entranceway, agitated, and talking loudly. Officer Patterson promptly approached Melvin telling him, "You're being detained. Put your hands behind your back."

But Melvin refused to produce his hands for handcuffing. Instead, he defied the Officers, walking and pulling his arms away, actively resisting their physical efforts to gain control of his hands. The Officers attempted to deescalate the situation by asking Melvin to calm down and pausing when Melvin said he would stop resisting. They also had to contend with the other occupants of the apartment who were creating a chaotic scene by screaming and yelling. The Officers issued dozens of commands to Melvin while grappling with him: to stop resisting, lay down on the ground, and give up his hands; but

Melvin refused to comply. Melvin exhibited super-human strength and irrational behavior, even twice attempting to jump headfirst out of the apartment's second story window (which, thankfully, the Officers prevented by grabbing onto Melvin and pulling him back inside the apartment). Melvin repeatedly asked Mr. Bruno to join in the fight, and Bruno approached the Officers during their struggle with Melvin, balling his fist and running in place, indicating his willingness to attack.

Throughout the approximate seven-minute effort to handcuff Melvin, the Officers steadily increased displays and uses of force to cause Melvin to cease resisting and to comply voluntarily with their commands, when less force proved ineffective. But even the Taser proved useless. After two minutes of physically struggling to get control of Melvin, Officer Archer deployed his Taser at Melvin. But during each of Officer Archer's deployments, Melvin continued to actively resist detention, leading the Officers to believe that the Taser's probes had not adequately connected with Melvin. After the one and only Taser deployment—by Officer Patterson—that did effect a five-second cycle of neuromuscular incapacitation, Melvin immediately jumped up, swatted the Taser wires away with his hand, and ran out of the apartment, down the hall, out the building and across the street.

Melvin eventually stopped running and lowered to his knees, but he still refused to display his hands for handcuffing, hiding them under his body. Only with the assistance of additional officers were they finally able to pull Melvin's hands from under his body and get him into handcuffs.

All force on Melvin ceased once Melvin was handcuffed. An ambulance promptly transported Melvin from the scene to the hospital. Melvin's medical condition deteriorated, and he died six days later.

Plaintiff will be unable to prove a failure to train claim against the City because the Officers' force was reasonable. A reasonable officer would believe that Melvin committed obstruction of a peace officer in their presence by slamming the apartment door in Officer Patterson's face while they were actively investigating felony crimes. They also reasonably believed that Melvin may have been the male who fought with Bruno in the apartment earlier. Melvin also committed obstructing a peace officer when he refused to turn around a put his hands behind his back when ordered.

Melvin also was a safety threat. The Officers didn't know whether Melvin was armed; neither he nor the apartment's occupants had been searched. Melvin also repeatedly invited Bruno to the fight with the Officers, and he attempted to jump head-first out of the apartment window. He was not tiring during the prolonged struggle, causing Officers Patterson to fear that Melvin ultimately may overpower the Officers and gain control of one of their firearms.

Melvin actively resisted arrest throughout the entire seven-minute encounter and attempted to flee multiple times. He never complied with the Officers' orders to surrender his hands for handcuffing. Not until additional officers arrived on scene to assist were the officers even able to handcuff Melvin. The Officers used only the force reasonably necessary to effect a lawful detention and arrest of Melvin, and they immediately ceased using force once he was restrained. The Officers' use of force was reasonable.

Plaintiff also will be unable to prove that the City's Taser training of the Officers was unconstitutionally deficient. The Colorado Springs Police Department ("CSPD"), a CALEA-accredited law enforcement agency, thoroughly trained its police officers in the use of force, including the Taser. Indeed, the City trained its officers with materials that Taser itself created. Those training materials emphasized that officers are to avoid multiple, repeated, prolonged, extended, or continuous Taser exposures unless necessary, and that the longer the Taser exposure, the greater the safety threat, specifically advising them that 15 seconds of Taser exposure is a significant safety point.

In addition, Plaintiff will be unable to prove that the City was deliberately indifferent to the need for different or more Taser training. No prior instances of multiple Taser deployments, caselaw, or industry standards put the City on notice that constitutional violations were certain to result from the training that the City did provide.

