IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Christine M. Arguello

Civil Action No. 20-cv-00991-CMA-MDB

ESTATE OF JEFFREY MELVIN, *by and through its personal representative Jeffrey Melvin Sr.*,

    Plaintiff,

v.

CITY OF COLORADO SPRINGS, COLORADO,
DANIEL PATTERSON, *in his individual capacity, and*
JOSHUA ARCHER, *in his individual capacity*,

    Defendants.

---

**AMENDED ORDER ON DEFENDANTS' MOTIONS TO EXCLUDE
AND PLAINTIFF'S MOTION FOR LEAVE TO TAKE PRESERVATION DEPOSITION**

---

This matter is before the Court on four pending motions:

1. Defendants' Motion to Exclude Plaintiff's Non-Retained Experts (Doc. # 157), which is GRANTED;

2. Defendants' Motion to Exclude Opinions of Allen Parkman Quantifying Hedonic Damages (Doc. # 158), which is GRANTED;

3. Defendants' Motion to Exclude Opinions of Jeffrey Nehls and Patricia L. Pacey (Doc. # 159), which is DENIED; and

4. Plaintiff's Motion for Leave to Take Preservation Deposition of Expert Dr. Geoffrey P. Alpert (Doc. # 203), which is GRANTED.

## I.    BACKGROUND

### A.    FACTS

On April 26, 2018, the Colorado Springs's Police Department ("CSPD") dispatched Defendants Daniel Patterson and Joshua Archer, two CSPD officers, to an apartment building over a reported physical altercation. (Doc. # 182 at 2). While investigating one of the dwellings, the officers encountered Mr. Jeffrey Melvin and decided to place him under arrest. (Doc. # 194 at 4.) Mr. Melvin resisted, which led to a physical struggle, during which the officers pepper-sprayed Mr. Melvin and Tased him five times in quick succession. *Id.* at 4–6. Mr. Melvin eventually began fleeing the apartment, but Officer Patterson pursued him. As Mr. Melvin ran, Officer Patterson Tased him several more times. *Id.* at 6–7. Although Mr. Melvin escaped the building, he collapsed roughly thirty-five seconds later. Once the officers caught up to him, they began handcuffing him. *Id.* at 7. As they did so, Mr. Melvin warned them that they were killing him—he could not breathe. *Id.* Yet the officers persisted, completing Mr. Melvin's arrest, and subsequently transported him to a hospital. He died six days later. The entire altercation lasted roughly seven minutes. *Id.* at 7.

On April 8, 2020, the Estate of Jeffrey Melvin, Plaintiff, initiated this lawsuit on Mr. Melvin's behalf. (Doc. # 1); *see* (Doc. # 30 at 15). The Estate has asserted a Section 1983 claim of excessive force against Officers Patterson and Archer in their individual capacities and against Defendant City of Colorado Springs ("the City") in its official capacity (collectively "Defendants"). (Doc. # 30 at 15–18); *but see* (Docs. ## 194, 196)

(reversing the denial of both officers' assertion of qualified immunity). This matter is set for trial beginning July 15, 2024. (Doc. # 202.)

**B.     PROCEDURAL HISTORY**

On December 22, 2022, Defendants filed three motions to exclude. The first motion seeks to exclude fifteen non-retained experts because the Estate allegedly failed to comply with the expert witness disclosure requirements set forth in Federal Rule of Civil Procedure 26(a)(2)(C). (Doc. # 157.) The second and third motions to exclude challenge the admissibility of three expert witnesses' opinions under Federal Rule of Evidence 702. (Docs. ## 158, 159.)

On April 9, 2024, the Estate filed a motion for leave to notice a preservation deposition. Because the Estate's use-of-force expert will be unavailable during trial—he has committed to delivering professional lectures in Australia—the Estate intends to offer the videotaped deposition at trial in lieu of live testimony. (Doc. # 203 at 2.)