The cause of Melvin's death also is hotly disputed. Melvin died from rhabdomyolysis, a condition in which muscle tissue releases proteins into the blood. Where proteins build up in the blood faster than the kidneys can flush them out, organ failure and death can occur. Extreme exertion, not a Taser, can cause death from rhabdomyolysis. Melvin had been diagnosed with rhabdomyolysis before, in 2007, following an incident in which he similarly exerted himself. He barely survived the extended hospital stay in critical condition. In April 2018, Melvin's own decisions to struggle with the Officers and then to sprint away from them triggered the rhabdomyolysis that caused his death. At any time up until the sprint, had Melvin stopped struggling, he more than likely would have survived. Melvin caused his own death by actively resisting

and evading arrest despite knowing the grave consequences of his decisions based on prior experience.

Finally, Defendants dispute that Melvin greatly enjoyed his life, so as to support a sizeable hedonic damages award. Melvin's occupation of choice was drug dealing. Between 2005 (at age 13) and his death in 2018 (at age 27), Melvin was almost always either on parole, probation, or incarcerated for various misdemeanor and felony charges. He did not have a permanent residence and lacked reliable transportation. He abused illicit drugs and expressed thoughts of suicidal ideation and self-harm. He had a history of violence and threats of violence against friends, family members, girlfriends/partners, and others. And on the night he was arrested by the Officers, he again was wanted for attempted second degree murder for strangling his girlfriend, among other violent felony and misdemeanor charges.

## 4. STIPULATIONS

1.      At all times pertinent hereto, decedent Jeffrey Melvin was a citizen of the United States of America and a resident in the State of Colorado.

2.      Jeffrey Melvin Sr. was the father of Jeffrey Melvin, Jr. and is the personal representative of the Estate of Jeffrey Melvin.

3.      At all relevant times, Officer Patterson was acting within his official duties and employment and under color of state law in his capacity as a law enforcement officer for Defendant City of Colorado Springs, Colorado.

4.      At all relevant times, Officer Archer was acting within his official duties

and employment and under color of state law in his capacity as a law enforcement officer for Defendant City of Colorado Springs, Colorado.

5.      At all times relevant to this Complaint, Defendant City of Colorado Springs was a Colorado municipal corporation.

6.      Jurisdiction is proper pursuant to 28 U.S.C. § 1331.

7.      Venue is proper pursuant to 28 U.S.C. § 1391(b).

8.      Jeffrey Melvin, Jr. died on May 2, 2018.

## 5.  PENDING MOTIONS

a.      Defendants' Motion to Exclude Plaintiff's Non-Retained Experts [ECF Doc. 157], filed on December 22, 2022, is fully briefed and pending before the Court. Plaintiff's Response [ECF Doc. 177] was filed February 2, 2023, and Defendants' Reply [ECF Doc. 179] was filed February 16, 2023.

b.      Defendants' Motion to Exclude Opinions of Allen Parkman Quantifying Hedonic Damages [ECF Doc. 158], filed on December 22, 2022, is fully briefed and pending before the Court. Plaintiff's Response [ECF Doc. 176] was filed February 2, 2023, and Defendants' Reply [ECF Doc. 178] was filed February 16, 2023.

c.      Defendants' Motion to Exclude Opinions of Jeffrey Nehls and Patricia Pacey [ECF Doc. 159], filed on December 22, 2022, is fully briefed and pending before the Court. Plaintiff's Response [ECF Doc. 175] was filed February 2, 2023, and Defendants' Reply [ECF Doc. 180] was filed February 16, 2023.

## 6.  WITNESSES

**Plaintiff:**

  **a.**  **Non-expert witnesses to be called by each party**

   (1) Plaintiff's witnesses who are expected to testify in person: ***See***

**Attached Witness List Exhibit A.**

   (2) Plaintiffs do not expect to call any witnesses whose testimony is

expected to be presented by deposition.