## II.     DEFENDANTS' MOTIONS TO EXCLUDE EXPERTS

**A.     APPLICABLE LAW**

   1.     Federal Rules of Civil Procedure 26(a)(2)(C) & 37(c)(1)

Rule 26(a)(2)(C) dictates the necessary steps a party must take to call a "non-retained" expert witness to offer trial testimony. The proffering party must disclose the expert's identity to the opposing party, summarize the expert's opinions, and summarize the facts on which those opinions rely. Fed. R. Civ. P. 26(a)(2)(C). A summary in this context "is customarily defined as '[a]n abridgement' of a fuller accounting of material."

3

*Vincent v. Nelson*, 51 F.4th 1200, 1216 (10th Cir. 2022) (citing *Summary*, *Black's Law Dict.* (11th ed. 2019)).

If a party offers an insufficient summary, the noncompliant party cannot call said expert to testify at trial unless "the failure was substantially justified or is harmless." *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 951–52 (10th Cir. 2002); *accord* Fed. R. Civ. P. 37(c)(1). A showing of harm requires addressing four factors: (1) the prejudice or surprise to the objecting party; (2) the party's ability to cure that prejudice; (3) the extent to which introducing the contested testimony would disrupt trial; and (4) the scienter, if any, of the expert's proponent. *Jacobsen*, 287 F.3d at 953. The burden of establishing substantial justification or harmlessness rests with the noncompliant party. *Id.* District courts have considerable discretion over motions to exclude on such grounds. *Compare Burton v. R.J. Reynolds Tobacco Co.*, 203 F.R.D. 636, 640 (D. Kan. 2001) (citation omitted) (referring to outright exclusion as a "drastic remedy" that should be used to deter misconduct), *with Cook v. Rockwell Int'l Corp.*, 233 F.R.D. 598, 600 (D. Colo. 2005) (framing the sanction as "mandatory" absent justification or harmlessness).

    2.    <u>Federal Rule of Evidence 702</u>

Properly disclosed experts may only offer opinions that satisfy Rule 702's admissibility standards. Rule 702 provides that a witness who is qualified as an expert by "knowledge, skill, experience, training, or education" may testify if:

    (a) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

    (b) The testimony is based on sufficient facts or data;

(c) The testimony is the product of reliable principles and methods; and

(d) The expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702; *see generally Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). The proffering party bears the burden of establishing admissibility. *E.g.*, *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009). Carrying that burden requires convincing the court by a preponderance of the evidence that (1) the expert is qualified and (2) that the expert's testimony would be relevant, *i.e.*, both helpful to the jury and reliable. *E.g.*, *Goebel v. Denver & Rio Grande W. R.R. Co.*, 215 F.3d 1083, 1087 (10th Cir. 2000).

Under Rule 702, a "relevant" expert opinion must rest on "reliable" methodologies and sufficient data. *Daubert*, 509 U.S. at 592–93; *see also United States v. Rodriguez-Felix*, 450 F.3d 1117, 1123 (10th Cir. 2006). Courts typically consider four nonexclusive factors in assessing an opinion's reliability:

i. Whether the theory at issue can be and has been tested;
ii. Whether the theory has been subject to peer review and publication;
iii. Whether there is a known or potential rate of error and whether there are standards controlling the methodology's operation; and
iv. Whether the theory has been accepted in the relevant scientific community.

*Daubert*, 509 U.S. at 593–94. This list of factors is neither definitive nor exhaustive. "[W]hen an expert purports to apply principles and methods in accordance with professional standards, and yet reaches a conclusion that other experts in the field would not reach, the trial court may fairly suspect that the principles and methods have not been faithfully applied." Fed. R. Evid. 702, *Advisory Cmty. Notes* (2000 Am.).

5

Under Rule 702, a "relevant" expert opinion must also be "helpful." Helpful opinions disclose material facts without offering any legal conclusions. *Specht v. Jensen*, 853 F.2d 805, 807 (10th Cir. 1988) (en banc) (citation omitted); *see also United States v. Richter*, 796 F.3d 1173, 1195 (10th Cir. 2015); *EEOC v. W. Distrib. Co.*, 643 F. Supp. 3d 1205 (D. Colo. 2022). Legal opinions are categorically unhelpful because, *inter alia*, they direct the jury towards reaching a particular conclusion, which risks impermissibly usurping the role of the jury altogether. Fed. R. Evid. 704, *Advisory Cmty. Notes* (1975 Enactment); *see also Specht*, 853 F.2d at 807 (citation omitted); *TBL Collectibles*, 285 F. Supp. 3d at 1184. Consequently, courts routinely exclude expert opinions that assert how the law should be applied. *Cf. United States v. Aruntoff*, 1 F.3d 1112, 1118 (10th Cir. 1993) (finding harmless error in admitting expert testimony that correctly stated the law without attempting to apply it to any facts).