  **b.**  **Expert witnesses to be called by each party.**

   (1) Plaintiff's expert witnesses who are expected to testify in person:

***See*** **Attached Witness List Exhibit A.**

**Defendant:**

  **a.**  **Non-expert witnesses to be called by each party**

   (1) Defendant's witnesses who are expected to testify in person: ***See***

**Attached Witness List Exhibit B.**

   (2) Defendant does not expect to call any witnesses whose testimony

is expected to be presented by deposition.

  **b.**  **Expert witnesses to be called by each party.**

   (1) Defendant's expert witnesses who are expected to testify in

person: ***See*** **Attached Witness List Exhibit B.**

## 7.  EXHIBITS

  a. **Exhibit Lists**. The Parties' Joint Exhibit List in the presiding judge's

preferred format is attached as **Exhibit C**.

  b. Copies of listed exhibits must be provided to opposing counsel and any

pro se party no later than 30 days before trial. The objections contemplated by Fed. R.

Civ. P. 26(a)(3) shall be filed with the clerk and served by hand delivery or facsimile no later than 14 days after the exhibits are provided.

## 8.  DISCOVERY

Discovery is complete.

## 9.  SPECIAL ISSUES

There are no special issues.

## 10.  SETTLEMENT

a.      Counsel for the parties have not met to discuss the settlement of the case.

b.      Just recently, on February 5, 2024, the parties agreed to schedule and participate in mediation with a private mediator. That mediation has not yet been scheduled.

c.      It appears from the discussion by all counsel that there is some possibility of settlement.

d.      Counsel for the parties considered ADR in accordance with D.C.COLO.LCivR. 16.6.

## 11.  OFFER OF JUDGMENT

Counsel acknowledge familiarity with the provision of Rule 68 (Offer of Judgment) of the Federal Rules of Civil Procedure. Counsel have discussed it with the clients against whom claims are made in this case. No Offer of Judgment has been sent in this case.

## 12.  EFFECT OF FINAL PRETRIAL ORDER

Hereafter, this Final Pretrial Order will control the subsequent course of this action and the trial, and may not be amended except by consent of the parties and approval by the court or by order of the court to prevent manifest injustice.  The pleadings will be deemed merged herein.  This Final Pretrial Order supersedes the Scheduling Order.  In the event of ambiguity in any provision of this Final Pretrial Order, reference may be made to the record of the pretrial conference to the extent reported by stenographic notes and to the pleadings.

### 13.  TRIAL AND ESTIMATED TRIAL TIME; FURTHER TRIAL PREPARATION PROCEEDINGS

1.      Trial is to a jury.

2.      Plaintiff anticipates that the trial will take 5 days. Defendants anticipate that the trial will take at least 10 days.

3.      Trial will be in Denver.


DATED this ___ day of February 2024.


BY THE COURT:


_____
Magistrate Judge


APPROVED:


*/s/ Darold W. Killmer*_____              */s/ Anne H. Turner*_____
Darold W. Killmer                               Anne H. Turner
Liana Orshan                                    Martha McKinney
Reid R. Allison                                 Office of the City Attorney of the
KILLMER LANE, LLP                               City of Colorado Springs

<table>
<tr><td>

1543 Champa Street, Suite 400
Denver, Colorado 80202
303-571-1000
303-571-1001 – facsimile
dkillmer@killmerlane.com
lorshan@killmerlane.com
rallison@killmerlane.com

*Counsel for Plaintiff*

</td><td>

30 S. Nevada Ave., Suite 501
Colorado Springs CO 80903
(719) 385-5909
Anne.Turner@coloradosprings.gov
Martha.mckinney@coloradosprings.gov

*Counsel for Defendants*

</td></tr>
</table>

## CERTIFICATE OF SERVICE

I certify that on this 7th day of February 2024 I, filed this **PROPOSED FINAL PRETRIAL ORDER** via CM/ECF, and CM/ECF will generate a Notice of Electronic Filing to the following:

Anne Turner
Martha McKinney
Assistant City Attorney
City of Colorado Springs
30 S. Nevada Ave., Suite 501
Colorado Springs CO 80903
Anne.Turner@coloradosprings.gov
Martha.mckinney@coloradosprings.gov

*s/ Charlotte Bocquin Scull*
Paralegal