**B.    ANALYSIS**

    1.    <u>Motion to Exclude Non-retained Experts (Doc. # 157)</u>

The Estate disclosed fifteen non-retained experts. (Doc. # 157-1 at 5–9.)[1] Eleven of them are treating physicians from Mr. Melvin's post-arrest hospitalization, and the remaining four are county coroners who performed his autopsy. *Id.* The Estate disclosed the eleven physicians in three batches—one disclosure for Dr. Rummel, one for Dr. Schroeppel, and one for the remaining nine physicians. *Id.* at 6. All three

---

[1] Of those fifteen experts, the Estate (in its Response) concedes that it will seek to elicit expert testimony from only six: Drs. Rummel, Schroeppel, Berry, Lingamfelter, Kelly, and Bux. (Doc. # 177 at 2.) As for the remaining nine, the Estate (again, in its Response) promises to elicit only lay testimony. *Id.* at 3, 11.

disclosures feature the same essentially boilerplate paragraph and reference the same 1051 pages of medical records. *Id.*[2] Similarly, all four coroners' disclosures recite the same boilerplate disclosure paragraph and cite the same 205 pages of records each time. *Id.* at 7–9.

Defendants challenge these expert disclosures under Rule 26(a)(2)(C) for two reasons. First, the disclosures rely on impermissibly generic boilerplate in lieu of specifying the anticipated topics of testimony and, second, they include no "summary of the facts and opinions" that the non-retained experts will share during trial. (Doc. # 157 at 4); *see also* (Doc. # 179 at 2–3, 5). Defendants assert that the deficient disclosures prejudice them by hindering their trial preparations; consequently, their motion to exclude requests any of the following four remedies: (1) ordering the Estate to serve supplemental disclosures (that cure the deficiencies and bind the Estate to forego expert testimony from nine of the physicians, as it promised), (2) ordering the Estate to make the non-retained experts available for deposition at the Estate's expense, (3)

---

[2] The disclosures repeat the same paragraph three times; admittedly, there are differences, but they are trivial. For example, Dr. Runnell's disclosure specifies that he was Mr. Melvin's admitting physician and, as with the other disclosures, states that he has:

> has knowledge or information related to his qualifications and background; his personal observations, evaluations, diagnosis, and treatment of Mr. Melvin, **as well as that of other medical providers** at Memorial [Hospital]; the nature of the injuries sustained by Mr. Melvin as a result of the use of force against him by Defendants; the nature and extent of physical damages Mr. Melvin suffered; conditions with which Mr. Melvin was diagnosed; **and other information contained in [1051 pages of] UCHealth records** . . . .

*Id.* at 6 (emphasis added). Dr. Schroeppel's disclosure specifies that he was a UCHealth surgeon that operated on Mr. Melvin and, beyond that, repeats the same paragraph with only one addition: that he treated Mr. Melvin "at UCHealth." *Id.*

7

ordering the Estate to pay Defendants' costs and fees associated with the instant motion, or (4) excluding the experts from testifying at trial. *Id.* at 5–6; (Doc. # 179 at 2–3, 5).

The Estate criticizes Defendants' arguments by characterizing them as "elevating form over substance." (Doc. # 177 at 4.) The Estate insists that its disclosures adequately put Defendants on notice because Defendants knew about these witnesses early into the discovery period and, as of December 2022, Defendants had access to all 1051 pages of records referenced in the disclosures. (Doc. # 177 at 4 ("every Party . . . had objectively almost no uncertainty about exactly what the witnesses would testify").) The Estate also notes that the disclosures list general topics, which the Estate claims is sufficient for purposes of Rule 26, especially because some physicians had limited contact with Mr. Melvin and therefore cannot offer testimony beyond the scope of their interactions with Mr. Melvin. *Id.* at 1–4, 6–7; *but see* (Doc. # 157-1 at 6 (stating that the experts' testimony may include the observations, evaluations, diagnosis, and treatment "of other medical providers at UCHealth" along with "other information contained in the UCHealth records"). In any event, the Estate asks for the opportunity to cure any deficiencies identified by the Court and, in case this Court denies that request to cure, the Estate makes its *Woodworker's Supply* factor argument in the alternative. *Id.* at 9–11.

Although the Tenth Circuit cautions against requiring "undue detail" in Rule 26(a)(2)(C) disclosures, a litigant cannot satisfy Rule 26(a)(2)(C) with language "so generic, unhelpful, and boilerplate [that] [it] could apply to . . . virtually any case."

8

*Nelson*, 51 F.4th at 1216 (internal quotation omitted). The Estate's disclosures, however, are just that—generic, unhelpful boilerplate that inadequately delineates "the subject matter on which the witness is expected to present evidence." Fed. R. Civ. P. 26(a)(2)(C). They list every topic about which the treating physicians **could** testify through impermissibly broad and near-verbatim boilerplate that could apply to any wrongful death suit. *See* (Doc. # 157-1 at 5–9.) They do not—as Rule 26 requires—disclose the topics about which the expert likely **will** testify. The Estate's approach is akin to providing a common carrier with an apartment building's street address and expecting the delivery person to divine the apartment number. Yet Rule 26 does not allocate the burdens of disclosure that way. The task of sifting through the underlying facts lies with the expert's proponent—not the opposing party. To the extent the Estate rejects the need for the latter as "form over substance," the Estate fundamentally misunderstands Rule 26(a)(2)(C)—the rule is as much about form as it is about substance.

Moreover, the Estate's disclosures neglect to meaningfully summarize "the facts and opinions to which the witness is expected to testify." Fed. R. Civ. P. 26(a)(2)(C). The Estate's disclosures contain neither opinions nor summaries. *See* (Doc. # 157-1 at 5–9.) Merely referencing records is not a summary. Summaries require more than identification—they require synthesis of information. *Nelson*, 51 F.4th at 1216. Citations offer no accounting of the material—at most, they point the opposing party to a body of facts and force them into the guesswork of drawing inferences about what the witness may say on the stand. Worse still, the sheer volume of the records cited here makes the

9

guesswork considerably more difficult and burdensome—again, in direct contravention of the purpose of Rule 26(a)(2)(C). The burden of sifting through 1051 pages of records or even 205 pages of records lies with the Estate as the proffering party. Citations alone do not cut it.

The referenced records offer perfunctory compliance with Rule 26(a)(2)(C)'s summary requirement at best. Defendants' first motion to exclude (Doc. # 157) is therefore GRANTED. The Estate shall supplement its expert disclosures within fourteen days. That supplement shall include a concession that the Estate will not elicit expert testimony from the nine non-retained experts as conceded in (Doc. # 177).

2. Motion to Exclude Hedonic Damages Opinion (Doc. # 158)

The Estate disclosed an economist, Mr. Allen Parkman, to offer expert testimony on hedonic damages. His report explains the general concept of hedonic damages and asserts that $11,000,000 is typically considered the monetary value of a human life based on statistical studies and the recommendations of the U.S. Department of Transportation. (Doc. # 158-1 at 3.) Notably, Mr. Parkman's suggested damages amount is not specific to Mr. Melvin but, rather, represents "a typical person, which must be adjusted in each case for a specific individual." *Id.*

Defendants contend that case law interpreting Rule 702 consistently excludes expert opinions that seek to quantify hedonic damages. (Doc. # 158 at 2–6 (characterizing it as unreliable and unhelpful); Doc. # 178 at 2.) Although the second motion to exclude is opposed, the parties apparently agree—the Estate agreed not to ask Mr. Parkman to quantify Mr. Melvin's hedonic damages. (Doc. # 176 at 3–4); *accord*

*Smith v. Ingersoll-Rand Co.*, 214 F.3d 1235 1245 (10th Cir. 2000) (noting that testimony quantifying hedonic damages is inadmissible). Because the parties apparently agree as to the proper scope of Mr. Parkman's testimony, (Doc. # 178 at 1–2), Defendants' second motion to exclude (Doc. # 158) is GRANTED. Mr. Parkman is prohibited from offering any opinions aimed at quantifying the value of Mr. Melvin's life for purposes of hedonic damages.

      3.      <u>Motion to Exclude Statistical Opinions on Racial Bias (Doc. # 159)</u>

Defendants' third and final motion to exclude challenges the Estate's expert statisticians, Drs. Patricia Pacey and Jeffrey Nehls. At the Estate's request, Drs. Pacey and Nehls authored a report that uses statistical principles to conclude that racial bias affects CSPD officers' decisions to use force to effectuate arrest. (Doc. # 159-1 at 3.) Notably, the challenged statisticians performed no statistical computation themselves—their opinions rest on their interpretation of another report separately authored by an organization named Transparency Matters ("TM Report"). *See id.* at 2. The challenged report cites "Table 4.17" from the TM Report for the conclusion that—all other factors held equal—black arrestees were 34–35% more likely to have force used against them relative to white arrestees. *Id.* at 3. The challenged report also touted the TM Report's p-value as statistically significant evidence that disparate treatment occurs. *Id.* at 3–4.

Defendants dispute the admissibility of the statisticians' opinions for two reasons. First, because the Estate made no racial discrimination claim against any defendant, Defendants assert that evidence of racial bias is irrelevant under Federal Rule of Evidence 401. (Doc. # 159 at 3, 4–6; Doc. # 180 at 3, 6, 8–10.) Second, Defendants

11

characterize the statisticians' methods as unreliable under Rule 702 because their characterization of the p-value runs "counter to decades-long established principles guiding the interpretation of statistical analyses for social science research." (Doc. # 159 at 3, 6–15; Doc. # 180 at 7.) To buttress their position on the proper definition of a p-value, Defendants submit an analysis of the challenged statisticians' report by Drs. Robin Engel and Jennifer Cherkauskas—two of the TM Report's five co-authors. (Doc. # 159-2 at 6.)

In response, the Estate argues that statistical evidence of racial bias relates to the Estate's excessive force claim against the City of Colorado Springs and request for punitive damages. (Doc. # 175 at 11–13.) As for the reliability of the statisticians' methodology, the Estate makes two points—neither of which respond to the thrust of Defendants argument.[3] Defendants' arguments, however, are unpersuasive. Consequently, the Court declines to strike the statisticians' expert opinions under Rule 702.

The Court begins with relevance. A fact is "of consequence" under Rule 401 "when its existence would provide the fact-finder with a basis for making some inference, or chain of inferences, about an issue that is necessary to a verdict." *E.g.*, *Cook v. Rockwell Int'l Corp.*, 580 F.Supp.2d 1071, 1087 (D. Colo. 2006) (citation

---

[3] For one, the Estate asserts that its experts' methodologies are reliable because they formed conclusions that are accurate enough to satisfy the preponderance-of-the-evidence standard, but the Estate confuses its evidentiary burden under Rule 702 with its ultimate burden of persuasion at trial. (Doc. # 175 at 6–7; *but see* (Doc. # 180 at 7). The Estate must show that its experts applied principles of statistics in a reliable manner, but the confidence in the conclusions says nothing about the methodology itself. Experts cannot shirk Rule 702's requirements based on confidence alone. The Estate's second *non sequitur* insists that its statisticians' opinions will be helpful to the jury, which entirely misses the point because helpfulness and reliability are separate inquiries under Rule 702. (Doc. # 175 at 10–11.)

12

omitted). Given that the Estate's Amended Complaint explicitly alleges that CSPD officers are inadequately trained on how racial bias impacts their decisions to deploy excessive force, the Estate's claim directly implicates evidence of racial bias in CSPD officers' uses of force because said evidence bears on the magnitude of the problem and whether proper training could have obviated a foreseeably problematic future scenario. *See* (Doc. # 30 at 16.) Although racial animus is not a necessary element of an excessive force claim, evidence thereof adds context to the Estate's *Monell* claim against the City of Colorado Springs—especially considering the obvious historical ties between law enforcement and the oppression of racial minorities. *See, e.g.*, Aya Gruber, *Policing and "Bluelining,"* 58 Hous. L. Rev. 867, 875 -76, 879 (2021) (explaining how local law enforcement agencies originally formed to police colored communities using vague local ordinances criminalizing vagrancy and disorderly conduct); *see also Colo. Mont. Wyo. State Area Conf. of NAACP v. U.S. Election Integrity Plan,* No. 22-cv-00581, 2021 WL 3865720, at *3 (D. Colo. June 7, 2023) (allowing expert testimony on racial animus in voter suppression case because said testimony indirectly supports a factual inference of a necessary element).

      Defendants' Rule 702 argument is more persuasive but ultimately unavailing. Defendants stress that Drs. Pacey and Nehls exaggerate the TM Report's findings because they incorrectly defined the concept of a p-value, misread the TM Report data underlying their ultimate conclusions, and opine on the magnitude of any purported effect without statistically relevant evidence. (Doc. # 159-2 at 12.) However, the definition that Drs. Engel and Cherkauskas dispute is a paraphrasing of their own

13

definition from the TM Report. (Doc. # 159-2 at 12); *but see* (Doc. # 159-1 at 3 & n.4); (Doc. # 159-4 at 11 & n.5); *see generally* Ronald Wasserstein, et al., *Moving to a World Beyond "p < 0.05,"* Am. Statistician Mar. 2019, at 1–2, https://www.tandfonline.com/doi/epdf/10.1080/00031305.2019.1583913?needAccess=true (detailing the professional-statistician community's ongoing debate over the extent to which p-values represent statistically significant evidence). In light of the fact that this attempted paradigm shift has not occurred and remains ongoing, this Court will not jump the proverbial gun without stronger evidence that Drs. Nehls and Pacey are flatly incorrect about what a p-value means. Moreover, although Drs. Engel and Cherkauskas are correct that the challenged experts misstated which variables were held constant in the TM Report's multivariate analysis, that issue goes to the weight of the proffered opinion—not its admissibility. (Doc. # 159 at 7 n.3) (explaining that the TM Report omitted many significant "situational control variables" that have demonstrable value in predicting use-of-force events).[4] Finally, the challenged experts' conclusions about magnitude are not issues of methodology. The subsection on magnitude is merely a comment on the TM Report's magnitude findings and, to the extent the challenged opinion claims there is strong evidence of disparate treatment, Defendants can explore that issue on cross-examination. (Doc. # 159-1 at 4–5.) Consequently, Defendants' third motion to exclude (Doc. # 159) is DENIED.

---

[4] The challenged experts' opinion that black arrestees are 34–35% more often subjected to use of force—*all other factors held equal*—rests on a misreading of Table 4.17, which expressly disclaimed controlling for all factors.

With Defendants' motions to exclude now addressed, the Court turns to the final pending motion—the Estate's motion for leave (Doc. # 203.)

### III. MOTION FOR LEAVE TO TAKE PRESERVATION DEPOSITION

On February 21, 2024, counsel for the Estate (Mr. Killmer) emailed counsel for Defendants (Ms. Turner) with a question. Because the Estate's "police practices expert," Dr. Geoff Alpert, committed to a professional engagement that would require his physical presence in eastern Australia during trial, Mr. Killmer asked Ms. Turner to confirm whether Defendants "object to taking [Dr. Alpert's] testimony either remotely or in a preservation video." (Doc. # 204-1 at 6.) Ms. Turner advised that Defendants are "opposed to the pretrial video examinations" and would prefer live remote testimony. *Id.* at 5. Mr. Killmer pressed Ms. Turner for her reasoning, which she provided. *Id.* at 4. In response, Mr. Killmer notified Ms. Turner that the Estate planned to notice a preservation deposition rather than plan to elicit trial testimony remotely. *Id.* at 3. He also accused Ms. Turner of "refusing to cooperate on simple issues such as this" by "resisting this evidence deposition." *Id.* Ms. Turner replied by quoting Mr. Killmer's initial question, which she characterized as an offer, and reiterated that Defendants oppose a preservation deposition. *Id.* at 1.

On April 9, 2024, the Estate filed the instant motion for leave to take Dr. Alpert's preservation deposition. (Doc. # 203.) At bottom, the Estate argues that the Federal Rules of Civil Procedure permit preservation depositions in lieu of live testimony for good cause, and good cause exists because remote testimony would require Dr. Alpert to essentially go without sleep for an evening between days of delivering professional

15

lectures and trainings. (Doc. # 203 at 2–3.) Defendants maintain that Dr. Alpert must testify remotely for three reasons but, as explained below, the Court finds none of Defendants' arguments availing.

### A.   APPLICABLE LAW

The Federal Rules of Civil Procedure state a soft preference for in-person trial testimony. *E.g.*, Fed. R. Civ. P. 43(a). However, when in-person testimony proves impracticable, the Rules allow for remote testimony or preservation depositions. *E.g.*, Fed. R. Civ. P. 32(a)(4)(B) (authorizing use of preservation deposition testimony if the witness is over 100 miles away during trial unless the witness's absence was "procured by the party offering the deposition"). The Rules addressing remote testimony are by their own terms, however, "permissive and not mandatory." *Eller v. Trans Union, LLC*, 739 F.3d 467, 478 (10th Cir. 2013) (noting that the rule is "intended to permit remote testimony when a witness's inability to attend trial is the result of 'unexpected reasons'"). The choice falls to the trial court's discretion. *See id.*

### B.   ANALYSIS

According to the Estate, Dr. Alpert has a longstanding professional commitment to conduct educational trainings for Australian law enforcement agencies. (Doc. # 203 at 1.) He has been conducting these trainings for twelve years and "long ago purchased his [plane] tickets for this training." *Id.* at 2. The Estate seeks to offer Dr. Alpert's videotaped deposition testimony in lieu of live testimony during trial because the time zone differences would require Mr. Alpert to testify sometime between midnight and 7:00 a.m. after a full day of conducting his training sessions. *Id.* ("It is unreasonable,

burdensome, and prejudicial to require an expert to stay up an entire night to provide testimony").

As a preliminary matter, Defendants exaggerate the Federal Rules of Civil Procedure's preference for live, remote testimony. As explained above, the Rules are permissive at best. The only preference that matters is that of this Court. That said, the Court strongly prefers to avoid the examination of a key expert witness that is operating on little to no sleep. Although Defendants claim that the Estate is exaggerating the extent of possible sleep deprivation, Defendants' argument rests on the dubious assumption that counsel in this case will stay perfectly on-schedule despite Defendants' emphasis on how trial is "dynamic." (Doc. # 204-1 at 4.) A preservation deposition's video recording could effectively convey the salient aspects of Dr. Alpert's anticipated testimony and allow for increased flexibility because, rather than coordinate with a witness halfway across the globe, his video deposition could be played at any time. The Court finds it unreasonable to force Dr. Alpert to go without sleep when the parties could easily take his preservation deposition. Consequently, the Estate's Motion for Leave to Take Preservation Deposition of Expert Dr. Geoffrey P. Alpert (Doc. # 203) is GRANTED.

## IV.    CONCLUSION

For the foregoing reasons, it is ORDERED as follows:

- Defendants' Motion to Exclude Plaintiff's Non-Retained Experts (Doc. # 157) and Motion to Exclude Opinions of Allen Parkman Quantifying Hedonic Damages (Doc. # 158) are GRANTED.

- Defendants' Motion to Exclude Opinions of Jeffrey Nehls and Patricia L. Pacey (Doc. # 159) is DENIED.

- The Estate's Motion for Leave to Take Preservation Deposition of Expert Dr. Geoffrey P. Alpert (Doc. # 203) is GRANTED.

DATED: June 12, 2024

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
Senior United States District Judge